**EXHIBIT F1**

**The Mandan, Hidatsa & Arikara
Nation, 196 IBLA 309 (2021)**





THE MANDAN, HIDATSA & ARIKARA NATION

196 IBLA 309               Decided March 26, 2021



# United States Department of the Interior
## Office of Hearings and Appeals
### Interior Board of Land Appeals
801 N. Quincy St., Suite 300
Arlington, VA 22203

703-235-3750                              703-235-8349 (fax)

THE MANDAN, HIDATSA & ARIKARA NATION

IBLA 2016-218                              Decided March 26, 2021

Appeal from a Decision Record of the North Dakota (Montana) Field Office, Bureau of Land Management, approving amendment of a right-of-way for construction of an oil pipeline across Federal lands. NDM-102507.

Motion to dismiss denied; decision affirmed.

APPEARANCES: Rollie Wilson, Esq., Patterson Earnhardt Real Bird & Wilson LLP, Washington, DC, and Peter J. Breuer, Esq., Fredericks Law Firm LLC, Commerce City, Colorado, for The Mandan, Hidatsa & Arikara Nation; Joan E. Drake, Esq., and Deanna M. Bennett, Esq., Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico, for BakkenLink Pipeline LLC; Curt R. Sholar, Esq., Office of the Field Solicitor, U.S. Department of the Interior, Billings, Montana, for the Bureau of Land Management.

OPINION BY ADMINISTRATIVE JUDGE SOSIN

The Mandan, Hidatsa & Arikara Nation (MHA Nation) brings this appeal challenging a Decision Record (DR) issued by the North Dakota (Montana) Field Office, Bureau of Land Management (BLM) on May 25, 2016. In the DR, BLM approved a request by BakkenLink Pipeline LLC (BLP)[1] to amend its existing right-of-way (ROW) to allow construction and operation of an extension to a crude oil pipeline, portions of which would cross Federal lands in McKenzie and Williams Counties, North Dakota.

BLP has filed a motion to dismiss the appeal for lack of standing. In this Decision, we deny BLP's motion and resolve the appeal on its merits.

---

[1] BLP merged with Tesoro High Plains Pipeline Company LLC in 2018. *See* Joint Status Report (filed Oct. 15, 2020). For ease of reference and consistency, we will refer to the applicant as BLP throughout.

SUMMARY

MHA Nation asserts that BLM violated the National Environmental Policy Act (NEPA) by failing to prepare an Environmental Impact Statement (EIS), and that the Environmental Assessment (EA) prepared by BLM suffered from fundamental flaws. In particular, MHA Nation alleges that BLM was required to prepare an EIS based on the potential significant impacts of the Project and failed to adequately analyze alternatives to the proposed action. MHA Nation also argues that BLM failed to adequately engage in government-to-government consultation, to fulfill its trust responsibilities, and to comply with a U.S. Army Corps of Engineers (USACE) plan governing a portion of the pipeline route. While we find that MHA Nation has presented sufficiently colorable allegations to establish standing, we find that it has failed to meet its burden to establish error in BLM's compliance with NEPA. The EA, and the processes leading and contributing thereto, incorporated substantial analyses of the various issues raised by MHA Nation, resulting in a DR that was reasonable and supported by record evidence. In pressing its challenge, MHA Nation does not present objective evidence demonstrating error in the analysis or findings, but instead relies largely on unsupported speculation, conclusory allegations, and mere disagreement and differences of opinion regarding the preferable course of action and likelihood or significance of impacts. This is insufficient to establish a violation of NEPA. Nor does MHA Nation establish error in BLM's compliance with its obligations related to tribal consultation, its trust responsibilities, or USACE policy. We therefore affirm BLM's decision.

BACKGROUND

*History of the ROW*

On March 14, 2013, BLP submitted an application seeking to amend its existing ROW authorization (NDM 102507) to allow construction, operation, and maintenance of the proposed BakkenLink Dry Creek to Beaver Lodge Project (Project).[2] The Project would consist of approximately 37 miles of 16-inch diameter steel crude oil pipeline connecting existing pipelines and terminal facilities to planned pipelines and facilities to the north.[3] Approximately 5.2 miles of the Project route would cross Federal lands administered by the U.S. Forest Service (USFS) (2.4 miles) and the USACE (2.8 miles), necessitating a ROW from BLM pursuant to the Mineral Leasing Act of 1920 (MLA) and its implementing

---

[2] Administrative Record (AR) Tab 063, BakkenLink Dry Creek to Beaver Lodge Pipeline Project Final Environmental Assessment at 1-1 (May 2016) (EA).
[3] *Id*. at 1-1, 1-3.

regulations.[4] The remainder of the route is located predominantly on private land, with a small portion on North Dakota state land.[5]

The Project would complete a crude oil pipeline system originally proposed in 2011, the first 9.45 miles of which were approved by BLM on October 23, 2012.[6] It is located in the Williston Basin, which at the time was experiencing a significant increase in production driven by technological advances and accounted for a substantial portion of the crude oil production from the region.[7] The Project is designed to initially transport up to 100,000 barrels of crude oil per day (bopd), with the capacity to expand up to 135,000 bopd.[8] BLP presented the pipeline system as a solution for regional pipeline constraints and traffic congestion from trucks hauling the area's oil production over western North Dakota roads.[9] While the northern portion of the pipeline currently at issue was included as part of BLP's comprehensive proposal in 2011, BLM did not include this segment in its 2012 decision approving the southern segment of the ROW due to questions surrounding the proposed crossing of the Missouri River at Lake Sakakawea.[10]

---

[4] *Id.* at 1-3, 1-8; *see* 30 U.S.C. § 185(c)(2) ("Where the surface of the Federal lands involved [in an oil and gas ROW] is administered by . . . two or more Federal agencies, the Secretary [of the Interior] is authorized, after consultation with the agencies involved, to grant or renew rights-of-way or permits through the Federal lands involved."); 43 C.F.R. § 2881.11 (requiring BLM ROW for any oil and gas pipeline crossing Federal lands under the jurisdiction of two or more Federal agencies). Unless otherwise noted, citations to regulations are to the current version of the Code of Federal Regulations, most recently published in 2019, and citations to statutes are to the current version of the U.S. Code, most recently published in 2018.

[5] EA at 1-1; AR Tab 061, BakkenLink Pipeline Project Plan of Development at 13 (Oct. 12, 2015) (POD) (identifying 28.78 miles on private land and 3.13 miles on State land).

[6] EA at 1-1.

[7] *Id.* at 3.2-1.

[8] *Id.* at 1-3, 2-2.

[9] *Id.* at 1-3 to 1-4; *id.* at 2-80 (identifying "a positive measurable effect on transportation in the Project vicinity" through reduction of "approximately 500 daily truck trips as a result of crude oil transportation"); POD at 7 ("The reduction in truck traffic is expected to increase human health and safety over the long term by decreasing impacts to air quality and reducing traffic" as well as "the strain on roads and related infrastructure"); *see also* Garrison Project – Lake Sakakawea Oil and Gas Management Plan at 45 (Dec. 2013), https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/15208 (last visited Jan. 27, 2021) (LSOGMP) ("Pipelines are the safest and least expensive form of transportation for petroleum products from the well to processing facilities.").

[10] EA at 1-1, Appendix (Appx.) F at F-1.

The Missouri River has been central to MHA Nation's lifestyle and culture for centuries.[11] Construction of the Garrison Dam on the Missouri River in 1953 created Lake Sakakawea (Lake), flooding significant portions of Tribal lands.[12] The Lake overlies cultural sites and objects that figure prominently in MHA Nation's history and identity, and there is a belief among MHA Nation that it contains sacred waters and places traditionally associated with the Missouri River.[13] At its closest point, the Project would run approximately five miles west of the Fort Berthold Indian Reservation (Reservation), home to MHA Nation.[14]

The proposed Lake crossing is approximately 15 miles upstream of the Reservation. In analyzing the proposed Lake crossing in 2012, BLM and USACE considered the viability of Horizontal Directional Drilling (HDD), which would involve drilling a path for the pipeline beneath the Lake bed as an alternative to the proposal to lay the pipeline in a covered trench across the Lake bed.[15] Because they lacked adequate geotechnical data at the time to determine the feasibility of HDD for the crossing, and because the southern portion of the system excluding the Lake crossing could proceed independent of the rest of the system, BLM approved that segment, which BLP has since constructed and placed into operation.[16]

BLP continued to pursue the northern extension of the pipeline system, obtaining and evaluating geotechnical data and expert analyses regarding the feasibility of HDD at the proposed Lake crossing.[17] The resulting third-party feasibility report concluded that HDD at the proposed location was not feasible and would have a very high likelihood of failure,[18] a determination with which the USACE ultimately concurred.[19] Accordingly, BLP's ROW amendment application proposed to cross Lake Sakakawea by burying the pipeline in a trench. This would entail floating the assembled pipe from the north shore of the Lake

---

[11] *Id*. at 3.22-1.

[12] *Id*. at 3.22-1 and 2; *see also MHA Nation v. U.S. DOI*, 358 F. Supp. 3d 1, 4 (D.D.C. 2019).

[13] EA at 3.22-2.

[14] *Id*. at 3.17-1.

[15] *Id*. at 1-1, 2-32 ("In general, HDD is a trenchless technique for installing pipelines or other linear utilities to avoid or minimize surface or sensitive area disruptions and install pipe where conventional installation techniques are unfavorable."), Appx. F at F-1.

[16] *Id*. at 1-1, Appx. F at F-1.

[17] *Id*. at 1-1, Appx. F at F-1.

[18] *Id*. at 1-1, Appx. F at F-1.

[19] AR Tab 031, Letter from Larry D. Janis, USACE, to Lowell Hassler, BLM at unpaginated (unp.) 1 (May 21, 2014) (May 2014 Janis Letter) (finding, based on review of consultant reports, "that sufficient geotechnical information was available to adequately characterize the site and [USACE] agreed that it is not feasible to install an HDD pipeline within the designated pipeline corridor"); *see also* EA Appx. C at 1.1, Appx. F at F-1.

across to the south shore using a linear winch, sinking the pipe to the Lake bottom, and burying it at a depth of at least four feet using a hydraulic lowering sled.[20]

On April 22, 2013, BLM initiated public scoping for an EA, on which USACE, USFS, and the U.S. Fish and Wildlife Service (USFWS) would serve as cooperating agencies.[21] BLP submitted its Plan of Development (POD) to BLM on March 3, 2014, with subsequent revisions dated October 29, 2014, and October 13, 2015.[22] BLM released the Draft EA for public review and comment between January 13, and February 13, 2015.[23] The USACE made the Draft EA available for an additional public comment period between December 4 and 20, 2015.[24]

Alongside these processes under NEPA,[25] BLM engaged with USFWS to ensure satisfaction of its obligations under the Endangered Species Act (ESA).[26] BLM determined, among other things, that the Project "may affect, but is not likely to adversely affect" pallid sturgeon, interior least tern, and piping plover, and the USFWS concurred with BLM's determination by letter dated March 26, 2015.[27] By letter dated March 2, 2015, however, BLM requested initiation of formal consultation with respect to piping plover designated critical habitat and the Dakota skipper based on its conclusion that the Project was "likely to adversely affect" those resources.[28] On August 10, 2015, USFWS issued a biological opinion (BO) concluding formal consultation with recommendations regarding avoidance, minimization, and mitigation measures that BLM incorporated into the Project.[29]

BLM also initiated government-to-government consultation with 17 tribes with tribal treaty interests in or traditional connections to western North Dakota, including

---

[20] EA at 1-1, 2-44, 2-48, 2-49; POD at 14 (noting four-foot minimum cover exceeds minimum regulatory requirements, requiring trench approximately five and half feet deep), Appx. X at 15-20.

[21] EA at 1-3, 1-8.

[22] BLM Response in Opposition to Petition for Stay at 2 (filed July 15, 2016); BLM Answer at 2 (filed Oct. 3, 2016).

[23] EA at 6-8, 6-9; AR Tab 063, BLM Finding of No Significant Impact and Decision Record at 14 (May 25, 2016) (BLM FONSI); AR Tab 064, USACE Mitigated Finding of No Significant Impact at unp. 5 (Apr. 13, 2016) (USACE FONSI); AR Tab 041, Press Release, BLM seeks comment on pipeline environmental assessment (Jan. 9, 2015).

[24] EA at 6-16, 6-15; USACE FONSI at unp. 5; *see also* EA at Appx. G (USACE responses to comments).

[25] 42 U.S.C. §§ 4321-4347.

[26] 16 U.S.C. §§ 1531-1544.

[27] EA at 1-9, 2-16 through 2-18.

[28] *Id.*

[29] *Id.*

MHA Nation, by letters dated April 18, 2013.[30] By August 17, 2015, that consultation process had included over 70 telephone conversations and 80 emails with tribal representatives, formal correspondence, and numerous face-to-face meetings.[31]

BLM released the Final EA, FONSI, and DR on May 25, 2016.

### Procedural History of the Present Appeal

MHA Nation filed a timely Notice of Appeal on July 6, 2016. Accompanying its Notice of Appeal, MHA Nation filed a Petition for Stay, which the Board granted by Order dated July 29, 2016. MHA Nation filed its Statement of Reasons (SOR) on August 1, 2016.

On September 26, 2016, BLP filed a motion to intervene, and two days later filed a motion for summary dismissal and to vacate the stay Order based on MHA Nation's failure to serve BLP. BLM filed its Answer on October 3, 2016. The Board granted BLP's motion to intervene by Order dated October 4, 2016, and BLP filed its Answer on November 4, 2016, which incorporated a motion to dismiss MHA Nation's appeal for lack of standing. MHA Nation filed a Joint Reply brief on November 21, 2016. By Order dated April 3, 2017, the Board denied BLP's motion for summary dismissal and to vacate the stay Order, but permitted BLP to file a motion to set aside the stay Order. MHA Nation opposed that motion, and the Board denied it by Order dated June 23, 2017.

On September 22, 2020, the Board ordered the parties to submit a joint status report, which they did on October 15, 2020, confirming the continued vitality of the dispute. The matter is now ripe for decision.

### BLP'S MOTION TO DISMISS FOR LACK OF STANDING

At the outset, we address BLP's assertion that MHA Nation lacks standing to pursue this appeal. Pursuant to Board regulation, any party to a case may appeal a BLM decision if it is adversely affected by the decision.[32] To show an adverse effect, an appellant must establish that it has a "legally cognizable interest" and the decision "has caused or is substantially likely to cause injury to that interest."[33] The appellant bears the burden to make colorable allegations of an adverse effect, supported by specific facts, sufficient to

---

[30] *Id.* at 1-11, 3.22-3.
[31] AR Tab 032, Tribal Consultation Executive Summary at 1 (Aug. 17, 2015) (Consultation Exec. Summ.); *see also* EA at 1-11, 3.22-3.
[32] 43 C.F.R. § 4.410(a).
[33] *Id.* § 4.410(d).

establish a causal relationship between the decision and the injury alleged.[34] The threat of injury must be real and immediate, and mere speculation of a possible future injury will not suffice.[35] The appellant need not prove that the injury or adverse effect is, in fact, certain to occur, however it must demonstrate that the threat of an injury and its effect on appellant are more than hypothetical.[36]

BLP concedes that MHA Nation qualifies as a party to the case, but argues that MHA Nation cannot establish that it is "adversely affected" because its asserted threat of injury is "hypothetical" and "mere speculation . . . refuted by the record," in light of "the extensive protections and mitigation measures included in the approval."[37] MHA Nation responds that "an appellant 'need not prove that an adverse effect will, in fact, occur as a result of the BLM action'" to establish standing, and asserts that "[i]nstalling an oil pipeline using an open trench method . . . poses 'real and immediate' injury to the MHA Nation."[38] It cites "concerns for the health of the water through inevitable sediment disruption" and "the risk that oil pipelines pose to sensitive water resources," which it asserts are not mitigated by the required monitoring.[39]

BLP relies primarily on a Board order from *SOAR Land Group*,[40] where we dismissed a challenge to BLM's approval of an oil-and-gas pipeline ROW because the appellant's asserted injuries from potential pipeline ruptures and resulting oil spills were too speculative to support standing. BLP acknowledges that the cited order is non-precedential and non-binding here.[41] Further, MHA Nation's allegations of injury go beyond the potential harms of a hypothetical future pipeline breach and spill alleged in *SOAR*, emphasizing

---

[34] *Concerned Citizens for Nuclear Safety (CCNS)*, 175 IBLA 142, 146-48 (2008) (finding allegations that right-of-way to divert surface waters from river would adversely affect appellant's interests in stopping contamination of water supplies and use of watershed sufficient to establish standing).

