# EXHIBIT F5

# Western Watersheds Project, 185 IBLA 293 (2016)

# 185 IBLA 293; 2015 IBLA LEXIS 23

Interior Board of Land Appeals

April 24, 2015, Decided

IBLA 2015-121

*Department of Interior Board of Land Appeals*     *Decisions*

**Reporter**
185 IBLA 293 *; 2015 IBLA LEXIS 23 **

## WESTERN WATERSHEDS PROJECT

## Core Terms

vegetate, sage-grouse, riparian, habitat, watershed, proposed action, wildlife, spring, livestock, sagebrush, project area, species, acre, legally cognizable, coalition, valley

## Headnotes

1. Administrative Procedure: Standing-Rules of Practice: Appeals: Dismissal--Rules of Practice: Appeals: Standing to Appeal

The Board properly dismisses an appeal from a BLM decision, approving a watersheds implementation and restoration plan, when the appellant lacks standing to appeal by failing to establish it is adversely affected by the decision, as required by 43 C.F.R. § 4.410.

## Counsel

APPEARANCES: Kenneth W. Cole, Idaho Director, Western Watersheds Project, Boise, Idaho, for appellant; Janell M. Bogue, Esq., Office of the Regional Solicitor, U.S. Department of the Interior, Sacramento, California, for the Bureau of Land Management.

## Action

 [**1]

 [*293]  Appeal from and petition for a stay of the effect of a Decision Record of the Field Manager, Egan (Nevada) Field Office, Ely District, Bureau of Land Management, approving the Newark and Huntington Watersheds Implementation and Restoration Plan. DOI-BLM-NV-L010-2012-0033-EA.

Appeal dismissed; petition for stay denied as moot.

**Opinion By:** KALAVRITINOS

## Opinion

OPINION BY ADMINISTRATIVE JUDGE KALAVRITINOS

The Western Watersheds Project (WWP) has appealed from and petitioned for a stay of the effect of a January 29, 2015, Decision Record (DR) of the Field Manager, **[\*\*2]** Egan (Nevada) Field Office, Ely District, Bureau of Land Management (BLM), approving the Newark and Huntington Watersheds Implementation and Restoration Plan (I&R Plan). The DR and a January 28, 2015, Finding of No Significant Impact (FONSI) were based on a January 2015 Environmental Assessment (EA) (DOI-BLM-NV-L010-2012-0033-EA), which was prepared pursuant to section **[\*294]** 102(2) (C) of the National Environmental Policy Act of 1969 (NEPA), *42 U.S.C. § 4332(2)(C)* (2012).

Because WWP has failed to establish that it has standing to appeal the Field Manager's January 2015 DR, we will dismiss the appeal, and deny the stay petition as moot.

*Background*

Based on an extensive analysis of existing conditions and recommendations for achieving desired future conditions in a November 2011 Watersheds Analysis, BLM proposed to undertake various vegetation treatment and riparian improvement actions with the overall aim of improving the functioning of upland and riparian areas in the adjacent Newark and Huntington watersheds, which together encompass a total of 577,528 acres of public land administered by BLM, as well as 68,913 acres of other Federal and private **[\*\*3]** land, in the northwestern corner of White Pine County, in the Newark Valley area of east-central Nevada. [1] *See* EA at 3. More specifically, such actions consist of:

(1) vegetation management, in the form of "seven vegetation treatment units, a rabbitbrush treatment strategy, a crested wheatgrass seeding[s] [management] strategy, and an aspen treatment strategy"; [2]

**[\*295]** (2) riparian improvement in the Robinson Spring Complex, which includes: "[R]e-contouring of embankments to assure water does not flow onto roads and trails as well as hardening channel crossings [to preclude water being shunted onto the road surface]. Redundant roads and trails will be eliminated and re-vegetated to reduce overall road density and reduce road influence on hydrologic flow paths during storm events. Whenever possible, riparian shrub species will be established or favored along natural stream channels in order to stabilize banks and retain riparian soils"; [3] and

(3) riparian habitat enhancement in the Stinston Spring and three unnamed springs, which includes: "[P]roviding off-site watering opportunities for wildlife and/or livestock. Fencing will be used to protect spring sources, riparian