[35] *S. Utah Wilderness All. (SUWA)*, 195 IBLA 315, 319-20 (2020); *SUWA*, 190 IBLA 152, 163-64 (2017); *Bd. of Cty. Comm'rs of Pitkin Cty., Colorado*, 186 IBLA 288, 297 (2015); *W. Watersheds Project (WWP)*, 186 IBLA 51, 55 (2015); *CCNS*, 175 IBLA at 147; *Santa Fe Nw. Info. Council, Inc. (SNIC)*, 174 IBLA 93, 103 (2008).

[36] *SUWA*, 195 IBLA 164, 168-69 (2020); *SUWA*, 190 IBLA at 163; *Bd. of Cty. Comm'rs of Pitkin Cty.,* 186 IBLA at 297; *CCNS*, 175 IBLA at 147; *SNIC*, 174 IBLA at 103 (finding allegations of increased traffic from BLM ROW approval sufficient to support adverse effect).

[37] BLP Answer at 5-7 (filed Nov. 4, 2016).

[38] MHA Nation's Joint Reply to BLM's and Bakkenlink's Answers to MHA Nation's Statement of Reasons at 2 (citing *SNIC*, 174 IBLA at 103) (filed Nov. 21, 2016) (Reply).

[39] *Id*. at 3.

[40] IBLA No. 2015-249 (Order dated Jan. 5, 2016).

[41] BLP Answer at 6; *see also SUWA*, 190 IBLA at 168.

adverse effects that it argues will arise from the proposed pipeline construction activities.[42] MHA Nation highlights the "inevitable sediment disruption" that will occur during construction, which it argues "will result in increased toxic sediments that will likely kill or damage plants, animals and fisheries downstream of the trenching and within the Reservation" and "release lead, zinc, and cadmium into the MHA Nation Reservation and impact the MHA Nation's and surrounding community's drinking water."[43] We relied, in part, on these allegations of harm in granting a stay of the decision pending appeal, finding significant "disagreement between the parties on the likelihood and magnitude of impacts from construction."[44] MHA Nation also asserts that pipeline construction activities would pose threats to tribal cultural resources[45] as well as protected species and critical habitat.[46] While BLM ultimately arrived at a FONSI based on its determination that Project design features reduce impacts to below the level of NEPA significance, its analysis in the EA acknowledges the potential for effects from construction activities on the resources of concern to MHA Nation.[47]

BLP's principal theory is that "the extensive protections and mitigation measures included in the approval" reduce the likelihood of environmental harm from Project activities to a level where adverse effects are merely hypothetical or speculative.[48] But the

---

[42] Reply at 2 n.1.

[43] SOR at 8, 2; *see also* Notice of Appeal and Petition for Stay at 6 (filed July 6, 2016) (Petition for Stay).

[44] Order Granting Petition for Stay at 6 (July 29, 2016); *see also* Order Denying Motion to Set Aside Stay Order at 3, 5 (June 23, 2017).

[45] SOR at 4, 12, 15.

[46] *Id*. at 12-13, 17, 21.

[47] *See, e.g.,* EA at 4.5-1 to 4.5-2 (noting the possibility of "temporary increased turbidity during construction and disturbance of sediments containing certain potentially hazardous substances" and that "adverse turbidity and siltation effects would occur" during trenching, but be "relatively temporary"); *id*. at 4.22-2 (acknowledging that construction activities "may temporarily reduce the amount of federal lands outside the reservation where tribal members could exercise their hunting, fishing, and gathering rights" or alter access and restrict certain activities); *id*. at 2-73, 4.10-8 (noting potential for impacts to the interior least tern and piping plover from the proposed construction method due to "incremental reduction of potentially suitable breeding and foraging habitat within the Project area during construction" and indirect impacts from increased noise levels and human activity, which "would be primarily short term"); *id*. at 2-75, 4.10-14, 4.10-15 (observing, with respect to Dakota skipper, that "[p]ipeline construction reduces native grasslands areas by removing vegetation and disturbing the prairie sod," which "encourages the establishment of weeds and other invasive species"); *id*. at 2-83 (noting that "[g]round-disturbance associated with Project construction has the potential to directly" and indirectly impact historic properties and properties of traditional, religious, and cultural importance).

[48] BLP Answer at 5-7.

Board has rejected this type of argument as a basis for finding that an appellant lacks standing, particularly when relied-upon protections and mitigation measures merely "reduce the extent and duration of environmental effects" or "minimize or prevent significant environmental impacts" but do not eliminate all effects from activities.[49] To the contrary, we have held that the standing analysis under 43 C.F.R. § 4.410 "does not require the kind of merits-based showing"[50] that BLP would have us require from MHA Nation, and that it is error to "equate[] . . . failure to prevail on the merits with a lack of standing."[51] The standing issue presents only the question of whether the appellant is entitled to have its claims reviewed on their merits, not whether it will prevail.[52] Our decisions finding the threat of injury too speculative to support standing typically involve circumstances where the challenged action maintains the status quo or otherwise does not authorize the activities cited by appellants as the source of potential harm.[53] This is not such a case.

Under the circumstances presented, we find that MHA Nation has plead sufficiently colorable allegations regarding the likelihood of adverse effects to survive BLP's standing challenge.

---

[49] *See, e.g., Missouri Coal. for the Env't Heartwood*, 172 IBLA 226, 235-36 (2007) (rejecting BLM arguments that permit stipulations and regulatory requirements designed to minimize environmental impacts from operations were sufficient to defeat allegations of adverse effect for standing purposes, while finding on the merits that they were sufficient to sustain the challenged FONSI).

[50] *Id*. at 235.

[51] *Frank Stebly v. Office of Surface Mining Reclamation and Enf't*, 109 IBLA 242, 245 (1989) ("Clearly, the two should be distinguished.").

[52] *Id*. at 245-46 (finding that appellant demonstrated sufficient adverse effects to establish standing, despite being unable to overcome agency finding of no significant impact on the merits).

[53] *See, e.g., SUWA*, 195 IBLA at 325, 329, 330 (finding approval of unit agreement did not create adverse effect because it "does not create a risk of development where none existed before" and "does not authorize any surface disturbance and development that could not have otherwise occurred . . . or itself . . . increase the possibility of development"); *SUWA*, 195 IBLA at 172-74 (explaining distinctions between cases where adverse effects have been found too speculative and not as turning on the extent to which the appealed decision increases the potential for development and attendant risk of injury versus maintaining the status quo, or being neutral to or reducing the risks of development and associated impacts); *SUWA*, 190 IBLA at 166 (finding that suspension did not create adverse effect because it does not give rise to development, the future potential of which is only speculative and contingent upon future events); *Colo. Open Space Council*, 109 IBLA 274, 283-84 (1989) (finding no adverse effect for standing purposes where decision granting lease suspension would maintain the status quo by suspending operations and associated impacts, and noting that denial would likely have increased development and impacts).

DISCUSSION

I.    *Standard of Review and Burden of Proof for NEPA Challenges*

MHA Nation seeks to overturn BLM's DR based primarily on an asserted failure to comply with NEPA and its implementing regulations. Section 102(2)(C) of NEPA requires Federal agencies to prepare an EIS evaluating the potential environmental impacts of any major Federal action significantly affecting the quality of the human environment.[54] BLM may prepare an EA to assist its determination of whether an EIS is required, or to aid the agency's decision-making when an EIS is not necessary.[55] BLM issues a FONSI when it determines that an EIS is not necessary.[56] An EA is "a concise public document" that includes "brief discussions" of essential elements of the impacts analysis[57] at a level of depth and detail normally "limited to the minimum needed to determine whether there would be significant environmental effects" from the proposed action.[58] We have consistently held that "[a]n EA need not discuss the merits and drawbacks of the proposal in exhaustive detail" as "[b]y its nature, it is intended to be an overview of environmental concerns, *not* an exhaustive study of all environmental issues"; accordingly, "[s]o long as an EA contains a 'reasonably thorough discussion of . . . significant aspects of the probable environmental consequences,' NEPA requirements have been satisfied."[59]

In evaluating the adequacy of an EA, the Board is guided by a "rule of reason"[60] and will generally find that BLM has taken the requisite "hard look" when its conclusion that no

---

[54] 42 U.S.C. § 4332(2)(C).

[55] 43 C.F.R. §§ 46.300, 46.325; *see also WildLands Defense* (*WLD*), 193 IBLA 59, 67-68 (2018); *WLD*, 192 IBLA 383, 388 (2018); *WWP*, 188 IBLA 234, 238 (2016).

[56] 43 C.F.R. § 46.325.

[57] 40 C.F.R. § 1508.9 (2016). On July 16, 2020, the Council on Environmental Quality (CEQ) published revisions to its NEPA regulations, which took effect on September 14, 2020, and "apply to any NEPA process begun after" that date. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,372 (July 16, 2020) (final rule). Because these modified regulations do not apply to the NEPA process at issue in this appeal, all citations to the CEQ regulations at 40 C.F.R. Chapter V are to the regulations in effect in 2016.

[58] 43 C.F.R. § 46.310(e); *see SUWA*, 194 IBLA 98, 102 (2019).

[59] *Wyoming Outdoor Council*, 147 IBLA 105, 107-08 (1998) (quoting *Don't Ruin Our Park v. Stone*, 802 F. Supp. 1239, 1247-58 (M.D. Pa. 1992)); *see WLD*, 193 IBLA at 68 (quoting *Duna Vista Resorts*, 187 IBLA 43, 47 (2016)); *WLD*, 192 IBLA at 388; *WLD*, 188 IBLA 68, 73-74 (2016) (quoting *Citizens of Dixon, New Mexico*, 186 IBLA 350, 351 (2015)).

[60] *SUWA*, 194 IBLA at 102; *WWP*, 191 IBLA 351, 356 (2017); *Klamath-Siskiyou Wildlands Center*, 190 IBLA 295, 304 (2017); *Center for Biological Diversity*, 189 IBLA 117, 129 (2016); *WWP*, 188 IBLA at 239 ("The Board is guided by a 'rule of reason' in assessing an EA's adequacy."); *Duna Vista Resorts*, 187 IBLA at 47.

significant environmental impact exists is founded on a reasoned evaluation of relevant factors that is documented in the record.[61] Our task is not to determine whether an EA is based upon the best scientific data or methodology available, or to resolve scientific disagreement over those subjects, but rather to determine whether BLM's analysis of the available data was reasonable and provides an adequate basis for its decision.[62] "An appellant challenging the adequacy of an EA has the burden of demonstrating with objective evidence that the assessment is premised on a clear error of law or demonstrable error of fact, or that the analysis failed to consider a substantial environmental question of material significance to the proposed action."[63] This burden is not satisfied by speculation, conclusory allegations unsupported by evidence, or mere differences of opinion regarding the likelihood or significance of environmental impacts.[64] Nor are disagreements or presentations of different points of view over the preferable course of action sufficient absent connection to an affirmative showing that BLM failed to consider a substantial environmental question of material significance.[65] The fact that "an appellant has a different opinion about the likelihood or significance of environmental impacts or prefers that BLM take another course of action does not establish that BLM violated the procedural requirements of NEPA."[66]

---

[61] *Kevin Kane*, 195 IBLA 17, 28 (2019) (citing *Utah Shared Access All. v. U.S. Forest Serv.,* 288 F.3d 1205, 1213 (10th Cir. 2002) ("NEPA requires that we review the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors.")).

[62] *Center for Biological Diversity*, 189 IBLA at 129; *Center for Biological* Diversity, 181 IBLA 325, 341 (2012).

[63] *Kevin Kane*, 195 IBLA at 20; *SUWA*, 194 IBLA at 102; *WLD*, 193 IBLA at 68; *WWP*, 191 IBLA at 356; *Klamath-Siskiyou Wildlands Center*, 190 IBLA at 304-05.

[64] *Kevin Kane*, 195 IBLA at 20; *SUWA*, 194 IBLA at 102-03; *WLD*, 193 IBLA at 68, 81; *WLD*, 192 IBLA at 389; *WWP*, 191 IBLA at 356, 371; *Pueblo of San Felipe*, 191 IBLA 53, 75 (2017); *Arizona Zoological Soc'y*, 167 IBLA 347, 357-58 (2006).

[65] *Arizona Zoological Soc'y*, 167 IBLA at 356-58; *see also SUWA*, 185 IBLA 150, 156 (2014) ("The appellant must make an affirmative showing that BLM failed to consider a material environmental question, and cannot simply allege errors or merely identify points of disagreements."); *Oregon Chapter Sierra Club*, 176 IBLA 336, 353 (2009) ("Unsupported differences of opinion do not satisfy that burden, nor do simple speculation and lists of alleged errors meet that burden unless those allegations are connected to an affirmative showing that BLM failed to consider a substantial environmental question of material significance.").

[66] *Nat'l Wildlife Fed'n*, 170 IBLA 240, 244 (2006); *see Cascadia Wildlands*, 184 IBLA 385, 412 (2014) ("While [appellant] clearly abhors BLM's decision . . . , impassioned disagreement does not demonstrate reversible error"); *Wyoming Wildlife Fed'n*, 184 IBLA 352, 358-59 (2014) ("A simple disagreement with the outcome, BLM's analysis, or its decision choice is not proof of a NEPA violation."); *id.* at 363 ("Displeasure with or dislike for a decision is not enough to show BLM disregarded its obligations under NEPA."); *Birch Creek Ranch, LLC*, 184 IBLA 307, 330 (2014).

BLM is entitled to rely on the professional opinions of its technical experts concerning matters within the realm of their expertise and which are reasonable and supported by record evidence, and an appellant challenging such reliance must demonstrate, by a preponderance of the evidence, error in the data, methodology, analysis, or conclusion of the expert.[67] Such opinions are entitled to considerable deference,[68] and a "mere difference of opinion, even of expert opinion, will not suffice to show that BLM failed to fully comprehend the true nature, magnitude, or scope of the likely impacts."[69] Ultimately, NEPA is a procedural statute that requires only full consideration of the environmental impact of a proposed action before undertaking it and does not direct that BLM take any particular action or prohibit action even where environmental degradation is inevitable.[70]

## II.    MHA Nation Has Not Met Its Burden to Establish a NEPA Violation.

MHA Nation asserts that BLM fell short of its obligations under NEPA both because it should have prepared an EIS under the circumstances and because its EA suffered from certain fundamental flaws, including an inadequate analysis of alternatives.[71] For example, MHA Nation argues that the Project "should have been reviewed through an" EIS, given the threats from the Project to "MHA Nation's members, homelands, drinking water supply, and historic, cultural and natural resources."[72] MHA Nation further argues that BLM did not adequately consider the possibility of using HDD at alternative locations for the Lake crossing.[73]

MHA Nation organizes much of its discussion around the "context" and "intensity" factors set forth in the regulations implementing NEPA.[74] Those regulations require agencies to consider certain factors in determining whether the potential impacts from a proposed action are significant. "Context" refers to the setting of the proposed action, such

---

[67] *Pueblo of San Felipe*, 191 IBLA at 76; *Klamath-Siskiyou Wildlands Center*, 190 IBLA at 314; *WWP*, 188 IBLA 250, 258 (2016); *Duna Vista Resorts*, 187 IBLA at 47-48.

[68] *Wyoming Outdoor Council*, 147 IBLA at 110.

[69] *WWP*, 188 IBLA at 258; *see Pueblo of San Felipe*, 191 IBLA at 76; *Klamath-Siskiyou Wildlands Center*, 190 IBLA at 314; *COG Operating LLC*, 190 IBLA 49, 63 (2017); *Duna Vista Resorts*, 187 IBLA at 48.