---

[1] BLM also proposed to undertake three range improvements to improve rangeland health by restricting livestock movement and promoting better distribution of livestock on the public lands in the Newark watershed, as well as provide a reliable source of water for cattle, wild horses, and wildlife. *See* EA at 29-33. Such actions were to be addressed in separate decisionmaking. *See* DR at unpaginated (unp. ) 1; Notice of Appeal/Petition for Stay (NA/Petition) at 3. On Jan. 29, 2015, the Field Manager issued a Final Decision. *See* Final Decision at unp. 1. WWP does not here appeal these grazing-related actions. *See* NA/Petition at 3. Rather, WWP has taken a separate appeal (NV-L010-2015-01) to the Hearings Division, Office of Hearings and Appeals, for the purposes of a hearing and decision by an administrative law judge, pursuant to 43 C.F.R. §§ 4.470 and 4160.4(a).

[2] The seven vegetation treatment units are denoted as follows, with the approximate numbers of acres targeted for treatment/total acreage in each of the units: Huntington (9,650/38,575); Diamond Mountain (7,450/24,845); Buck Mountain (5,800/29,111); Bald Mountain (10,300/51,520); Pancake (1,450/14,292); Monte Cristo (4,000/40,360); and Hamilton (6,800/27,218).

[3] The Robinson Spring Complex is situated in sec. b, T. 20 N., R. 55 E., Mount Diablo Meridian, White Pine County, Nevada.

soils, and/or [**4] riparian vegetation. Small experimental plots of riparian vegetation will be established with small wildlife and livestock exclosures to protect plantings." [4]

DR at 1; *see* EA at 13-29. The areas of treatment and improvement were delineated by BLM. *See* EA at 13, 14, 16 (Map 2.1 (General Treatment Map)).

 [**5]

Vegetation treatments would include cutting and removal, including chaining, mowing, and other mechanical treatments, hand cutting, Tebuthiuron and other chemical herbicides, seeding, and prescribed fire, as specifically outlined in Appendix A of the EA. In accordance with project design features of the proposed action, no vegetation treatments would occur within [**6] a quarter-mile of any active Greater sage-grouse courtship strutting grounds (leks) (except pinyon-pine and juniper removal), within two miles of any active leks during the breeding and nesting season from March 1 to June 30, in sage-grouse winter range from November 1 to March 31; during the migratory bird nesting season from May 1 to July 15, within one-half mile of active raptor nests from April 15 to July 15, in big game calving/fawning/kidding grounds or crucial summer range from April 15 to June 30, or within 100 feet of any [*296] riparian areas in the Plan area. *See* EA at 17, 44; Response to Petition for Stay (Response) at 8, n.4. [5]

 [**7]

BLM also provided that vegetation treatments would be designed so as to conform to the Class II Visual Resource Management prescription for most of the treatment units, thus retaining the existing character of the landscape, where activities are visible, but do not attract the attention of the casual observer. *See* EA at 18. In addition, livestock grazing would not be permitted in treatment areas during treatments and, thereafter, would resume when treated areas exhibit at least 10% foliar cover of desirable perennial grasses and forbs, and would not occur for at least two growing seasons in seeded areas (unless certain vegetation objectives were determined to have been met). *See id.* at 19-20. BLM also specified measures to control any existing or new cheatgrass and other invasive non-native plant species, in accordance with established guidance. *See id.* at 21-22.

Importantly, BLM denoted the total acres in each of the seven treatment units, the target acreage and the maximum number of acres to be treated, the primary and secondary treatment methods, and the treatment objectives. *See* EA at 22-27. Within each of these general areas, the specific areas that would be affected [**8] by Plan activities were left to be determined by BLM, using adaptive management, which would be based on monitoring undertaken before and after implementation of the selected treatment regime "to establish baseline vegetation characteristics and determine post treatment success towards meeting treatment objectives." *Id.* at 28; *see id.* at 13. While treatments might disturb or displace individual animals during implementation of the Plan, BLM concluded: "Treatments are expected to improve habitat for sage grouse, pygmy rabbits, and other special status species by removing pinyon pine and juniper trees, increasing available sagebrush habitat, and increasing grass and forb production in sagebrush communities." *Id.* at 54.