[70] *Backcountry Against Dumps (BAD)*, 179 IBLA 148, 161 (2010); *SUWA*, 177 IBLA 29, 33 (2009); *Biodiversity Conservation Alliance*, 174 IBLA 1, 13-14 (2008); *Nat'l Wildlife Fed'n*, 170 IBLA at 252.

[71] SOR at 2.

[72] *Id.*; *see* Petition for Stay at 7 ("BLM's approval of the Project through a brief EA and FONSI doesn't match the magnitude of the Project or its level of impacts.").

[73] *See* SOR at 8, 11-12; Reply at 4 (arguing "alternative crossings utilizing HDD were improperly eliminated from the EA").

[74] 40 C.F.R. § 1508.27.

as the "affected region, the affected interests, and the locality."[75] "Intensity" refers to the severity of the impacts.[76] The regulations set forth 10 specific intensity factors, including the unique characteristics of the geographic area; cumulative impacts; the degree to which possible effects are likely to be highly controversial, highly uncertain, or involve unique or unknown risks; and the degree to which the action may set a precedent for future actions with significant effects, adversely affect sites or objects listed in or eligible for the National Register of Historic Places, cause loss or destruction of significant scientific, cultural, or historical resources, or adversely affect an endangered or threatened species or habitat.[77] The regulations require only that BLM consider these factors in determining whether an action would significantly impact the environment, and do not mandate preparation of an EIS based on satisfaction of any one or more of the factors.[78]

        With respect to the consideration of whether the effects "are likely to be highly controversial," that criterion does not pertain to the mere existence of opposition to the proposed action, but rather to whether there is a substantial dispute about the size, nature, or effect of the action.[79] With respect to cumulative impacts, it is not sufficient merely to note the existence of other projects without concretely identifying the adverse impacts caused by such projects to which the proposed action will add,[80] and demonstrating that there is likely to be an interaction with the other projects due to geographic proximity or another factor that is likely to result in a specific enhanced or synergistic impact that BLM failed to address.[81] "Numerous judicial decisions have recognized that an agency may

---

[75] *Id.* § 1508.27(a).

[76] *Id.* § 1508.27(b).

[77] *Id.*

[78] *Duna Vista Resorts*, 187 IBLA at 55 (citing *Missouri Coal. for the Env't*, 172 IBLA 226, 249 (2007)).

[79] *WLD*, 193 IBLA at 82; *WWP*, 191 IBLA at 364; 43 C.F.R. § 46.30 ("*Controversial* refers to circumstances where a substantial dispute exists as to the environmental consequences of the proposed action and does not refer to the existence of opposition to a proposed action, the effect of which is relatively undisputed."); *see also* WLD, 192 IBLA at 394 ("Under NEPA, controversy does not exist because people have concerns about a project."); *Birch Creek*, 184 IBLA at 326 ("Here, while appellants clearly disagree and object to implementation, we are unable to conclude that there is a substantial dispute as to the size . . . , nature . . . or effect.").

[80] *WWP*, 191 IBLA at 366-67; *COG Operating*, 190 IBLA at 72; *Biodiversity Conservation All.*, 183 IBLA 97, 123 (2013).

[81] *WWP*, 191 IBLA at 366-67; *Great Basin Resource Watch*, 185 IBLA 1, 26 (2014) ("the impacts of the proposed operation and those conducted at existing operations will overlap in a manner that would cause the consequent impact to properly be considered cumulative or synergistic"); *BAD*, 179 IBLA at 174 (citing *Wyoming Outdoor Council*, 147 IBLA 105, 109 (1998)).

aggregate the cumulative effects of past projects into an environmental baseline against which the incremental impact of a proposed project is measured."[82]

In advancing its arguments, MHA Nation focuses on several central themes it invokes repeatedly. For clarity and efficiency, we organize our analysis around those themes and refer, where appropriate, to the intensity factors cited by MHA Nation as relevant to each. But as we explain below, while MHA Nation vehemently disagrees with BLM's decision to approve the ROW amendment, it makes only conclusory arguments and provides no support or evidence to sustain its disagreement. As a result, MHA Nation does not meet its burden to show error in BLM's NEPA compliance.

### A.  MHA Nation has not shown error in BLM's decision to prepare an EA rather than an EIS.

#### 1. BLM adequately considered the Project's potential impacts related to sedimentation from construction and spills during operation.

MHA Nation first argues that the EA failed to adequately address the threats posed by the proposed Lake crossing both in its context and as analyzed against certain of the regulatory intensity factors, including adverse impacts, threats to public health, unique characteristics of the geographic area, its highly controversial nature, and cumulative impacts.[83] It asserts that the proposal to bury the pipeline in a trench on the Lake bottom upstream of the Reservation "threatens the lands, waters and resources reserved by the MHA Nation in its 1851 Treaty of Fort Laramie with the United States" that "provide for the safety, health, wellbeing and economic livelihood of the MHA Nation and its members" and serve as "a unique homeland to the MHA Nation . . . for its numerous historic and cultural resources that are central to the religion and identity of the MHA Nation."[84] MHA Nation notes its "long-standing reliance on the River and its resources for the health and economic welfare o[f] its members," serving as "the lifeblood of the MHA Nation and at the heart of the MHA Nation's religion, culture, identity and existence" as well as "a primary source of drinking water for the MHA Nation" and now "thousands of others [who] receive their drinking water from Lake Sakakawea."[85] It identifies two principal threats posed by the

---

[82] *WLD*, 193 IBLA at 77.

[83] SOR at 9-13.

[84] *Id*. at 6, 10; *see id*. at 2 (stating that "the trenched pipeline sitting on the riverbed would forever threaten the MHA Nation, its drinking water and resources held in trust for the MHA Nation by the United States" including "MHA Nation's members, homelands, drinking water supply, and historic, cultural and natural resources").

[85] *Id*. at 7; Petition for Stay at 5, 6.

Lake crossing: sediment disruption associated with construction activities and releases of oil associated with pipeline operations.[86] We address each in turn.

### a. Construction and Sedimentation

MHA Nation first asserts that "trenching will almost certainly cause toxic sediment disruption, killing and damaging plants and animals in and around the lake, and sending that sediment downstream toward MHA Nation,"[87] citing to the EA and FONSI associated with BLM's 2012 approval of the southern portion of the system. MHA Nation asserts that the proposed "method of construction will release lead, zinc, and cadmium into the MHA Nation Reservation and impact the MHA Nation's and surrounding community's drinking water."[88]

BLM analyzed the threats posed by construction sedimentation and the design features of the Project directed toward minimizing those effects in the EA. The EA acknowledges the possibility of "temporary increased turbidity during construction and disturbance of sediments containing certain potentially hazardous substances."[89] Examining the Project features designed to address those issues, the EA emphasizes that "impacts from turbidity and siltation would be reduced by the use of turbidity curtains" that "would control the extent of sediment suspension and contain the settlement of silts suspended during the crossing construction."[90] In addition to this turbidity reduction system and pump designs that would direct the slurry back into the trench and reduce lateral dispersion,[91] BLP would be required to deploy turbidity monitoring instrumentation and a third-party inspector (in addition to a dive team) monitoring turbidity levels during construction.[92] Pre-work background turbidity levels would be taken 1,000 feet downstream of the construction area no more than one hour prior to work starting each

---

[86] *See, e.g.,* SOR at 9 (asserting threats to Nation's lands and water supply "through the disruption of sediments while it is being installed, leakage of crude oil considered acceptable by industry standards, and from the ongoing threat of a devastating accidental leak").

[87] *Id.* at 15; *see also id.* at 8; Petition for Stay at 6, 10.

[88] SOR at 2.

[89] EA at 4.5-1.

[90] *Id.* at 4.5-2; *see also id.* Appx. B at 8, Appx. F at F-2 (explaining that "turbidity mats behind the pipe lowering skid and above the discharge diffuser [would] reduce turbidity"); POD Appx. X at Appx. 9.5, Memo on Lake Crossing Lowering Equipment, unp. 2 ("An unique aspect of dredging with the Toyo submersible pumps is the lack of turbidity. ...... All the solids that are disturbed from their settled state are drawn into the low pressure area and through the pump – minimizing turbidity. Turbidity is further reduced due to the fact that the Toyo pump typically operates sub surface – below the mud line.").

[91] EA at 2-49.

[92] *Id.* at 2-21, 2-51, 4.5-2, Appx. B at 8.

day, again one hour after work commences, and every four hours thereafter until work concludes for the day.[93] The third-party inspector would have stop-work authority if turbidity levels exceeded 100 Nephelometric Turbidity Units above pre-workday background levels, and work would not recommence until turbidity levels fell below that threshold.[94] In light of these protections, BLM determined in the EA that, while "adverse turbidity and siltation effects would occur" during trenching, they "would occur as relatively temporary exceedances of narrative water quality standards."[95] This conclusion is bolstered by the report from BLP's contractor, Environmental Resources Management, found in the record, which reflects that dredging-induced turbidity would drop below average background levels within 250 feet downstream of the trench,[96] miles short of the Reservation or drinking water intakes.

MHA Nation offers no objective evidence that BLM's analyses or conclusions are erroneous. Indeed, it largely if not entirely ignores them, resting on conclusory allegations and mere differences of opinion regarding the likelihood or significance of potential impacts. The EA specifically addresses the one piece of evidence cited by MHA Nation – the 2012 EA, which noted that some sediment samples at the crossing location showed elevated values for zinc, lead, and cadmium.[97] BLP consulted with the North Dakota Department of Health (NDDH) and USACE pursuant to their respective jurisdictional responsibilities to ensure that water quality would be maintained during construction operations.[98] BLM explained in the EA that the resulting soil sampling yielded a small subset of samples indicating "minor" exceedances which, "[d]ue to the limited occurrence of these concentrations, . . . are not anticipated to create water quality impacts" in light of the above-described turbidity control and monitoring design features that would be employed during construction.[99] In fact, the 2012 EA reached the same conclusion.[100] The NDDH also agreed that the proposed construction operations would not present significant water quality issues.[101]

---

[93] *Id*. at 2-21, 2-51, 4.5-2.

[94] *Id*.; *see also* BLM FONSI at 9; USACE FONSI at Table 1.

[95] EA at 4.5-2.

[96] *See* AR Tab 052, Sediment Dispersion Assessment at Lake Sakakawea, Environmental Resources Management, at 15 (Sept. 28, 2015) (ERM Report); *id*. at 9 ("the presence of a turbidity mat was assumed to act like a silt curtain and reduce the sediment release by 85%").

[97] *See* SOR at 15 (citing BakkenLink Pipeline Project Environmental Assessment (DOI-BLM-MT-C030-2012-427-EA) at 4.5-2 (Aug. 2012) (2012 EA)).

[98] EA at 4.5-1 (citing POD, Appx. X.B-A at sec. 4.6.3).

[99] *Id*. at 4.5-2.

[100] 2012 EA at 4.5-2.

[101] *See* AR Tab 031, BLP Application to USACE for Section 408 Review at unp. 2 (dated Oct. 24, 2014) (noting that "USACE is required to meet state water quality regulations prior to

    We find that MHA Nation has not met its burden on appeal to demonstrate that BLM's EA failed to take a hard look at the potential effects of sedimentation arising from construction of the Project.

### b.    Operation and Spills

    MHA Nation next argues that "pipeline leaks that are considered acceptable within the industry or any devastating accidental leaks . . . will also impact the water intake for the MHA Nation's drinking water system and rural water systems for other communities"[102] as well as "[i]rrigation and livestock grazing."[103] In particular, it emphasizes the threats posed by erosion of the Lake-bottom sediment covering the pipeline, "especially when the lake returns to a riverine environment during drought," which could potentially "leave the pipeline suspended and susceptible to breach and failure from numerous causes including river scour, trees and branches, and ice."[104] MHA Nation acknowledges that "there are other pipelines crossing Lake Sakakawea" in the vicinity but asserts that the "addition of the proposed Project would cumulatively increase the threat to the MHA Nation and its water supply."[105] It cites to prior leaks from pipelines at other locations as "objective proof of the real world consequences of ill-advised or outdated pipeline siting decisions."[106] It notes the Environmental Protection Agency's (EPA) estimate that a spill at the Lake Sakakawea crossing could reach the closest downstream water intake within approximately 13 hours and its recommendations for enhanced monitoring in the context of a different pipeline in proximity to a sensitive water resource.[107] MHA Nation asserts that the "risks of violating water quality standards and laws intended to protect and provide for the MHA Nation's homeland and the health, safety and security of its members

---

granting a Section 404 permit" and following "analytical testing of Lake Sakakawea sediments" BLP obtained concurrence from the NDDH "that disturbance of lake sediments would not affect water quality"); POD Appx. X at 7 (discussing teleconference with NDDH Water Quality Division in which it "communicated comfort level with proposed construction method and turbidity control relative to resuspension of soils and elutriate testing").

[102] SOR at 8; *id.* at 9 ("[T]here is a strong likelihood of damage and contamination to the drinking water systems constructed by the United States in Lake Sakakawea."); Petition for Stay at 7.

[103] SOR at 17.

[104] *Id.* at 15, 2-3 ("BLM never assessed the ongoing threat of laying a pipeline across a major water-body that is subject to dramatic changes in water depth as well as freezing and thawing."); Petition for Stay at 10.

[105] SOR at 12.

[106] Reply at 14; *see also* SOR at 16; Petition for Stay at 10-11.

[107] SOR at 17 (citing EA Appx. G at G-8); Petition for Stay at 11; Reply at 13 (citing Exh. C to Reply, Letter from Strobel, EPA to Cossette, USACE regarding Dakota Access Pipeline (Mar. 11, 2016)).

is high"[108] and "the consequences of a spill would have devastating, long-term effects on the entire area and the MHA Nation's homelands reserved in treaty with the U.S."[109]

As with their argument that the Project's construction will result in harm from sedimentation, MHA Nation's argument that the Project's operation will result in harm from oil spills is speculative. MHA Nation provides no objective evidence demonstrating error in the EA's analysis and conclusions related to the potential for spills and the Project features designed to minimize that potential or the impacts of any spill.

With respect to MHA Nation's principal specifically-described concern – the threat of the pipeline becoming exposed to damage through erosion of sediment cover – the EA cited underwater surveys of the Lake bottom that revealed no evidence of scouring or sediment disturbance at other longstanding pipeline crossings of the Lake in the vicinity, and concluded that "[d]ue to the extremely low flows within Lake Sakakawea, the likelihood of exposed spans at the lake bottom developing over time is negligible."[110] Nevertheless, the EA went on to analyze BLP's Erosion Monitoring Plan (EMP), designed to address threats and responses across the spectrum of potential Lake levels.[111] The EMP provides for tiered levels of surveying depending on water levels, including underwater visual inspections by divers, cameras, or sonar, and various types and degrees of escalating response based on the findings of those surveys.[112] BLP would be required to hold an annual threat assessment meeting with USACE to analyze water level forecasts and determine whether the pipe must be lowered, additional protection is needed around the pipe, or the pipe must be shut-in and evacuated of oil until protective steps can be completed.[113] More generally, the EA observed that the walls of the pipe would be almost 60% thicker at the Lake crossing[114] and would be coated with a two-inch thick Concrete Weight Coating for additional mechanical protection against damage, as well as buoyancy control.[115] MHA Nation does not acknowledge these points or offer any basis for concluding that BLM's analysis failed to take a hard look at the cited threat.

---

[108] SOR at 13.

[109] Reply at 12.

[110] EA Appx. F at F-2, F-4; *see also* AR Tab 052, Final Report, Chris Ransome & Assocs., Inc. (July 10, 2011) (Ransome Report); ERM Report at 5 (noting average ambient velocity of Lake Sakakawea is 0.036 feet per second at the crossing location); BLM Answer at 6 (noting that "[t]he ambient velocity of Lake Sakakawea at the trench is .036 feet/second, or 2.16 feet/minute, a very minimal flow rate").