After a lengthy scoping period, BLM used an interdisciplinary team of resource specialists to address potential environmental impacts of the proposed action and reasonable alternatives thereto in an EA. A draft EA was issued

---

[4] The Stinston Spring and three unnamed springs are situated, respectively, in sec. 22, T. 20 N., R.55 E., sec. 5, T. 21 N., R. 56 E., sec. 29, T. 22 N., R. 56 E., and sec. 21, T. 22 N., R. 56 E., Mount Diablo Meridian, White Pine County, Nevada.

[5] In addition, BLM provided that vegetation treatments would be employed in such a manner that sagebrush treatments would create or maintain a mosaic vegetation pattern, especially by not treating more than 20% of sage-grouse breeding and nesting habitat at any time and deferring treatment until the areas to be treated exhibit suitable sage-grouse habitat (15-25% sagebrush cover and greater than 10% herbaceous cover), sagebrush treatments would be designed to minimize short-term impacts in pygmy rabbit and winter sage-grouse habitat, and pinyon-pine and juniper trees exhibiting old-growth characteristics would not be removed. *See* EA at 17-18.

for a 45-day public **[\*297]** comment period on November 11, 2013, followed by a final EA (DOI-BLM-NV-L010-2012-0033-EA) on September 24, 2014. [6]

**[\*\*9]**

In a September 24, 2014, DR, the Field Manager approved the proposed action, which WWP appealed. In a December 23, 2014, Order, styled *WWP*, IBLA 2015-25, the Board set aside the DR, and remanded the case to BLM, in order that BLM might amend the original EA, by including consideration of the reasonably foreseeable Overland Pass Habitat Improvement Project in its assessment of the cumulative impacts of the proposed action. Based upon a review of the amended EA, the Field Manager once again approved the proposed action.

In her January 2015 DR, the Field Manager concluded that the proposed action would (1) address adverse impacts to the riparian areas arid improve their chemical, physical, and biological integrity; (2) address the significant departure from the natural fire regime, owing to drought and fire suppression efforts; (3) reduce threats to life, property, and other aspects of the environment from large-scale wildfires; and (4) make long-term improvements to the habitat for wild horses and sage-grouse, big game, and other wildlife species. *See* DR at unp. 2; EA at 3; Response at 11-12. She also determined that approval of the proposed action was consistent with all applicable **[\*\*10]** Federal law and policy, including those concerning Greater sage-grouse and other special-status fish and wildlife species, and conformed to the Ely District RMP, as required by section 302(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), *43 U.S.C. § 1732(a)* (2012). *See* DR at unp. 2; EA at 4-6; Ely District Record of Decision and Approved RMP at 105 (identifying Newark and Huntington watersheds as "high priority" for management actions). In her FONSI, the Field Manager found that since approval of the proposed action was not likely to significantly affect any aspect of the human environment, BLM was not required to prepare an EIS by section 102(2)(C) of NEPA.

WWP appealed timely from the Field Manager's January 2015 DR, requesting a stay of the effect of BLM's decision to approve the vegetation treatment and riparian improvement actions during the pendency of the appeal. WWP objects to the decision, alleging it "will authorize the BLM's plans to mow, chop, burn and poison over half a million acres of sagebrush habitat across vast swaths of public lands in Nevada," and will threaten special-status fish and wildlife species, including **[\*\*11]** **[\*298]** the Greater sage-grouse, pygmy rabbit, Rocky Mountain elk and other big game, and Newark Valley Tui chub. NA/Petition at 3; *see id.* at 14 ("At over half a million acres, this project area is truly massive. Much of it is within preliminary priority habitat (PPH) or priority general habitat (PGH) for sage-grouse, and sage-grouse numbers in the project area are declining."). WWP asserts that the proposed action "is clearly nothing more than a livestock forage production project cloaked in tangential and ill-defined wildlife 'benefits.'" *Id.* at 24. BLM opposes a stay.

We now address whether WWP has standing, under *43 C.F.R. § 4.410*, to appeal from the Field Manager's January 2015 DR.