[111] EA at 2-49, Appx. B.

[112] *Id*. Appx. B at 5-10, Appx. G at G-2.

[113] *Id*. at 2-22, 2-49, Appx. B at 5, Appx. G at G-2; BLM FONSI at 10; USACE FONSI at Table 1.

[114] EA at 2-2 (noting majority of route would have 0.312-inch walls whereas Lake crossing would have 0.5-inch walls), Appx. G at G-6; POD at 12.

[115] EA Appx. B at 3-4, Appx. G at G-6; POD at 12, Appx. X at 8; AR Tab 032, Design Basis Memorandum, Lake Sakakawea Crossing Pipeline Segment, at 9 (May 15, 2015).

With respect to the risk of leaks more broadly, the EA acknowledged that 13 water intakes are located within 10 miles upstream and 20 miles downstream of the proposed crossing,[116] and that surface water quality "could be adversely affected by incidental spills, pipeline ruptures, or leaks" during construction or "if a pipeline leak or rupture released crude oil during operations."[117] The EA incorporated as Appendix A a Risk Assessment and Environmental Consequences Analysis prepared by Stantec Consulting Services, Inc. (Stantec), which addressed the potential for contamination from a pipeline release, with "particular attention to potential impacts to Lake Sakakawea and associated resources."[118] That analysis identified a very low probability of a spill occurring at any specific waterbody, with conservative occurrence intervals of approximately 1,400 years for a spill at a large waterbody (such as the Lake) and a median total release volume of four barrels or less based on historical U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) data.[119] It likewise concluded that it is "highly unlikely that a spill would impact drinking water, given the location of the drinking water intake and the distance (and associated time) from the pipeline."[120] In its responses to comments, BLM similarly observed that "by the time a potential lake spill reaches Four Bears Village and New Town, oil constituent concentrations in the water are highly unlikely to exceed water quality standards even when conservative assumptions are used," and "[e]vaporative loss and emergency containment and cleanup would further reduce potential impacts to water quality."[121]

---

[116] EA at 3.5-4; *see also* Garrison Dam/Lake Sakakawea Master Plan at 1.4.4 (Dec. 14, 2007), https://usace.contentdm.oclc.org/digital/collection/p16021coll7/id/91/ (last visited Jan. 27, 2021) (discussing municipal, rural, and industrial water supply uses of water from Lake).

[117] EA at 2-65.

[118] *Id.* Appx. A at 2.1.

[119] *Id.* at 4.5-3 and 4.5-4; *id.* Appx. A at 5.11; *see also id.* Appx. A at 2.1 (noting that the analysis is "intentionally conservative (i.e., overestimates risk)" and cited spill frequencies "are not likely to occur"); *id.* at 4.1-4.2 (noting that baseline incident frequency data reflect incident rates associated with older pipeline designs and construction methods that do not meet the standards or have the technology and protective measures applicable to the Project, and thus "is considered extremely conservative and overestimates the probability of a spill"); *id.* at 4.3 ("Implementation of current industry standards and compliance with federal regulatory standards ensures that the likelihood of spills to occur would be very small, and that the volume released, in the unlikely event of a spill, would be very small. For these reasons, it is expected that the actual number of incidents would be substantially lower than those estimated in this analysis."); *id.* at 7.1 ("[T]his conservative analysis of the proposed Project shows that the predicted frequency of incidents is very low, the probability of a large spill occurring is very low, and consequently, risk of environmental impacts is minimal.").

[120] *Id.* Appx. A at 5.20.

[121] *Id.* Appx. F at F-4.

Moreover, BLM stated in the EA that the "severity and duration of . . . an impact [to water quality from a release] would depend on its location, the volume of oil released, and the spill response and countermeasures implemented" and concluded that identified requirements, procedures, and equipment "would minimize the potential for such impacts" or "reduce their potential to negligible levels."[122] For example, the EA included extensive analysis of BLP's testing and inspection programs[123] and pipeline design features[124] developed to reduce both the risks of a spill occurring and the impacts should one occur. The EA similarly examined in detail the multi-tiered system proposed by BLP to monitor pipeline pressures and flow rates for purposes of prompt identification of and response to leaks.[125] It also evaluated both the technology that would enable BLP to promptly stop the flow of oil in the event of a leak[126] as well as the steps taken to ensure the availability of

---

[122] *Id.* at 2-65, 4.5-2 and 3; *see also id.* Appx. F at F-4; *id.* at 2-71 (finding it "unlikely that a potential spill would affect terrestrial species due to the low probability of a spill and the behavioral avoidance of a spill area by wildlife species," or aquatic species "due to the low probability of a spill and the low probability of the spill directly impacting individuals"); *id.* at 4.9-8 (concluding that even in the unlikely event of a worst-case scenario spill in the Lake it is unlikely that concentrations would be sufficient to cause acute toxicity in fish or sink and impact benthic resources, and response actions would further contribute to reducing impacts to low).

[123] *See, e.g., id.* at 2-51, 4.5-2; *id.* Appx. A at 3.2, 6.1; *id.* Appx. G at G-3; *see also* POD at 21; *id.* Appx. X at Appx. 9.1, Detailed Lake Crossing Methodology Document, § 15.0; *id.* Appx. XIV (Hydrostatic Test Plan); AR Tab 032, Design Basis Memorandum, Lake Sakakawea Crossing Pipeline Segment, at 10 (May 15, 2015); AR Tab 032, BakkenLink Project Meeting Notes at 2, 3 (June 29, 2015) (June 29, 2015, Meeting Notes).

[124] *See, e.g.,* EA at 2-13, 2-22 (discussing pipeline coating and corrosion protection systems); *id.* Appx. A at 6.1; *see also* BLM FONSI at 10; USACE FONSI at Table 1; POD at 37.

[125] EA at 2-12, 2-13, 2-22, 2-52, 2-53, 4.5-4, Appx. A at 6.1, 6.2 (discussing supervisory control and data acquisition (SCADA) system, software-based volume balance monitoring systems, model- and trend-based detection systems, and Atmos Pipe Leak Detection System); *see also* BLM FONSI at 10; USACE FONSI at Table 1; POD at 38, 40-41; LSOGMP at 46 (explaining that "[t]hese systems also work in real time, meaning that there is little lag time between the measurements taken along the pipeline and their transmission to the control station . . . allowing pipeline engineers to know exactly what is happening along the pipeline at all times . . . [which] enables quick reactions to equipment malfunctions, leaks, or any other unusual activity along the pipeline").

[126] EA at 2-4, 2-12, 2-22, 4.5-3 (discussing remotely controlled double mainline valves on both shores); *see also* BLM FONSI at 10; USACE FONSI at Table 1; POD at 27.

adequate emergency response equipment[127] and expert support for different types of responses.[128]

In response to MHA Nation's invocation of prior pipeline spills at other locations as "objective proof" of the cited risks, the EA analyzed key differences between the circumstances underlying those events and relevant features of the Project. For example, in responding to MHA Nation's comments detailing the impacts from a 2015 spill on the Yellowstone River, BLM observed that the pipeline at issue was older and utilized "now-obsolete" technologies and processes, including less effective corrosion-resistant coatings and a welding process that predisposed such pipelines to catastrophic failure.[129] It also noted that the portions of the pipeline that failed were exposed within riverine areas presenting high external stresses, whereas the Project's proposed Lake crossing would be at a location of extremely low flows presenting negligible risk of exposure.[130] In response to the EPA estimate cited by MHA Nation, USACE observed that "the trajectory of crude oil would depend largely on specific atmospheric and environmental conditions at the time of the spill" as well as "the speed and efficacy of emergency response," but pointed to the Stantec Risk Assessment that utilized "a conservative methodology to overestimate the speed and distance with which crude oil could spread across the lake" and concluded that it is "highly unlikely that a spill would impact drinking water, given the location of the drinking water intake and the distance (and associated time) from the pipeline."[131] Based on the responses to EPA's comments, it appears that EPA did not raise the referenced concerns regarding monitoring technologies with respect to this Project's proposed design features, and in fact "support[ed] the emergency response and spill prevention measures identified in the draft EA."[132]

---

[127] EA at 2-10, 2-22, 4.5-5 (noting facilities on both shores would house a dedicated boat launch, trailers with winter/ice spill response gear, booms for summer/water spill response, and gear for initial response, containment and cleanup, as well as 2,000 feet of 18-inch hard boom).

[128] *Id.* at 2-10, 2-12, 2-22, 4.5-5, Appx. B at 7 (discussing agreements with three separate spill response organizations); *see also* BLM FONSI at 10; USACE FONSI at Table 1; POD Appx. X at 19.

[129] EA Appx. F at F-4.

[130] *Id.*; *see also id.* at F-3 (stating that "the [Montana Governor's] task force examined pipelines crossing rivers that are not impounded"); AR Tab 032, Letter from Loren Wickstrom, BLM, to Mark Fox, Chairman, MHA Nation (Mar. 11, 2015) (discussing differences between "the age of the pipelines and technologies used during their manufacturing and installation," including welding techniques prone to failure and ineffective coatings, as well as reduced external stresses from being in a low flow lake as opposed to a river).

[131] EA Appx. G at G-8, Appx. A at 5.20.

[132] *Id.* Appx. G at G-7.

MHA Nation again provides little to no acknowledgment of the EA's analysis of these factors, much less objective evidence of error demonstrated by contrary data, studies, or analyses. Instead, MHA Nation relies on allegations of threat supported primarily by speculation. MHA Nation's disagreement with and difference of opinion regarding the proposed course of action and its potential effects is insufficient to establish that BLM violated NEPA. MHA Nation has not met its burden to show that BLM failed to consider a substantial environmental question of material significance with respect to the threat of pipeline leaks at the Lake Sakakawea crossing.

> *2. BLM adequately considered the Project's potential impacts to cultural resources and sites.*

MHA Nation also raises concerns under the eighth regulatory intensity criterion that "the proposed Project may adversely affect places listed in the National Register of Historic Places or may cause the loss or destruction of significant historical, cultural, or scientific resources," noting that "the Missouri River and Lake Sakakawea are significant historical and cultural resources that are at the center of the MHA Nation's religious and cultural identity."[133] In recognition of such concerns, on June 3, 2014, BLM circulated for review and comment to representatives of MHA Nation, among other tribes, a draft tribal field survey work plan and held a conference call to discuss tribal comments the following week.[134] A Class I investigation of site files and survey reports maintained by the North Dakota State Historic Preservation Officer (SHPO) had identified 159 previously recorded cultural resources within a two-mile corridor centered around the pipeline route.[135] From June 24 to July 2, and July 8 to 11, 2014, 18 tribal members representing seven tribes, including MHA Nation, conducted field surveys along a 200-foot wide corridor surrounding the proposed centerline. That survey identified a number of cultural resources and areas of tribal concern, and plans were developed to avoid each of them through realignment,

---

[133] SOR at 12.

[134] AR Tab 032, e-mail from Shannon Gilbert, BLM, to Pete Coffey and Elgin Crows Breast, MHA Nation (among other tribal representatives) (June 3, 2014) (attaching draft Scope of Work for Field Visit and Evaluation of Historic Properties of Traditional Religious and Cultural Importance); *id.*, Conference Call Notes (June 10, 2014) (provided to MHA Nation representatives by e-mail dated June 25); *id.*, e-mail from Shannon Gilbert, BLM, to Pete Coffey and Elgin Crows Breast, MHA Nation (among other tribal representatives) (June 11, 2014) (attaching final Statement of Work incorporating tribal input); *id.*, Consultation Phone Log (showing calls from S. Gilbert, BLM, to Pete Coffey, MHA Nation, on June 12, 18, and 19 discussing planning for survey).

[135] EA at 3.21-4; AR Tab 052, BakkenLink Pipeline Beaver Lodge to Dry Creek: Phase II of the BakkenLink Pipeline in McKenzie and Williams Counties North Dakota, Metcalf Archaeological Consultants, Inc. (Nov. 2014) (Metcalf Report).

narrowing of the construction ROW, or use of HDD.[136] BLM provided additional information regarding the identified tribal sites and a hydrographic survey of the Lake crossing to representatives of MHA Nation on August 7, 2014, soliciting feedback and recommendations.[137] On November 20, 2014, BLM sent copies of a Class III cultural resources inventory report, including an appendix with the results of the tribal field survey, to all consulting tribes requesting review and comment; no comments were received.[138]

With respect to the Lake crossing specifically, a survey of historical records, including materials managed by the SHPO, revealed no cultural resources in the vicinity.[139] Application of several remote sensing technologies, including depth sounding, sub-bottom profiling, side scan sonar, magnetometer survey, and video recording along a corridor 500-feet wide centered on the pipeline path, likewise identified no archaeological features on the Lake bottom.[140] During a February 19, 2015, call between Shannon Gilbert of BLM and Pete Coffey of MHA Nation, Coffey noted "that the [Tribal Historic Preservation Officer (THPO)] feels that their concerns were addressed and that safeguards are in place to protect cultural properties."[141]

The EA provided further analysis of these issues, noting that "[g]round-disturbance associated with Project construction has the potential to directly" and indirectly impact historic properties and properties of traditional, religious, and cultural importance, but

---

[136] EA at 3.22-3 and 4, 4.22-1 (finding no adverse effects from construction as a result); *id.* Appx. F at F-5; Consultation Exec. Summ. at 2; AR Tab 032, email from Shannon Gilbert, BLM, to Pete Coffey and Elgin Crows Breast, MHA Nation (among other tribal representatives) (July 3, 2014) (noting completion of first portion of tribal survey, and identification and avoidance of sites and features); *id.*, email from Shannon Gilbert, BLM, to Pete Coffey and Elgin Crows Breast, MHA Nation (among other tribal representatives) (July 17, 2014) (noting completion of second portion of tribal survey, soliciting reporting documentation).

[137] AR Tab 032, emails from Shannon Gilbert, BLM, to Pete Coffey, Elgin Crows Breast, and Frankie Lee, MHA Nation (among other tribal representatives) (Aug. 7 & 13, 2014).

[138] AR Tab 032, Letter from Richard A. Rymerson, BLM, to Mark Fox and Elgin Crows Breast, MHA Nation (Nov. 20, 2014) (sharing results of Class III Inventory, noting identification of 22 cultural resources and soliciting comments regarding recommendations, and tribal field survey, noting identification of 21 areas of resource concern, and explaining avoidance of all through rerouting, neckdown, or HDD); Consultation Exec. Summ. at 3; EA at 3.22-4.

[139] EA at 3.21-4, 3.22-2, 4.22-1; Metcalf Report at iii, 40 ("Historical sources also do not indicate the presence of precontact or postcontact cultural resources in or immediately adjacent to the lake crossing.").

[140] EA at 3.22-2, 4.22-1; POD Appx. X at 8-9; Ransome Report; AR Tab 052, Operations Report, Ocean Surveys, Inc. (Aug. 1, 2014); Metcalf Report at 40.

[141] AR Tab 032, Consultation Phone Log.

observing that all properties and features identified through cultural and tribal surveys would be avoided.[142] Further, unknown properties discovered during construction "would be handled as stipulated in the Unanticipated Discoveries Plan,"[143] triggering immediate stoppage of work, protection of the discovery, and notification of the consulting archaeologist, BLM, and SHPO, who would evaluate the nature of the discovery, and involve the tribes if it is associated with Native American culture.[144] During construction across the Lake bottom, commercial divers trained by the consulting archaeologist would monitor installation and observe for inadvertent discoveries of cultural materials requiring additional investigation, which would trigger similar responses.[145] Construction could not resume until written permission is received confirming that work in the area does not present a hazard to cultural resources.[146]

The EA concluded that impacts to historic, traditional, religious, and cultural properties were not anticipated as a result of Project operations.[147] Specifically regarding the Lake crossing, the EA concluded that no impacts to potentially submerged cultural resources were anticipated "given the lack of previously recorded cultural resources in the Project area as indicated through examination of historical documents, and the fact that no features/anomalies were identified during the use of remote sensing technologies."[148] On January 7, 2015 (and again on June 11, and July 24, 2015), the North Dakota SHPO concurred with BLM's determination that the Project will not have an adverse effect on identified cultural resources and found the monitoring and discoveries plans acceptable.[149] During scoping, the Bureau of Indian Affairs (BIA) similarly found "that the listed action will not affect cultural resources on Tribal or individual landholdings for which we are

---

[142] EA at 2-19, 2-83, 4.21-1 and 2; BLM FONSI at 7; *see also* EA at 4.21-2 (noting that indirect effects such as illegal collecting or inadvertent damage from the presence of workers would be mitigated by personnel education and strict policies prohibiting collection, public access would be blocked, and aboveground structures would be painted to minimize potential visual effects to settings).