*Standing to Appeal*

[1] In order to pursue an appeal from and seek a stay of a BLM decision, an appellant is required to have standing under *43 C.F.R. § 4.410* to appeal from the decision. *43 C.F.R. § 4.410(a)* requires that an appellant demonstrate that it is both a "party to a case" and "adversely affected" by the decision, within the meaning of *43 C.F.R. § 4.410(b)* and (d). *See The Coalition of Concerned National Park [Service] Retirees, 165 IBLA 79, 81-86 (2005)*, **[\*\*12]** and cases cited. An appeal must be dismissed if either element is lacking. *Southern Utah Wilderness Alliance, 140 IBLA 341, 346 (1997)*; *Mark S. Altman, 93 IBLA 265, 266 (1986)*.

---

[6] The EA was tiered to the November 2007 Final Environmental Impact Statement (EIS) that was prepared in connection with promulgation of the applicable land-use plan (August 2008 Ely District Resource Management Plan (RMP)). *See* EA at 6. It was also tiered to the June 2007 Final Programmatic EIS for Vegetation Treatments Using Herbicides on BLM Lands in the 17 Western States. *See id.*

It is the appellant's responsibility to demonstrate the requisite elements of standing. *Concerned Citizens for Nuclear Safety, 175 IBLA 142, 146 (2008)*; *Colorado Open Space Council, 109 IBLA 274, 280 (1989)*. WWP clearly qualifies as a "party to a case," within the meaning of 43 C.F.R. § 4.410(b), since it "has otherwise participated in the process leading to the decision under appeal, *e.g.*, . . . by commenting on an environmental document, or by filing a protest to a proposed action. " *See, e.g., The Coalition of Concerned National Park [Service] Retirees*, 165 IBLA at 81-82. The question here is whether WWP is "adversely affected" by BLM's decision to approve the Plan.

In accordance with longstanding Board precedent, 43 C.F.R. § 4.410(d) provides that a party to a case is adversely affected by a decision when it causes or is substantially likely to cause **[**13]** injury to a legally cognizable interest of the party. *See, e.g., The Coalition of Concerned National Park [Service] Retirees*, 165 IBLA at 81-82. The legally cognizable interest must be shown to have been held by the appellant at the time of the decision that it seeks to appeal. *See WWP v. BLM, 182 IBLA 1, 8-9 (2012)*; *Center for Native Ecosystems, 163 IBLA 86, 90 (2004)*. In addition, when an organization appeals a BLM decision, ***it must demonstrate that one or more of its members has a legally cognizable interest in the subject matter of the appeal, coinciding with the organization's purposes***, that is or may be negatively affected by **[*299]** the decision. *The Coalition of Concerned National Park [Service]Retirees*, 165 IBLA at 86-87.

Above all, the burden falls upon the appellant to make colorable allegations of an adverse effect, supported by specific facts, set forth in an affidavit, declaration, or other statement of an affected individual that are sufficient to establish a causal relationship between the approved action and the injury alleged. *The Fund for Animals, Inc., 163 IBLA 172, 176 (2004)*; **[**14]** *Southern Utah Wilderness Alliance, 127 IBLA 325, 327 (1993)*; *Colorado Open Space Council*, 109 IBLA at 280. The appellant need not prove that an adverse effect will, in fact, occur as a result of the BLM action, but we have long held that the threat of injury and its effect on the appellant must be more than hypothetical. *See Missouri Coalition for the Environment, 124 IBLA 211, 216 (1992)*; *Donald K. Majors, 123 IBLA 142, 145 (1992)*; *George Schultz, 94 IBLA 173, 178 (1986)*. "Standing will only be recognized where the threat of injury is real and immediate. *Laser, Inc.,* 136 IBLA [271,] 274 [(1996)]; *Salmon River Concerned Citizens, 114 IBLA 344, 350 (1990)*." *Legal & Safety Employer Research Inc., 154 IBLA 167, 172 (2001)*. "[M]ere speculation that an injury might occur in the future will not suffice." *Colorado Open Space Council*, 109 IBLA at 280.