[143] EA at 2-83, 4.21-1 and 2.

[144] *Id.* at 2-19, 4.21-2; BLM FONSI at 7; POD at 26 and Appx. XV.

[145] EA at 4.22-1; POD Appx. XV at 4.

[146] EA at 2-19, 4.21-2; BLM FONSI at 7; POD Appx. XV at 3-4.

[147] EA at 2-83.

[148] *Id.*

[149] AR Tab 033, Letter from Claudia J. Berg, North Dakota SHPO, to Loren Wickstrom, BLM (Jan. 7, 2015); *id.*, Letter from Claudia J. Berg, North Dakota SHPO, to Jason Renschler, USACE (June 11, 2015); *id.*, Letter from Claudia J. Berg, North Dakota SHPO, to Loren Wickstrom, BLM (July 24, 2015) (concurring in BLM No Historic Properties Affected determination for modifications to route and facilities); *see also* EA at 2-19, 3.21-5; BLM FONSI at 7; AR Tab 033, Letter from Loren Wickstrom, BLM, to Claudia Berg, North Dakota SHPO (Dec. 31, 2014) (recommending finding of No Historic Properties Affected based on described measures).

responsible."[150] MHA Nation offers no objective evidence or meaningful analysis demonstrating that the EA's assessment of these issues is premised on an error of law or fact, or failed to consider a substantial environmental question of material significance.

### 3. BLM adequately considered the Project's potential impacts to Endangered or Threatened Species and Designated Critical Habitat.

MHA Nation next argues that BLM did not sufficiently consider the Project's potential significant impacts on "numerous threatened and endangered species including the piping plover, interior least tern, pallid sturgeon, and Dakota skipper."[151] MHA Nation raises this argument for the proposition that BLM should have prepared an EIS and specifically in the context of the ninth intensity criterion.[152]

While MHA Nation acknowledges BLM's engagement with USFWS under the ESA,[153] it argues that "FWS failed to consult with the MHA Nation" which "does not agree with the view of the FWS" and believes "the BO should have been more fully assessed in an EIS."[154] To the extent MHA Nation asserts USFWS was required and failed to consult with MHA Nation pursuant to Section 7 of the ESA, such a claim is not before us and would lie outside the Board's jurisdiction.[155] Similarly, the Board has no authority to review the substantive merits of the BO; accordingly, our review is limited to the question of whether it was reasonable for BLM to rely on the products of its consultation with USFWS in fulfilling its obligations under NEPA.[156] In considering this question, we look to whether MHA Nation has provided a substantive basis for disputing the reasonableness of the USFWS analysis, such as by providing "information or data that was not available to" the agencies "or was not considered . . . that would furnish reason to find BLM should have rejected the BO's findings and conclusions in fulfilling its obligations under NEPA."[157] Mere "conclusory disagreements" suggesting "that BLM should have reached a different conclusion than [US]FWS did in the BO" do not suffice.[158]

MHA Nation's argument does not meet its burden. The EA included substantial analysis of the Project's potential impacts on the species and habitats identified by MHA Nation. It determined that impacts to the interior least tern and piping plover were

---

[150] AR Tab 043, Letter from Dep. Reg'l Dir. – Indian Services, BIA, to Lowell Hassler, BLM (Apr. 29, 2013).
[151] SOR at 17; *see also* Petition for Stay at 11-12.
[152] SOR at 12-13 (citing 40 C.F.R. § 1508.27(b)(9)).
[153] *See supra* notes 26-29 and accompanying text.
[154] SOR at 12-13.
[155] *See* 43 C.F.R. § 4.1(b)(2); 212 DM 13.5, 13.8D (2012).
[156] *See Cascadia Wildlands*, 184 IBLA 385, 401 (2014).
[157] *Id.* at 401-02.
[158] *Id.* at 402.

possible from the proposed construction method due to "incremental reduction of potentially suitable breeding and foraging habitat within the Project area during construction" and to indirect impacts from increased noise levels and human activity if breeding was taking place within a half mile,[159] though such impacts "would be primarily short-term."[160] To address those impacts, construction would be restricted to between August 15 and April 1 to avoid the breeding season of those species. Any construction outside of that period would trigger a requirement to coordinate with relevant agencies[161] and to engage a qualified biologist to perform surveys in suitable habitat within a half-mile of the Lake crossing no more than 5 days prior to construction activities to identify occupied breeding territories or active nests for purposes of developing appropriate protective measures.[162] The EA also acknowledged that these species may be indirectly impacted by Project operation through displacement and decreased breeding and foraging success due to increased noise and human activity, and may be directly impacted by a spill,[163] though the risks of adverse effects from a spill were low due to a combination of the low probability of a spill and the limited (five month) annual window during which these species are present in the area.[164] These factors, in combination with legally mandated containment and cleanup responses in the event of a spill, led BLM to a conclusion that impacts would be low.[165]

---

[159] EA at 2-73, 4.10-8; *see also* BO at 47-48.

[160] EA at 4.10-7, 4.10-9; *see also* BO at 48, 49 ("The Service anticipates that the permanent and temporary habitat impacts will . . . not have a measurable effect on conservation role of the [critical habitat (CH)] unit and thus, any potential effect on the nesting success of the piping plover population on Lake Sakakawea is expected to be discountable.").

[161] EA at 2-21; BLM FONSI at 9; USACE FONSI at Table 1; *see also* POD Appx. X at 7 (noting that pallid sturgeon spawning ends around June 15 and avian species nesting period ends around July 15, so restriction of construction before August 15 provides a one-month temporal buffer).

[162] EA at 2-18, 4.10-9, 4.10-10; BLM FONSI at 6; *see also* EA at 4.10-8, 4.10-9 (requiring similar coordination with USFWS on maintenance activities during breeding season).

[163] EA at 2-73, 4.10-8, 4.10-10; *see also id.* Appx. A at 5.8 (noting that piping plovers and interior least tern could experience physical and toxicological impacts from exposure to a spill); BO at 49-50.

[164] EA at 4.10-9, 4.10-10 (estimating a spill while individuals are in the area once every 495 years, taking "a conservative approach" based on data from pipelines without modern protections that would accompany the Project); *see also* BO at 50.

[165] EA at 4.10-9, 4.10-10; *see also* BO at 50 (stating that "the Service has determined that due to the low probability of a release that occurs in piping plover CH, and mandated cleanup of potential spills, impacts to piping plover CH are considered unlikely"); *id.* at 51 (stating that "the Service concludes that there will be no adverse destruction or modification to CH to the extent that the value of CH is appreciably diminished for the conservation of the piping plover").

With respect to the Dakota skipper, the EA observed that "[p]ipeline construction reduces native grasslands areas by removing vegetation and disturbing the prairie sod," which "encourages the establishment of weeds and other invasive species."[166] It noted that grasslands identified as high and moderate quality for the Dakota skipper would receive post-construction monitoring inspections for five years following the first growing season to confirm the success of revegetation, with additional mitigation measures and extended monitoring triggered if two consecutive years of successful revegetation is not documented.[167] Revegetation would use approved seed mixtures to restore a diverse mix of native grasses and forbs from local sources to the extent possible, with an objective of no net loss of native prairie habitat.[168] In addition, the Project includes measures to reduce habitat impacts, including additional and extended HDD segments, reduction of ROW width in key areas, use of previously-disturbed areas where practical, and limiting width of access roads.[169] All in all, the EA concluded that these measures would render impacts to habitat temporary in nature.[170] It also determined that while direct and indirect impacts to individuals and habitat were possible, historic occurrences of the Dakota skipper were not found within the Project area and habitat vegetation would "become established" during Project operation.[171] Though the EA observed that direct contact with oil in the event of a spill could have adverse effects, it concluded the probability of such effects was low due to the low probability of a spill, the reduced probability of a spill occurring while Dakota skipper are present, and requirements for containment and cleanup response.[172]

With respect to pallid sturgeon, the EA concluded that direct impacts were possible from construction activities due to increased sedimentation and alteration of the Lake bottom, but that such impacts would be minimized through protective measures including turbidity containment fencing, turbidity mats, turbidity monitoring instrumentation, and

---

[166] EA at 2-75, 4.10-14, 4.10-15; *see also* BO at 33.

[167] EA at 2-15; BLM FONSI at 3.

[168] EA at 2-17; BLM FONSI at 5; BO at 13; *see also* EA at 2-17; BLM FONSI at 5 (noting that, where avoidance of native prairie is not feasible, impacts to the Dakota skipper would be minimized through protective measures including restricted workspaces, salvaged topsoil, and elimination of pesticide use).

[169] EA at 4.10-18; BLM FONSI at 11; BO at 13-15, 34; *see also id.* at 13-14, 36-37 (discussing BLP commitment to acquire conservation easements on approximately 460 acres of high quality grasslands in McKenzie County, which would aid conservation of Dakota skippers).

[170] EA at 4.10-15.

[171] *Id.* at 2-75, 4.10-14, 4.10-15; *see also* BO at 31 (finding that "there is an extremely low likelihood that Dakota skippers occupy native grassland habitat within the action area"); *id.* at 32 (finding that "the species has a very low likelihood of occurrence within the action area.......Accordingly, no direct effects to individual Dakota skippers are expected.").

[172] EA at 4.10-15; *see also* BO at 35 (finding probability of adverse effects from spill "extremely unlikely" due to low probability of spill and very low probability of spill in CH).

use of a third-party inspector.[173] It also concluded that routine pipeline operations "would not likely impact the pallid sturgeon" and adverse effects from a spill or leak are "unlikely due to the low probability of a spill or leak of a sufficient amount to cause toxic effects in Lake Sakakawea" in the presence of pallid sturgeon, in addition to legally required containment and cleanup measures.[174]

MHA Nation offers no analysis of or evidentiary rebuttal to the substance of these conclusions, merely stating its unsupported disagreement with agency experts. As with its other arguments, MHA Nation offers no objective evidence that would provide any basis on which to find shortcomings sufficient to demonstrate an error of law or fact, or a failure to consider a substantial environmental question of material significance to the Project. While MHA Nation disagrees with BLM's decision, such disagreement is not sufficient to demonstrate that BLM violated the procedural requirements of NEPA in its consideration of impacts to threatened or endangered species.

### 4.    BLM complied with the Departmental Manual.

MHA Nation also asserts that the "Departmental Manual requires an EIS for . . . significant actions like a pipeline right-of-way upstream from unique and sensitive resources . . . with impacts that are expected to be significant,"[175] and that "under 'normal' circumstances, the [Departmental] Manual includes right-of-ways for major pipelines as requiring an EIS."[176] With respect to the former point, the Departmental Manual does not speak specifically to pipeline ROWs upstream from unique and sensitive resources, but it does generally require preparation of an EIS "[i]f the impacts of a proposed action are

---

[173] EA at 4.10-16, 2-76; *see also id.* Appx. B at 7-8 (limiting pipeline remediation activities to outside pallid sturgeon season).

[174] EA at 2-76; *see also id.* at 4.9-7 (discussing temporary impacts to waterbody habitat at Lake crossing that would be minimized by environmental protection measures); *id.* at 4.10-17 (noting that light Bakken crude oil would not sink to bottom sediments where it could potentially come into contact with pallid sturgeon; conservatively estimating a spill while pallid sturgeon are in the area every 206 years); *id.* Appx. A at 5.16 ("it is unlikely that an oil spill into Lake Sakakawea would result in acute benzene toxicity to even the most sensitive fish species, given that benzene concentrations in affected areas would not be expected to reach a sufficient threshold of concentration"); *id.* Appx. G at G-2 (noting that USFWS considers the Lake only marginal habitat for the pallid sturgeon and agreed that the Project "may affect, but is not likely to adversely affect" pallid sturgeon).

[175] SOR at 17; *see also* Petition for Stay at 8.

[176] SOR at 17 (citing 516 DM 11.8(B)(5)(b)); *see also* BLM NEPA Handbook H-1790-1, at 7.2 (Jan. 2008), https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_Handbook_ h1790-1.pdf (last visited Jan. 28, 2021) (same); Petition for Stay at 8.

expected to be significant."[177] This is little more than a restatement of the requirements of NEPA and its implementing regulations, however. BLM concluded in the FONSI, based on the analysis in the EA, that the Project was not such an action, and MHA Nation has not met its burden to demonstrate error in that finding.

With respect to the latter, MHA Nation's argument is unavailing for two reasons. First, while the Departmental Manual does identify "[a]pproval of applications to the BLM for . . . Rights-of-way for major . . . pipelines" among "actions [that] normally require preparation of an EIS,"[178] it does not define the term "major pipelines." Though not decisive of the appropriate interpretation of this language from the Departmental Manual, BLM's Manual regarding MLA ROWs indicates that when BLM uses the term "major pipelines" in this context, it is referring to pipelines 20 inches in diameter or larger,[179] whereas the proposed pipeline would be only 16 inches in diameter. Accordingly, the Project does not fall within the Bureau's interpretation of the scope of identified actions for which an EIS would "normally" be required. Second, even if it did, "[n]ormally does not mean always," and BLM "retains discretion to prepare only an [EA] even when it normally would do otherwise as long as it takes the required close look at its actions."[180] The cited Departmental Manual expressly contemplates the preparation of an EA for any of the actions identified as normally requiring an EIS where potentially significant impacts are not anticipated.[181] We find that MHA Nation has not demonstrated that the Departmental Manual required preparation of an EIS here.

*B. MHA Nation has not shown error in BLM's consideration of alternatives.*

*1. MHA Nation's Arguments*

MHA Nation next argues that BLM failed to conduct the "[r]igorous exploration and objective evaluation of 'all reasonable alternatives'" that "is the 'heart' of environmental

---

[177] 516 DM 11.8(A)(1).

[178] *Id.* at 11.8(B)(5)(b).

[179] BLM Manual MS-2884, Applying for a MLA Grant or TUP, § 2884.10(D)(1)(c), https://www.blm.gov/sites/blm.gov/files/uploads/mediacenter_blmpolicymanual2884.pdf (last visited Jan. 28, 2021); *see also id.* § 2884.20(A) (indicating that public notification would be triggered if the pipeline were 24 inches in diameter or larger); EA Appx. G at G-1.

[180] *Ky. Coal Ass'n v. TVA*, 804 F.3d 799, 805 (6th Cir. 2015); *see also Great Basin Resource Watch*, 185 IBLA at 23 (citing *Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1555 (10th Cir. 1993)) ("[A]ctions which an agency determines will normally require an EIS, do not always require an EIS.").

[181] 516 DM 11.8(B) and (C).

review of major actions."[182] It asserts that "[n]umerous safer and more responsible methods exist for crossing the Missouri River and Lake Sakakawea with a crude oil pipeline" which "should have been more fully considered in an EIS."[183] This included "at least 5 reasonable alternative routes presented for the Project"[184] that "were given less than 7 pages of review in the entire EA."[185] MHA Nation argues that "these alternatives were not and could not be given adequate analysis"[186] as the EA does not provide "enough space to consider the wetlands, water bodies, endangered species, grasslands, residential areas, roads, farmlands, cultural sites and more that would be affected by each route."[187] It presents these points in support of its views that BLM should have prepared an EIS and that the EA was fundamentally flawed, including through inadequate consideration of the intensity factors of uncertain, unknown, or unique risks and potential for setting precedent.