To establish its standing to appeal, WWP provides only the undated Declaration **[**15]** (Decl.) of Kenneth W. Cole, Idaho Director, WWP (Ex. A to NA/Petition). *See* NA/Petition at 2. Cole sets forth, at some length, his observations regarding the consequences of vegetation treatments that occurred in 2009/2010 in connection with BLM's Lincoln County Sage-Grouse Habitat Restoration (SGHR) Project, which affected five treatments areas (Cave Valley, Hamblin, Lake Valley, Patterson Wash, and South Spring Valley). *See* Cole Decl. at 9-30. He describes these areas as "areas of similar ecology," situated to the south of the Newark and Huntington Watersheds I&R Plan area. *Id.* at 9. Cole notes that, rather than promoting a suitable landscape composed of a diversified mix of sagebrush, forbs, and native grasses, the "unintended consequences" of these vegetation treatments, using mechanical and chemical treatment methods, were to greatly diminish, if not eliminate, sagebrush, forbs, and native grasses, often resulting in extensive areas of cheatgrass and other invasive non-native species, in the vicinity of sage-grouse leks. *Id.* He further states that the result has been a relatively steady decline in the presence of male sage-grouse at the leks. Were similar consequences **[**16]** to occur in the case of the treatment areas associated with the Newark and Huntington Watersheds I&R Plan, Cole indicates that his use and enjoyment of these areas, particularly of the scenery, sage-grouse, and other wildlife, would be negatively affected. *See id.* at 2-3, 30-31.

While establishing, with photographic documentation, that he has visited the treatment areas associated with the Lincoln County SGHR Project, Cole does not **[*300]** demonstrate he visited any of the treatment areas associated with the Newark and Huntington Watersheds I&R Plan. Cole only asserts:

> On several occasions I have visited the Newark and Huntington watersheds for recreation and to observe conditions of the landscape. At many of the sites where the BLM has proposed treatments, damage from livestock grazing is very evident. Wind and water soil erosion is evident from past and ongoing grazing practices, cheatgrass is present in some of the last good sage grouse habitat.

> I first visited the Newark and Huntington project area in August, 2011 where I observed livestock degraded uplands and spring areas. I returned to southern and western portions of the project area in October, 2011 and observed similar conditions. [**17]
>
> I intend to return to the Huntington and Newark project area in the coming year to recreate and enjoy and observe landscape conditions and wildlife.

Decl. at 3.

Cole asserts he has visited the 577,528-acre "Newark and Huntington project area," but does not aver he has visited any of the specific areas where vegetation treatments or riparian improvements are to take place (or adjacent/ nearby lands likely to be affected by such activities). *See* Cole Decl. at 5 (Figure 1 (Newark and Huntington Watersheds I&R Plan Project Area)). At best, Cole indicates that he may have visited "many of the sites where the BLM has proposed treatments." *Id.* at 3. However, he does not set forth the date(s) of his visits, where he was, what he did, or otherwise place himself in, adjacent to, or near any of the identified treatment areas.

We do not believe Cole's allegations of limited use in 2011 and indefinite prior and future use are sufficient to demonstrate that WWP held *a legally cognizable interest at the time of the Field Manager's January 2015 DR. See WWP v. BLM*, 182 IBLA at 8-9. In these circumstances, WWP has not demonstrated it (or any member) uses lands [**18] and/or resources or has another legally cognizable interest that is subject to or otherwise affected by the approved use of the public lands at issue.

Moreover, just as WWP's general statements fail to demonstrate a legally cognizable interest, its limited assertions are inadequate to support a claim of adverse effect from the Field Manager's January 2015 DR to approve the Plan. Simply stated, WWP fails to establish a causal relationship between the decision and any alleged injury to it.

[*301] We, therefore, conclude that WWP has failed to carry its burden to demonstrate that it is "adversely affected" by the Field Manager's January 2015 DR, and thus has standing, under *43 C.F.R. § 4.410*, to appeal. For this reason, the appeal must be dismissed.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, *43 C.F.R. § 4.1*, the appeal is dismissed, and the petition for a stay is denied as moot.

Christina S. Kalavritinos

Administrative Judge

**Concur By:** JACKSON

**Concur:**

I concur:

James K. Jackson
Administrative Judge

Department of Interior Board of Land Appeals        Decisions

**End of Document**