MHA Nation focuses principally on the assertion that BLM did not adequately consider the possibility of using HDD at alternative locations for the Lake crossing – in particular, the "Williston Alternative" – to protect against the threats discussed previously.[188] MHA Nation argues that BLM rejected HDD based on the length of the proposed crossing, but asserts that even though it would require the longest HDD ever attempted in the U.S., it is nevertheless within world record capabilities and therefore not prohibitive, and in any event shorter crossings are available at alternate routes.[189] According to MHA Nation, the EA relied on "HDD overviews" of alternative crossings that "consist of a few sentences each" and fail to reflect sufficient geotechnical investigation, leading BLM to determine that the HDD alternatives would not be feasible despite being "within the current [world] record capabilities."[190] MHA Nation concedes that geology was also a factor in the decision not to pursue HDD, but notes that other pipelines have been

---

[182] SOR at 19 (citing 40 C.F.R. § 1502.14); *see also id.* at 11 ("[T]he EA did not provide full consideration of the environmental effects and risks, or lack there of [sic], associated with alternatives.").

[183] *Id.* at 8; *see also id.* at 2, 4 (stating that "BLM's EA mentions alternatives to trenching a pipeline across Lake Sakakawea, but these alternatives are limited to a brief review," whereas "[a]n EIS would have provided for a full assessment of alternatives").

[184] *Id.* at 19; Petition for Stay at 12-13.

[185] SOR at 21 (citing EA at 2-55 to 2-61); Petition for Stay at 13.

[186] SOR at 19.

[187] Petition for Stay at 13.

[188] *See* SOR at 8; *see also id.* at 11-12; Reply at 4 (stating that "alternative crossings utilizing HDD were improperly eliminated from the EA").

[189] SOR at 22-23; Petition for Stay at 14-15; MHA Nation's Reply to BLP's Motion to Set Aside Stay Order and Brief in Support at 8 (filed May 30, 2017) (citing EA Appx. C at 3.1-3.7).

[190] Reply at 9, 10; *see also generally id.* at 7-11; SOR at 21-22 ("BLM only performed a 'desktop' review of the four alternate crossings of Lake Sakakawea utilizing HDD technology."); Petition for Stay at 13.

proposed or constructed using HDD to cross the Missouri River and asserts that the HDD consultant's report found drilling to be feasible at alternative locations.[191] MHA Nation asserts that USACE "pushed BLM to consider HDD," citing correspondence from 2013 conveying USACE's preference for that method and desire to reduce impacts to the Congressionally authorized purposes of the Garrison Dam project, but the agencies relented "only after pressure from" BLP.[192]

### 2. Applicable Standards and Burdens

An EA must include a brief discussion of appropriate alternatives, which are informed by BLM's stated purpose and need for the proposed action.[193] BLM need only consider alternatives that will accomplish the project's intended purpose, are technically and economically feasible, and will avoid or minimize adverse environmental impacts.[194] BLM enjoys considerable discretion in defining the purpose and need,[195] and where BLM is preparing the EA in response to an application it should base the scope of review and range of alternatives considered on the needs and purposes defined by the applicant and the agency's statutory authority to act thereon.[196] BLM may reject alternatives that do not meet these ends, providing a brief discussion of the reasons for their elimination.[197] An appellant challenging BLM's rejection of alternatives bears the burden to demonstrate, with objective proof, that the rejected alternative would not only achieve the intended purpose of the

---

[191] SOR at 23-24; Petition for Stay at 15-16.

[192] SOR at 19-20; *see also* AR Tab 031, Letter from Ryan L. Newman, USACE, to Steven J. Greisser, President, BLP at unp. 1 (dated Apr. 22, 2013) (2013 Newman Letter); *id.*, Letter from Larry D. Janis, USACE, to Lowell Hassler, BLM at 1 (dated Dec. 3, 2013) (2013 Janis Letter).

[193] 40 C.F.R. § 1508.9(b); *WLD*, 192 IBLA at 399; *SUWA*, 185 IBLA at 166.

[194] *Roseburg Resources Co.*, 186 IBLA 325, 336 (2015) (internal quotes and cites omitted); 43 C.F.R. § 46.420(b) ("Reasonable alternatives . . . includes alternatives that are technically and economically practical or feasible and meet the purpose and need of the proposed action."); *see also Kevin Kane*, 195 IBLA at 23; *WWP*, 191 IBLA at 358-59; *Klamath-Siskiyou Wildlands Center*, 190 IBLA at 306; *WWP*, 188 IBLA at 241; *SNIC*, 174 IBLA at 116 (affirming BLM decision not to formally consider an alternative that involved a longer ROW route with greater environmental impacts than the proposed action).

[195] *WLD*, 193 IBLA at 69; *Roseburg Resources Co.*, 186 IBLA at 334, 335; *Powder River Basin Res. Council*, 183 IBLA 242, 248 (2013).

[196] *Oregon Chapter Sierra Club*, 176 IBLA at 349; *see also* 43 C.F.R. § 46.420(a)(2); *BAD*, 179 IBLA at 165 (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 994 (1991) ("The purpose and need are defined by the ROW applicant, not BLM."; "An agency cannot redefine the goals of the [applicant's] proposal that arouses the call for action; it must evaluate alternative ways of achieving its goals, shaped by the application at issue.")).

[197] 40 C.F.R. § 1502.14(a); *WildEarth Guardians*, 182 IBLA 100, 107 (2012).

proposed action at less cost to the environment, but also be technically and economically feasible under the particular circumstances presented.[198] The fact that an appellant may prefer that BLM take a different course of action or select a different alternative does not demonstrate a violation of NEPA,[199] nor does mere disagreement or difference of opinion.[200]

### 3. BLM's Analysis of Alternatives

The EA stated that the purpose of the proposed action was "to consider providing [BLP] with a ROW across federal lands to meet their interests and objectives for the Project," and identified the need as "the requirement to consider granting approval for the construction, operation, maintenance, and termination of a pipeline system for the purpose of transporting crude oil on public lands . . . under the authority of the MLA."[201]

BLM first considered, but eliminated from detailed analysis, four alternative approaches to transporting area oil other than construction of the new pipeline.[202] BLM then went on to consider five alternative routes for the proposed pipeline. The EA evaluated each of the routes based on factors including service areas, economics, engineering design, feasibility to construct, and environmental impacts, and compared the routes based on factors including length, total acres impacted, USFS and USACE land crossed, number and acres of waterbodies impacted, number and acres of wetlands impacted, acres of perennial grasslands and woodland, number of cultural resource sites, acres of Dakota skipper critical habitat, total costs, and HDD feasibility.[203] The route reflected in the Proposed Action was found to have minimal effects on natural resources, physical resources, and residents, being shorter than the alternatives, impacting fewer acres (both total acres and acres of wetlands, waterbodies, grasslands, and woodlands individually), crossing fewer waterbodies and wetlands, implicating fewer cultural sites, and impacting no Dakota skipper critical habitat.[204] The EA concluded that each of the other alternatives would have greater environmental impacts and higher construction costs than the Proposed Action.[205] Accordingly, only the Proposed Action and No Action Alternatives were carried forward for more detailed analysis.

---

[198] *Powder River Basin Res. Council*, 180 IBLA 32, 48 (2010).

[199] *See Kevin Kane*, 195 IBLA at 20; *WLD*, 192 IBLA at 399-400; *WWP*, 191 IBLA at 359; *Klamath-Siskiyou Wildlands Center*, 190 IBLA at 306; *SUWA*, 152 IBLA 216, 224 (2000).

[200] *Oregon Chapter Sierra Club*, 176 IBLA at 352.

[201] EA at 1-4.

[202] *Id*. at 2-54, 2-55; *see also* USACE FONSI at unp. 2.

[203] EA at 2-55 to 2-58.

[204] *Id*. at 2-55, Table 2-9.

[205] *Id*. at 2-58 to 2-60.

With respect to HDD, the proposed Project route would use the technique at 36 different locations, primarily to avoid impacts to wetlands, waterbodies, and roads, but also to protect landslide-prone areas near the Lake shores.[206] The Proposed Action in fact incorporated greater use of HDD, by both number and length, than any of the alternative routes considered.[207] As the agencies' desire for further investigation of the feasibility of HDD for the Lake crossing was the driving force behind separating the Project from the southern portion of the pipeline system in 2012, the EA focused significant attention in that area. It incorporated as Appendix C a geologic and HDD review by Stantec of the proposed Lake crossing and four identified alternative crossings, which analyzed the findings from an HDD geotechnical boring evaluation report produced by Braun Intertec Corp. and an HDD feasibility report produced by Laney Directional Drilling Co.[208] The review concluded that HDD would not be feasible at the proposed crossing location due to the presence of "caving sands, extensive gravel and cobbles, and lignite" that would not be competent to maintain the integrity of the borehole, combined with the unprecedented length of the boring required.[209] During HDD, drilling fluid is pumped into the borehole under substantial pressure – increasing with the length of the drill – and will flow to the path of least resistance, such that if the substrate material in the drilling annulus is highly porous or incompetent, it could lead to the surface (here, the Lake bed) and unplanned releases of drilling fluid (frac out).[210] Accordingly, MHA Nation's overemphasis of the fact that an HDD crossing would come in under the current world record length speaks to only half the story. And contrary to MHA Nation's characterization, the review concluded that three of the alternative routes "would not be suitable for the HDD construction method" and the fourth "has some geologic constraints that would make it extremely difficult to use the HDD construction method," leading to the recommendation that "[c]onsideration should be given to crossing Lake Sakakawea using construction methods other than HDD" as permitted by the governing USACE management plan "when it has been determined, based on geologic and engineering constraints, that the HDD construction method would not be feasible."[211]

---

[206] *Id.* at 2-32, 2-13, 2-62, 4.2-1; BLM FONSI at 1.

[207] EA at Table 2-9.

[208] *Id.* Appx. C at 1.1; *see also* POD Appx. X at 1 (discussing analyses by Laney and Braun).

[209] EA Appx. C at 2.1 (stating that "the conceptual Lake Sakakawea HDD crossing would be the longest HDD crossing ever attempted by HDD contractors in the U.S." which "presents a huge challenge in addition to the unfavorable geotechnical conditions"); POD Appx. X at 1 (discussing Laney analysis of Braun findings, which "in all cases finds that a HDD crossing solution is not technically feasible" because of "subsurface conditions that do not support a drilling operation combined with the challenges associated with the length of the crossing").

[210] EA at 2-32; *see also* POD Appx. XXI, Inadvertent Returns Contingency Plan, at 1-2.

[211] EA Appx. C at 4.1; *see also* POD at 9 ("As a result of the meetings with the federal agencies and evaluation of the engineering, construction and commercial drivers for the

Based on the findings of this review and the underlying reports, the EA concluded that HDD would not be feasible for three of the four alternative routes considered, as they presented the same geotechnical problems as the proposed crossing.[212] While noting a recent HDD project in the area, the EA also concluded that, "[b]ased on review of the geologic strata at the crossing of the Missouri River" contemplated by the fourth (Williston Alternative), "using the HDD construction methodology may be extremely difficult."[213] But even were HDD "feasible" for the Williston Alternative, as MHA Nation asserts, the EA further evaluated that route against a number of additional factors and found that, compared to the Proposed Action, it would nearly triple the overall length of the pipeline segment, impacted acreage, wetland and waterbody acreage, landslide prone areas, and grassland and woodland acreage; nearly double the number of waterbodies crossed and cultural sites impacted; quadruple the number of wetlands crossed; and cost over $70 million more.[214] BLM therefore rejected that alternative on the grounds that it would have greater environmental impacts, substantially higher costs, and not meet the purpose and need.[215] MHA Nation's sole focus on the feasibility of HDD for the Lake crossing under the Williston Alternative ignores these actual bases for BLM's rejection of that overall route, and thus fails to meet its burden to demonstrate, with objective proof, that the route would both achieve the purpose at less cost to the environment and be technically and economically feasible.

MHA Nation's citation to two 2013 letters from USACE likewise does not meet its burden to show that BLM erred in its consideration of alternatives. While that correspondence communicated USACE's well-understood preference for HDD at Lake crossings and desire to avoid interference with the Garrison Dam Project purposes,[216] it is undisputed that USACE subsequently concurred with the conclusion that HDD would not be feasible at the Project's proposed crossing[217] and ultimately reached its own FONSI regarding the Proposed Action. In doing so, it found that HDD, while "the preferred pipeline placement method," would have "a high risk of failure at the preferred *and alternative*

---

project, the current crossing location north of Keene was preferred over other crossing locations.").

[212] EA at 2-58 to 2-59; *id*. Appx. C at 3.1-3.8; *see also id*. Appx. G at G-1.

[213] *Id*. at 2-60; *id*. Appx. C. at 3.4-3.5 (noting presence of gravels, sand, cobbles, boulders, and lignite, but stating that it "poses no extraordinary engineering challenges beyond the normal risk profile for HDDs").

[214] *Id*. at Table 2-9.

[215] *Id*. at 2-60. Similar considerations also informed BLM's rejection of the route alternatives for which HDD was deemed infeasible.

[216] *See* 2013 Newman Letter at unp. 1; 2013 Janis Letter at 1.

[217] May 2014 Janis Letter at 1 ("Corps personnel concluded that sufficient geotechnical information was available to adequately characterize the site and agreed that it is not feasible to install an HDD pipeline within the designated pipeline corridor."); EA Appx. C at 1.1; POD Appx. X at 4.

pipeline crossing locations at Lake Sakakawea" and the Proposed Action "would not impact or interfere with the Garrison Project's authorized project purposes."[218] Indeed, the proposed crossing location for the Project was selected, in part, because it would be adjacent to a number of existing pipelines in an established utility corridor described in the USACE's plans for the Lake.[219] Similarly unavailing is MHA Nation's citation to the requirement in the Garrison Project – Lake Sakakawea Oil and Gas Management Plan (LSOGMP) that proposals for HDD across the Lake include reports of additional geotechnical investigation, as that requirement applies to applications presented to USACE for approval to implement, not alternatives considered but rejected in a BLM NEPA analysis.[220]

MHA Nation has provided no objective proof that the rejected alternatives would not only achieve the intended purpose of the proposed action at less cost to the environment, but also be technically and economically feasible. Its mere disagreement with the Proposed Action and preference for a different alternative are insufficient to establish error in BLM's analysis of alternatives.

III.    *BLM Complied With Its Government-to-Government Consultation Obligations.*

MHA Nation next asserts that "BLM did not adequately consult with the MHA Nation on likely impacts to its lands, waters and resources" in accordance with the requirements of the Department's Policy on Consultation with Indian Tribes,[221] emphasizing that "the

---

[218] USACE FONSI at unp. 1, 5 (emphasis added).

[219] EA at 1-1, 3.11-1, Appx. F at F-1 (noting that the Project "is located in a corridor where existing pipelines cross Lake Sakakawea and that is acknowledged by" the USFS and USACE); LSOGMP at 9 (noting pipeline "would cross Lake Sakakawea at the Garrison Project's established eastern pipeline corridor"); *id.* at 10 (map identifying multiple pipelines crossing Lake in proximity to proposed crossing); *see also* POD Appx. X at 6 (discussing three meetings with federal agencies to discuss alternative crossing locations, and representing that "the USACE identified the current crossing location as their preferred route due to the presence of existing pipelines at that location"); POD at 9 ("There are currently pipelines installed in this area across the Missouri River thus creating a quasi-corridor for pipelines."); Ransome Report at 24 (noting presence of existing pipeline ranging from 100 to 250 feet to the east of proposed route).

[220] *See* LSOGMP at 46 (stating that "Applicants [for pipeline projects that propose to cross Lake Sakakawea] are required to complete geotechnical investigations and provide this data to the Garrison Project" to "allow the Corps to evaluate the risk of completing the HDD projects . . . in order to approve an HDD project"); *id.* Appx. F at 2-3 (listing requirements for "Pipeline Installation Using HDD Techniques," including geotechnical investigation "along the proposed borehole alignment" to "determine the foundation conditions that would be encountered along the designed drill path").

[221] SOR at 25; Petition for Stay at 17.

Missouri River and Lake Sakakawea are significant historical and cultural resources that are at the center of the MHA Nation's religious and cultural identity."[222] In particular, it asserts that BLM and USACE "never consulted with the MHA Nation" regarding the "change in thinking" reflected in their acceptance of "the cut and drag method" rather than HDD for the Lake crossing,[223] because BLP had already concluded that HDD was not feasible in 2012, prior to the commencement of consultation.[224] MHA Nation states that if it "had been consulted at the initial planning stage, it could have aided the Pipeline project by pulling from resources acquired in the other projects on the Reservation or conducting its own analysis of HDD feasibility in order to provide a legally sufficient and objective review."[225]

Although MHA Nation presents its consultation arguments within the larger framework of its assertion of NEPA violations,[226] the relevant processes and obligations are distinct, and we will review these arguments accordingly. While MHA Nation argues that BLM did not properly conduct consultation, the record reflects that BLM engaged in a robust consultation process.

BLM commenced government-to-government consultation with 17 tribes who have tribal treaty rights in or traditional connections to western North Dakota, including MHA Nation, by letters dated April 18, 2013.[227] On May 29, 2014, the agencies held a face-to-face tribal consultation meeting, that included representatives of MHA Nation, to formally present the Project and preliminary results of biological and cultural resource studies, spill risks and plans, and to provide the opportunity for tribal questions and feedback.[228] The

---

[222] SOR at 12; *see id.* at 15 (water of Lake Sakakawea "holds unique religious and cultural significance to the MHA Nation"); MHA Nation's Reply to BLP's Motion to Set Aside Stay Order and Brief in Support at 3 ("The MHA Nation has deep cultural and religious ties to the waters and resources of Lake Sakakawea.").

[223] SOR at 20.

[224] Reply at 15 ("the MHA Nation was brought in after the decisions most crucial to the Pipeline and the MHA Nation were already made").

[225] *Id.* at 16.

[226] *See* SOR at 4 (asserting that the EA "was not developed in consultation with the MHA Nation" whereas "[a]n EIS would have provided for . . . meaningful consultation with the MHA Nation").

[227] EA at 1-1, 3.22-3; Consultation Exec. Summ. at 1; AR Tab 032, Government-to-Government Consultation Invitation Certified Mailing List (Apr. 18, 2013); *id.*, Letter from Richard A. Rymerson, BLM, to Tex Hall, Chairman, and Elgin Crows Breast, Tribal Historic Preservation Officer (THPO), MHA Nation (Apr. 18, 2013) (return receipts showing April 22 delivery).

[228] EA at 3.22-3; Consultation Exec. Summ. at 1; AR Tab 032, Transcript of May 29, 2014, Tribal Consultation Meeting; *id.*, Attendee Sign-In Sheet (showing attendance by Frankie Lee, MHA Nation); *id.*, Tribal Consultation Meeting Agenda (May 29, 2014); *see also, e.g., id.*,

tribes expressed concerns on issues including spills, emergency response, impacts to water and species resources, and cultural resources.[229] The same day, Chairman Tex Hall of MHA Nation sent a letter to USACE expressing concern with impacts from construction and operation of the pipeline at the Lake crossing, including sediment disruption and groundwater contamination, and advocating use of HDD.[230] Over the ensuing three months, BLM made repeated unsuccessful attempts to arrange a face-to-face meeting with Chairman Hall to discuss his concerns,[231] finally sending a letter on September 23 and a follow-up email on September 29.[232] In the interim, BLM engaged with MHA Nation, among

---

Letter from Richard A. Rymerson, BLM, to Tex Hall, Chairman, and Elgin Crows Breast, THPO, MHA Nation (Apr. 28, 2014) (inviting representatives to meeting, to present information regarding Project, biological and cultural resource surveys, and to consult regarding historic properties of traditional or cultural significance); *id.*, e-mail from Shannon Gilbert, BLM, to Tex Hall, Elgin Crows Breast, Pete Coffey, Victoria Mandan, MHA Nation (Apr. 29, 2014) (transmitting invitation and agenda); *id.*, Project Biological Surveys Presentation, Miranda Meehan, Carlson McCain (May 29, 2014); *id.*, Spill Risk Assessment and Spill Response Presentation, Stantec (May 29, 2014); *id.*, Biological Assessment/Biological Evaluation Presentation, Stantec (May 29, 2014); *id.*, Class III Cultural Resources Inventory Presentation (May 29, 2014); *id.*, Pipeline Leak Detection System Presentation (May 29, 2014); *id.*, Lake Sakakawea Crossing Presentation (May 29, 2014).

[229] *See* EA at 3.22-4, 4.22-1; AR Tab 032, Summary of Tribal Concerns and Action Items from May 29, 2014 Meeting.

[230] AR Tab 032, Letter from Tex Hall, Chairman, MHA Nation, to Col. Joel R. Cross, USACE (May 29, 2014); *see* EA at 3.22-4. The USACE responded by letter dated June 23, 2014, redirecting Chairman Hall to BLM as the lead agency. AR Tab 031, Letter from Col. Joel R. Cross, USACE, to Tex Hall, Chairman, MHA Nation (June 23, 2014).

[231] EA at 3.22-4; Consultation Exec. Summ. at 1, Table 1; *see* AR Tab 032, Consultation Phone Log (showing July 17 and August 1 calls, and August 27 and September 4 voicemails, from S. Gilbert, BLM, to E. Bluestone, MHA Nation, pursuing scheduling of meeting); *id.*, e-mail from Shannon Gilbert, BLM, to Elizabeth Bluestone, MHA Nation (July 17, 2014) (requesting meeting with Chairman Hall to discuss his letter and concerns, offering three dates in early August or requesting alternatives); *id.*, e-mail from Shannon Gilbert, BLM, to Elizabeth Bluestone, MHA Nation (July 25, 2014) (following up to arrange meeting); *id.*, e-mail from Shannon Gilbert, BLM, to Elizabeth Bluestone, MHA Nation (Aug. 27, 2014) (following up with two proposed weeks in September for a meeting); *id.*, e-mail from Shannon Gilbert, BLM, to Elizabeth Bluestone, MHA Nation (Sept. 11, 2014) (following up with proposal for meeting the last week of September).

[232] Consultation Exec. Summ. at 1, Table 1; AR Tab 032, Letter from Richard A. Rymerson, BLM, to Tex Hall, Chairman, MHA Nation (Sept. 23, 2014) (noting "BLM has attempted several times via phone and email communications to set up a meeting with you to go over your concerns about the project but our attempts have been unsuccessful to date. BLM

other tribes, on cultural resource survey efforts described in further detail above in Section II.A.2.

A second face-to-face consultation meeting took place on August 5, 2014, again including representatives of MHA Nation, to provide updates regarding the Project, specialist responses to the concerns raised to that point, results of the tribal surveys including identified areas of tribal concern and plans for avoidance, and results of Lake bottom surveying efforts.[233] On January 15, 2015, BLM sent a letter to the newly-elected Chairman of MHA Nation, Mark Fox, enclosing the draft EA and POD for review and comment and proposing an in-person meeting.[234] Chairman Fox responded by letter dated January 29, 2015, raising concerns regarding the Lake crossing, including impacts to the Lake, species, ecology, and sacred Missouri River, sedimentation, pipeline integrity, oil

---

respectfully requests a face to face meeting with you to discuss your concerns in detail . . . so that we can insure that your concerns will be adequately addressed in the draft EA"); *id.*, e-mail from Shannon Gilbert, BLM, to Tex Hall and Elizabeth Bluestone, MHA Nation (Sept. 29, 2014) (following up and attaching letter).

[233] EA at 3.22-3; Consultation Exec. Summ. at 1; AR Tab 032, e-mail from Shannon Gilbert, BLM, to Pete Coffey and Elgin Crows Breast, MHA Nation (among other tribal representatives) (July 3, 2014) (announcing August 5 meeting to follow up on issues raised at May 29 meeting and results of tribal survey); *id.*, Letter from Richard A. Rymerson, BLM, to Tex Hall and Elgin Crows Breast, MHA Nation (July 9, 2014) (formal invitation to August 5 consultation meeting); *id.*, e-mail from Shannon Gilbert, BLM, to Pete Coffey, Frankie Lee, Victoria Mandan, and Elgin Crows Breast, MHA Nation (July 11, 2014) (transmitting same, with draft agenda); *id.*, Tribal Consultation Meeting Agenda (Aug. 5, 2014); *id.*, e-mail from Shannon Gilbert, BLM, to Pete Coffey, Frankie Lee, and Elgin Crows Breast, MHA Nation (among other tribal representatives) (Aug. 1, 2014) (circulating agenda and documents, including analysis of historical records for cultural sites, report on tribal field survey and lake bottom survey, specialist responses to concerns regarding spills and response, comments and responses to tribal concerns raised at May meeting); *id.*, Attendee Sign-In Sheet (showing attendance by Frankie Lee and Pete Coffey, MHA Nation); *id.*, Transcript of August 5 meeting; *see also* AR Tab 031, E-mail from Shannon Gilbert, BLM, to Nancy Brown, Advisory Council on Historic Preservation (Aug. 26, 2014) (reporting on meeting, noting "[t]he tribes were satisfied that the proponent had adjusted the route to avoid sites identified by the tribes and by the Class III contractor"; "[t]he current sonar data and video of the lake crossing seemed to help alleviate their concerns"; "The tribes asked a lot of good questions and the proponent and their contractors were able to answer all of them.").
[234] Consultation Exec. Summ. at 1, Table 1; AR Tab 032, Letter from Loren Wickstrom, BLM, to Mark Fox and Elgin Crows Breast, MHA Nation (Jan. 15, 2015) (enclosing copy of draft EA and POD and inviting comment); *id.*, e-mail from Shannon Gilbert, BLM, to Frankie Lee, Pete Coffey, and Elgin Crows Breast, MHA Nation (among other tribal representatives) (Jan. 15, 2015) (notifying of release of draft EA and formal letter); EA at 3.22-4.

spills, and cumulative impacts, reiterating much of Chairman Hall's May 2014 letter.[235] Shannon Gilbert of BLM held a telephone call with Pete Coffey of MHA Nation on February 19 to discuss Chairman Fox's letter and how to address MHA Nation's concerns regarding spill risks.[236]

On February 25, 2015, BLM and USACE met with Chairman Fox and other MHA Nation representatives to discuss the Project, the concerns in his January letter, alternative approaches, and potential mitigations, and the parties agreed to schedule a face-to-face meeting for further discussions.[237] BLM followed up with a letter dated March 11, 2015, in which it provided detailed responses to Chairman Fox's concerns and reiterated the desire to schedule a follow-up meeting.[238] This was one of a number of attempts by BLM to schedule a meeting with the Chairman over that Spring.[239] The Chairman and his staff ultimately accepted a meeting scheduled to coincide with the June 22, 2015, Fort Berthold Partners Meeting, where they again expressed concerns regarding the potential for spills at the Lake crossing and impacts to drinking water, and a preference for HDD.[240] The following week, on June 29, BLM, USACE, BLP, and USFS met with representatives of MHA Nation to further discuss the Project and the Nation's questions and concerns.[241] BLM

---

[235] AR Tab 032, Letter from Mark Fox, Chairman, MHA Nation, to Lowell Hassler, BLM (Jan. 29, 2015); Consultation Exec. Summ. at 1; EA at 3.22-4.

[236] AR Tab 032, Consultation Phone Log.

[237] AR Tab 032, Handwritten Minutes of February 25, 2015, Government to Government Consultation Meeting; Consultation Exec. Summ. at 1; EA at 3.22-5, Appx. F at F-5; *see also* AR Tab 032, e-mail from Diane Friez, BLM, to Kari Mossett, MHA Nation (Feb. 25, 2015) (proposing dates in March for follow-up meeting).

[238] AR Tab 032, Letter from Loren Wickstrom, BLM, to Mark Fox, Chairman, MHA Nation (Mar. 11, 2015); Consultation Exec. Summ. at 1; EA at 3.22-5; BLM FONSI at 15.

[239] Consultation Exec. Summ. at Table 1; EA Appx. F at F-5; AR Tab 032, email from Diane Friez, BLM, to Kari Mossett, MHA Nation (Mar. 11, 2015) (pursuing scheduling of meeting with Chairman Fox, noting "it is a priority for us to meet with the Chairman and discuss his concerns as soon as possible"); *id.*, email from Diane Friez, BLM, to Kari Mossett, MHA Nation (Mar. 26, 2015) (follow-up request for meeting); *id.*, email exchange between Diane Friez, BLM, and Kari Mossett, MHA Nation (Mar. 31 – Apr. 1, 2015) (attempting to schedule meeting); *id.*, email from Diane Friez, BLM, to Kari Mossett, MHA Nation (Apr. 14, 2015) (pursuing scheduling of meeting); *id.*, email exchange between Diane Friez, BLM, and Kari Mossett, MHA Nation (May 18 – 19, 2015) (attempting to schedule meeting); *id.*, email exchange between Diane Friez, BLM, and Kari Mossett, MHA Nation (May 22 – June 15, 2015) (attempting to schedule meeting).

[240] AR Tab 032, Handwritten Notes from Meeting (June 22, 2015); Consultation Exec. Summ. at 2; EA at 3.22-5, Appx. F at F-5.

[241] Consultation Exec. Summ. at 2; AR Tab 032, email exchange between Lowell Hassler, BLM, and Frankie Lee, MHA Nation (June 24, 2015) (confirming and circulating agenda and

representatives met the following day with the MHA Nation Natural Resources Committee to discuss the Project further.[242] Following those meetings, BLM facilitated a conference call between MHA Nation and PHMSA regarding its role in the Project.[243]

BLM met again with Chairman Fox and MHA Nation's Executive Council in government-to-government consultation on July 9, 2015, where the Chairman and Council conveyed their opposition to and concerns with the Project, invoking effects of a potential spill, the sacredness of the Missouri River, lack of community involvement, and BLM's trust responsibilities.[244] BLM discussed the Project with representatives of MHA Nation, including the Chairman, again at a January 2016 meeting, further addressing their concerns regarding spills and preference for HDD and responding to questions.[245] On May 26, 2016, BLM notified MHA Nation regarding its completion of the EA, execution of the FONSI, and decision to issue the ROW.[246]

MHA Nation does not meaningfully identify shortcomings in the above-described consultation process or explain how a consultation accompanying an EIS would have resolved those shortcomings. MHA Nation submits for consideration an inter-Departmental letter soliciting tribal input regarding how to improve federal decisionmaking on infrastructure projects through improved consultation efforts.[247] However that document is general, prospectively focused, and does not demonstrate that BLM failed in its consultation obligations in this instance.

---

resources for June 29 meeting); *id.*, BakkenLink Project Meeting Notes (Jun. 29, 2015); *id.*, Meeting Sign-In Sheet; *see also, id.*, emails from Darren Snow, BLP, to Travis Hallam and Frankie Lee, MHA Nation (July 2, 6, 2015) (providing follow-up responses to questions regarding worst case spill risk from meeting and inviting further discussions).
[242] AR Tab 032, email from Loren Wickstrom, BLM, to Shannon Gilbert, BLM (July 1, 2015).
[243] AR Tab 032, email from Loren Wickstrom, BLM, to Harold Winnie, Hans Shieh, and Allan Beshore, Dept. of Transp. (July 1, 2015); *id.*, Invitation: Conference Call with PHMSA and Three Affiliated Tribes (July 1, 2015) (scheduling call for July 7); *id.*, email from Allan Beshore, Dept. of Transp., to Frankie Lee and Travis Hallam, MHA Nation (July 7, 2015) (summarizing discussion regarding role of PHMSA).
[244] EA at 3.22-5, Appx. F at F-5; Consultation Exec. Summ. at 2; AR Tab 032, email exchange between Jamie Connell, BLM, and Mark Fox, Chairman, MHA Nation (July 7, 2015) (arranging briefing of Tribal Council); *id.*, Tribal Business Council Meeting Notes (July 9, 2015).
[245] AR Tab 032, email from Loren Wickstrom, BLM, to Lowell Hassler, Diane Friez, and Shannon Gilbert, BLM (Jan. 25, 2016).
[246] AR Tab 032, Letter from Loren Wickstrom, BLM, to Mark Fox, Chairman, MHA Nation (May 26, 2016).
[247] *See* MHA Nation Notice of Supplemental Authority, at unp. 2 and Ex. A (filed Sept. 30, 2016).

MHA Nation's principal, specific complaint regarding consultation is that the decision to use the trench-and-pull method over HDD for the Lake crossing had already been made prior to commencement of consultation. The USACE, however, continued to press investigation of the viability of HDD through at least the end of 2013,[248] did not concur that HDD was infeasible at the proposed crossing location until May 2014, and even then continued to press for further analysis of alternative crossing locations where HDD might be feasible.[249] BLP did not submit its POD and appendices to BLM until March 2014, and it amended those materials in October of both 2014 and 2015.[250] USACE did not sign its FONSI until April 2016, only then concluding that HDD, while "the preferred pipeline placement method," would have "a high risk of failure at the preferred and alternative pipeline crossing locations at Lake Sakakawea" and the Proposed Action should be allowed to proceed.[251] The final Stantec HDD review is dated May 2016,[252] and it was not until the end of that month that BLM reached its FONSI and made the final determination that HDD would not be used. While MHA Nation asserts that it could have aided the analysis by pulling from resources at its disposal or conducting its own analysis of HDD feasibility if included in a timely fashion, it does not explain why it did not do so in the over three years between commencement of consultation and final decision, during which BLM engaged with MHA Nation extensively on the subject.

MHA Nation's argument also ignores the fact that the Lake crossing was proposed as part of the original comprehensive project in 2011, with tribal consultation including MHA Nation launched for that proposal in October 2011.[253] BLM undertook public scoping, including direct outreach to MHA Nation, in November and December 2011, during which concerns were raised specifically regarding the Lake crossing and use of trenching as opposed to HDD.[254] The resulting EA analyzed the proposal to cross the Lake using trenching as opposed to HDD,[255] with a draft issued for public review in August and September 2012, on which MHA Nation did not comment.[256] The Final EA made clear that the proposed Lake crossing was excluded from the approval because additional evaluation of HDD and geotechnical investigation needed to be completed. Accordingly, MHA Nation was aware of and invited to contribute to the evaluation of trenching versus HDD at the Lake crossing well before the Project application was even submitted.

---

[248] *See* SOR at 19-20.

[249] *See* May 2014 Janis Letter at 1-2.

[250] BLM Response in Opposition to Petition for Stay at 2 (filed July 15, 2016); BLM Answer at 2.

[251] USACE FONSI at unp. 1, 5.

[252] *See* EA Appx. C.

[253] 2012 EA at 1-10, 3.21-5, 4.21-3 to 4.21-4.

[254] *Id*. at 1-9 to 1-10, 6-1 to 6-2.

[255] *Id*. at 2-32 to 2-37.

[256] Finding of No Significant Impact and Decision Record, BakkenLink Pipeline Project, at 12 (Oct. 22, 2012) (2012 FONSI).

MHA Nation asserts that BLM stated at a February 2015 meeting "that talking will not help as the decision to trench the pipeline across the Lake bottom was already made."[257] Aside from the fact that this meeting occurred almost two years into the consultation process, the record of that discussion does not support MHA Nation's characterization. MHA Nation cites handwritten minutes of the February 25, 2015, meeting noted above.[258] Those notes reflect that, following a discussion regarding MHA Nation's concerns over the potential for spills and desire for further consideration of alternatives such as HDD, BLM noted BLP's position that it had identified and would implement mitigation measures to address those concerns and was willing to meet with MHA Nation to discuss those efforts.[259] The notes then show that a representative of BLM suggested to counsel for MHA Nation that he "will set up mtg w/ Bakkenlink, but can't see them convincing TAT."[260] The natural reading of this statement is not that the agencies had reached an inflexible final decision by this point, but rather, to the contrary, that BLM did not anticipate *BLP* being able to convince *MHA Nation* – i.e., the Three Affiliated Tribes (TAT) – to waver from its insistence on HDD.

In light of the above, we find that MHA Nation has failed to demonstrate error or inadequacy in BLM's handling of the consultation process.

IV.    *BLM Complied with its Trust Responsibilities.*

MHA Nation next argues that, "as the MHA Nation's trustee, the United States has a trust responsibility to ensure the Reservation's resources are protected and forever provide a homeland to the MHA Nation," which "should have been fully assessed in an EIS."[261] While MHA Nation is correct that the United States owes it a general trust responsibility, absent a specific duty placed on the Government with respect to tribes, this responsibility is satisfied by BLM's compliance with general regulations and statutes not specifically aimed at protecting tribes.[262] As MHA Nation does not identify a specific duty with which BLM failed to comply other than its responsibilities under NEPA, BLM's

---

[257] Reply at 15.
[258] *See* AR Tab 032, Handwritten Minutes of Consultation Meeting with MHA Nation (Feb. 25, 2015).
[259] *Id.* at 1-5.
[260] *Id.* at 4.
[261] SOR at 8 (raised as evidence of fundamental flaws in the EA, including failure to adequately analyze context); *see also* Petition for Stay at 7.
[262] *Confederated Tribes of the Goshute Reservation*, 177 IBLA 171, 185 (2009).

"compliance with applicable NEPA requirements under the circumstances of this case" satisfied its trust responsibilities.[263]

The EA acknowledged that "[t]ribes with traditional or cultural affiliation within the Project area have the right to conduct traditional cultural activities on federal lands crossed by the Project" and "have treaty rights which enable them to hunt, fish, and gather on unoccupied federal lands within the Project area."[264] While the EA observed that construction activities "may temporarily reduce the amount of federal lands outside the reservation where tribal members could exercise their hunting, fishing, and gathering rights" or alter access and restrict certain activities, it concluded that "these temporary impacts would be negligible" and there would be no restrictions after construction is completed.[265] MHA Nation offers no challenge to this analysis and makes little more than a conclusory statement that BLM's trust responsibilities required it to consider the Project through an EIS.[266] We conclude that the United States' trust responsibilities were met through BLM's compliance with NEPA and its implementing regulations, and with its consultation requirements addressed elsewhere in this decision.

*V.    BLM's Decision is Consistent with the Lake Sakakawea Congressional Purposes and USACE Plan.*

MHA Nation next argues that the Project "conflicts with Congress' authorized purposes for Lake Sakakawea," and violates the USACE's LSOGMP because USACE "requires that pipelines utilize HDD for . . . crossing Lake Sakakawea."[267] It again highlights two 2013 letters from USACE to BLP and BLM, respectively, in which USACE stated that it "is not in favor of the open-cut method and will not approve the use of this pipe installation method for pipelines crossing Lake Sakakawea," reiterated its preference for HDD, and stated that "[n]o impacts to the authorized purposes [of the Dam/Lake Project] should occur as a result of implementing the proposed action."[268] Though MHA Nation concedes that USACE

---

[263] *Id.*; *see also Confederated Tribes of the Goshute Reservation*, 193 IBLA 333, 364 (2018); *In re. MHA Nation*, 53 OHA 198, 202 (Mar. 22, 2008) ("[I]n matters beyond the scope of a tribe's jurisdiction, it is entirely possible for an agency to meet its trust obligations in the course of reaching an agency decision, even over a tribe's objection or assertion that it conflicts with tribal law or a tribal court order.").

[264] EA at 3.22-1, 4.22-2.

[265] *Id.* at 2-83, 4.22-2.

[266] SOR at 8.

[267] *Id.* at 11, 22; *id.* at 11, 13 (invoked for intensity factors, as showing proposed action to be highly controversial and risking violation of law); Reply at 4 ("The O&GMP requires HDD for pipelines crossing the Lake."); *id.* at 11 (arguing that "the EA is fundamentally flawed and inadequate because it violates the O&GMP and no sound analysis or basis was provided for violating the O&GMP"); Petition for Stay at 13-14.

[268] *See* 2013 Newman Letter at 1; 2013 Janis Letter at 1; *see also* Reply at 8; SOR at 19-20.

also stated that "alternative installation methods can be considered" if HDD and alternate locations are not feasible, it asserts that "[t]his is wrong" and "[p]ipelines crossing the lake 'have to do so by using HDD.'"[269]

The USACE – which created the LSOGMP and is responsible for its administration – rejected MHA Nation's arguments on multiple occasions. The USACE participated as a cooperating agency throughout the Project review "to assure conformance with their . . . Garrison Dam/Lake Sakakawea Master Plan."[270] In its FONSI, USACE states that "[w]hile . . . HDD . . . is the preferred pipeline placement method for crossing USACE reservoirs, it has a high risk of failure at the preferred and alternative pipeline crossing locations at Lake Sakakawea," leading USACE to approve "the push-pull (trenching) method" because it "would only have localized, minor and short term impacts to the environment and would not impact or interfere with the Garrison Project's authorized project purposes."[271] In doing so, USACE implemented the express language of the LSOGMP. The LSOGMP states initially that pipeline crossings of the Lake "would have to do so by using [HDD] to bore underneath the lake," however it goes on to clarify that "[w]hile drilling under the lake is the preferred method . . . [a]lternative . . . methodologies may be required if it is determined that the risk to the lake is too high to move forward."[272] MHA Nation actually acknowledges in places that the LSOGMP "provides that alternative methods of crossing can be considered if HDD at the preferred site is not feasible and other locations are 'investigated and . . . not found.'"[273] Furthermore, in its review of the proposed action under Section 14 of the Rivers and Harbors Act of 1899,[274] USACE confirmed that the Project "will not be injurious to the public interest and will not impair the usefulness of the Garrison Dam, Lake Sakakawea Project," and likewise "will not limit the ability of Garrison Project to function as authorized and will not compromise or change any authorized project conditions, purposes, or outputs."[275] MHA Nation's bare assertion that USACE's understanding and implementation of its own project and plan "is wrong" does not meet its burden to demonstrate error in BLM's analysis, or its acceptance of the analysis and decisions by USACE in areas within its relevant jurisdictional responsibility.

---

[269] Reply at 7.

[270] EA at 1-8; *see also* LSOGMP at 21 (explaining that USACE developed the LSOGMP "to provide a management vision for oil and gas activities that considers authorized Project purposes").

[271] USACE FONSI at unp. 1, 4-5; *see also id.* at 3 (stating that "the proposed work is in compliance with all applicable federal, state and local laws and regulations").

[272] LSOGMP at 46.

[273] *See* Reply at 7-8 (citing AR tab 63).

[274] 33 U.S.C. § 408.

[275] AR Tab 064, Memorandum for Commander, USACE Omaha District, from Larry Janis, USACE at unp. 1, 3 (Mar. 28, 2016); *see id.*, Letter from Larry Janis, USACE, to Lowell Hassler, BLM (Apr. 15, 2016).

Nor do the 2013 letters cited by MHA Nation dictate a different outcome. The 2013 Newman Letter in effect communicates little more than USACE's well-understood position that "HDD is the preferred method" for Lake crossings. Moreover, the following year the relevant USACE District Office clarified that the LSOGMP "states that HDD is the preferred method of pipeline installation, but if not feasible other locations should be investigated and if not found, alternate installation methods can be considered."[276] Further, the 2013 Janis Letter does not state that "the proposed Project conflicts with at least two" of "the Congressionally authorized purposes for Lake Sakakawea," as MHA Nation implies.[277] Rather, it provides USACE's input on the nascent EA as a cooperator, stating that "[n]o impacts to the authorized purposes [of the Lake] should occur" but not conveying any conclusion that they would.[278] Contrary to MHA Nation's reading, the letter expressly states that "[a]lternatives should evaluate different pipeline installation methods," implying that there is more than one potentially viable method (HDD).[279] And it in no way suggests that pipeline crossings of the Lake violate the Congressionally-authorized purposes as a general matter, as it encourages BLM to "look at crossing Lake Sakakawea at different locations."[280] Indeed, the proposed crossing location for the Project was selected, in part, because it would be adjacent to eight existing pipelines – none of which were installed using HDD – in an established utility corridor described in USACE's plans for the Lake.[281]

We find that MHA Nation has not met its burden to demonstrate error in BLM's analysis regarding the Project's consistency with the Lake's Congressionally authorized purposes or the LSOGMP.

## VI.    Notices of Supplemental Authority

Finally, we briefly acknowledge the parties' dueling Notices of Supplemental Authority presenting, respectively, a December 2016 Memorandum from the Assistant Secretary for the Army recommending preparation of an EIS for the Dakota Access Pipeline (DAPL)[282] and a January 2017 Presidential Memorandum encouraging rescission of that recommendation.[283] These documents pertain to a different project presenting different factual and legal circumstances, and reflect high-level policy positions related to that

---

[276] May 2014 Janis Letter at 1; *see Great Basin Resource Watch*, 185 IBLA at 19 (finding that "an inconsistent statement by an agency's regional office during early stages of review does not render the decisionmaking process arbitrary and capricious where proper procedures are followed").

[277] SOR at 19-20.

[278] 2013 Janis Letter at 1.

[279] *Id.*

[280] *Id.*

[281] *See supra* n.219.

[282] *See* MHA Nation Notice of Supplemental Authority (filed Dec. 6, 2016).

[283] *See* BLM Notice of Supplemental Authority (filed Feb. 21, 2017).

proposed project. The Federal district court charged with reviewing the adequacy of USACE's NEPA compliance for DAPL placed little import on these shifting policy positions,[284] focusing instead – as we do here – on the substance of the EA rather than underlying policy decisions.[285] The memoranda offer no insight into the adequacy of the EA and record before the Board for this separate and distinct Project. Nothing about the submitted materials alters our conclusions on the merits of this appeal.

CONCLUSION

For the reasons set forth above, we find that MHA Nation has not met its burden to demonstrate with objective evidence that the EA for the Project is premised on a clear error of law or demonstrable error of fact, or that the analysis failed to consider a substantial environmental question of material significance to the proposed action. We also conclude that MHA Nation has not shown error in BLM's compliance with its government-to-government consultation obligations or trust responsibilities, or that BLM's decision is

---

[284] *See, e.g., Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 15 (D.D.C. 2020) affirmed by *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 2021 U.S. App. LEXIS 2049 (D.C. Cir., Jan. 26, 2021) ("The agencies' position changed after a new administration took office.........This is certainly their prerogative.").

[285] *See, e.g., Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs,* 205 F. Supp. 3d 4 (D.D.C. 2016) (denying motion for preliminary injunction raising fears that pipeline construction would destroy sites of cultural and historical significance based on proponent's efforts to identify and avoid historic properties including cultural surveys, coordination with SHPOs, consultation with tribes, locating lake crossing adjacent to existing pipelines, and adoption of unexpected discovery protocols); *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs,* 255 F. Supp. 3d 101 (D.D.C. 2017) (finding that the USACE "substantially complied with NEPA in many areas," including its analysis of: spill risk based on protective measures and standards, testing, monitoring, and low spill probability; cumulative effects with other pipelines crossing the river; impacts on treaty rights and trust obligations; impacts of construction on resources; impacts of a spill on water resources including downstream tribal drinking water intakes; consideration of alternatives, including alternative water crossings, based on table showing greater impacts and costs; and adequacy of consultation – but remanding for consideration of multiple expert reports submitted by tribes raising scientific critiques of methodology and data flaws in the agency's analysis, as well as spill impacts on fishing and hunting rights, and environmental justice); *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs,* 440 F. Supp. 3d at 15 (finding that presentation of "concrete objections to the Corps' analytical process and findings" through "[u]nrebutted expert critiques" including multiple expert reports and studies on multiple topics submitted by tribes established that the effects on the human environment were "likely to be highly controversial," necessitating preparation of an EIS).

IBLA 2016-218

inconsistent with the Congressional purposes for the Garrison Dam/Lake Sakakawea Project or governing USACE Plan.

       Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior,[286] we affirm BLM's DR approving the amendment to BLP's ROW.

_____/s/_____
Amy B. Sosin
Administrative Judge

I concur:

_____/s/_____
Laura B. Brown
Administrative Judge

_____
[286] 43 C.F.R. § 4.1.