**EXHIBIT F8**

**Wyoming Outdoor Council, et al.,
164 IBLA 84 (2004)**

WYOMING OUTDOOR COUNCIL, ET AL.

IBLA 2002-126, 2002-303                Decided November 30, 2004

Consolidated appeals from decisions of the Deputy State Director, Minerals and Lands, Wyoming State Office, Bureau of Land Management, dismissing two protests of the inclusion of 27 parcels in an August 7, 2001, competitive lease sale, and inclusion of 35 parcels in a February 12, 2002, sale. WY-0108-167 through -221; WY-0202-140 through -179, respectively.

Decision in IBLA 2002-126 affirmed; appeal in IBLA 2002-303 dismissed to the extent it pertained to conventional oil and gas activities and otherwise reversed and remanded.

1.      National Environmental Policy Act: Environmental Assessments--National Environmental Policy Act: Environmental Impact Statements--Oil and Gas Leases: Competitive Leases

The "reasonably foreseeable development" scenario (RFD scenario) for oil and gas is a long-term projection of oil and gas exploration, development, production, and reclamation activity in a defined area for a specified period of time.  The RFD scenario projects a baseline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order.  The baseline RFD scenario provides the mechanism to analyze the effects that discretionary management decisions have on oil and gas activity, and it also provides basic information that is analyzed in environmental documents under various alternatives.

2.      National Environmental Policy Act: Environmental Assessments-- National Environmental Policy Act:  Environmental Impact

164 IBLA 84

Statements--Oil and Gas Leases: Competitive Leases--Oil and Gas Leases: Competitive Leases

Whether an RMP's exceeded RFD scenario demonstrates an inadequate analysis of environmental impacts to the extent of such exceedance is a question that must be determined on a case-by-case basis. Where the RMP is being revised pursuant to 43 CFR 1610.5-6, the Board will not further consider appellants' arguments regarding the RFD scenario in support of that outcome.

3.     Appeals: Burden of Proof--National Environmental Policy Act: Environmental Assessments--National Environmental Policy Act: Environmental Impact Statements--Oil and Gas Leases: Competitive Leases

The appropriate time for considering the potential impacts of oil and gas exploration and development is when BLM proposes to lease public lands for oil and gas purposes because leasing, at least without no surface occupancy stipulations, constitutes an irreversible and irretrievable commitment to permit surface-disturbing activity, in some form and to some extent. Where the environmental assessment (EA) of each parcel at issue shows that there is no serious promise of CBM development, the burden falls upon the appellant to come forward with objective, countering evidence showing error in the EA's conclusions, to demonstrate that BLM could not properly rely on the RMP/EIS's environmental analysis to support the decision to offer these parcels for sale. In light of the absence of any serious potential for CBM development on the parcels, BLM could rely on the impacts analysis contained in the RMP to fulfill its pre-leasing NEPA obligation.

4.     National Environmental Policy Act: Environmental Assessments--National Environmental Policy Act: Environmental Impact Statements--Oil and Gas Leases: Competitive Leases

Where appellants' allegations regarding the potential for CBM extraction and development on the parcels at issue and the unique impacts associated therewith were not refuted by the record or by BLM on appeal, and where it is also undisputed that

the RMP/EIS did not analyze CBM extraction and development
or the unique impacts that might be occasioned by such
activities, existing environmental NEPA documents did not
provide the required pre-leasing NEPA analysis for the sale of
those parcels.  BLM's decision dismissing a protest on the basis of
a contrary conclusion is properly reversed and the case
remanded for further action.

APPEARANCES:  Susan Daggett, Esq., Denver, Colorado, and Thomas F. Darin, Esq.,
Washington, D.C., for appellants; Lyle K. Rising, Esq., Office of the Regional Solicitor,
U.S. Department of the Interior, Lakewood, Colorado, for the Bureau of Land
Management; and Jerrold A. Long, Esq., Cheyenne, Wyoming, for intervenor,
Burlington Resources, Inc.

OPINION BY ADMINISTRATIVE JUDGE PRICE

In IBLA 2002-126, Wyoming Outdoor Council, Greater Yellowstone Coalition,
and Wyoming Wildlife Federation (collectively referred to as WOC), have appealed
from the October 12, 2001, decision of the Deputy State Director, Minerals and
Lands, Wyoming State Office, Bureau of Land Management (BLM), dismissing their
protest to the inclusion of 27 parcels located in the Pinedale Resource Area in the
competitive oil and gas lease sale held on August 7, 2001.  [1/]  The protest was
received by BLM on August 3, 2001.  WOC also sought a stay of the decision.

In IBLA 2002-303, Wyoming Outdoor Council, Greater Yellowstone Coalition,
Wyoming Wildlife Federation, Sierra Club, Defenders of Wildlife, The Wilderness
Society, and Natural Resources Defense Council (also collectively referred to as
WOC), have appealed from the March 29, 2002, decision of the Deputy State
Director, Minerals and Lands, Wyoming State Office, BLM, dismissing their protest
of the offering of 35 parcels located in the Pinedale Resource Area in the competitive oil
and gas lease sale held on February 12, 2002.  [2/]  Appellants state that their protest

_____
[1/] Those parcels are WY-0108-167, WY-0108-177, WY-0108-178, WY-0108-188,
WY-0108-197 and -198, and WY-0108-201 through -221.
    In that decision, the Deputy State Director simultaneously dismissed WOC's
separate protest of the sale of 159 parcels in other Field Offices that were also part of
the Aug. 7, 2001, sale.  That portion of the decision is not before us in these appeals.
[2/] Those parcels are WY-0202-140 through WY-0202-163; WY-0202-165 through
WY-0202-169; WY-0202-173, and WY-0202-175 through WY-0202-179.
    In that decision, the Deputy State Director simultaneously dismissed WOC's
separate protest of the offering of 123 parcels in other Field Offices that were part of
                                                                    (continued...)

164 IBLA 86

IBLA 2002-126, 2002-303

was filed on February 8, 2002, and that it incorporated the protest dated August 2, 2001, which involves the 27 parcels docketed as IBLA 2002-126. [3/]

In both protests, WOC argued that inclusion of the parcels in the lease sales violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2) (2000), and the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1732 (2000). Specifically, WOC contended that the parcels could not lawfully be leased until the "amendment" of the Pinedale Resource Management Plan (RMP) had been completed; that leasing the parcels violated NEPA's prohibition against interim actions; that BLM's Land Use Planning Handbook prohibits new leasing until the RMP is amended; and that the leasing was improper because the "reasonably foreseeable development" (RFD) scenario projected in the environmental impact statement (EIS) for the RMP (collectively RMP/EIS) had been surpassed. WOC further alleged that allowing coalbed methane (CBM) development on the parcels violated NEPA and FLPMA because none of the existing environmental documents addressed the severe and unique impacts of CBM development and because CBM development did not conform to the existing RMP.

Although there are differences, we have *sua sponte* determined to consolidate the two appeals for decision: the lead appellants are the same and there are some common appellants as well, the subject matter and circumstances are the same, and the arguments appellants advance on appeal are essentially the same.

<u>Procedural Background</u>

<u>IBLA 2002-126:</u>

In an Information Notice dated August 6, 2001, BLM acknowledged that WOC had filed a protest and announced the Wyoming State Director's determination to delete 19 of the protested parcels from the sale, [4/] not because of the protest, but because the Pinedale Field Office (PFO) had advised the Wyoming State Office that it

---

[2/] (...continued)
the Feb. 8, 2002, sale. That portion of the decision is not before us in these appeals.
[3/] The Deputy State Director's decision responded by incorporating prior decisions to earlier WOC protests, but the decision dismissing the Aug. 2, 2001, protest was not among those listed. Copies of those decisions were not provided, and if they were separately appealed to this Board, no docket numbers or other identifying information was provided that would enable us to easily retrieve them. Given that WOC referenced only the Aug. 2, 2001, protest, however, we rely on the Deputy State Director's decision in IBLA 2002-126 to resolve these appeals.
[4/] The parcels that were deleted were WY-0108-203 through -221.

164 IBLA 87

was actively processing three land use applications in the area where the land contained in those parcels was located. It was decided that the eight remaining parcels would be offered at the sale while the merits of the protest were being considered.

In his October 12, 2001, decision dismissing WOC's protest, the Deputy State Director concluded that Board precedent and BLM internal policies and guidance supported BLM's authority to offer the parcels for oil and gas leasing in conformance with the existing RMP while that plan was undergoing amendment. He found that BLM's leasing determination did not violate NEPA's prohibition against interim actions, because the decisions necessary to authorize leasing had previously been issued. Lastly, he responded that the RFD scenario had not been exceeded, because it had been updated through project-related environmental analyses. [5/]

On November 23, 2001, WOC filed the Notice of Appeal and Request for Stay (NA/Petition) with the Board. On December 20, 2001, appellants "adopt[ed] their Petition for Stay, pages 1-28 and all referenced exhibits, [[6/]] filed on or about November 6, 2001, subject to further supplement on motion to leave [sic] to file response/reply pleadings in this case" as their statement of reasons for appeal (SOR). [7/] (SOR at 1.)

On December 21, 2001, BLM moved to dismiss the appeal, asserting that WOC had failed to provide any acceptable affidavits establishing its standing with respect to any of the parcels sold in the August 2001 lease sale. (BLM Motion to Dismiss at 1.) In response, on January 25, 2002, WOC filed its opposition to the BLM Motion to Dismiss (Opposition), submitting affidavits from members of one or more of the appellants, attesting to their use of one or more of the 27 parcels identified in its protest. Acknowledging that 19 parcels had not been offered for sale and that its appeal was moot as to those parcels, WOC nonetheless urged in its Opposition that its appeal should remain viable as to those parcels, because of the likelihood that they would be included in future sales. (Opposition at 3.) In Wyoming Outdoor Council, 156 IBLA 377 (2002), the Board rejected that argument and request, holding that WOC was not adversely affected by the decision on its protest because BLM had

---

[5/] The Deputy State Director did not identify those project-related analyses, but like WOC, we assume that these analyses include the EIS for the Pinedale Anticline Project (collectively PAP/EIS), a CBM project discussed *infra*.

[6/] By identifying pages 1-28 of the stay request, WOC omits its arguments pertaining to irreparable harm.

[7/] Accordingly, in discussing appellants' reasons for appeal, we will cite the NA/Petition. It should be noted that WOC filed no motion for leave to supplement the NA/Petition in IBLA 2002-126 or to file a further response.

excluded those parcels from the sale.  The Board therefore dismissed WOC's appeal for lack of standing as to those 19 parcels.  <u>Wyoming Outdoor Council</u>, 156 IBLA at 379-380.

BLM also moved to dismiss WOC's petition for a stay on the ground of lack of jurisdiction. [8/]  That motion was denied as well, as was WOC's request for a stay, and service on the purchasers of the eight parcels with respect to which WOC had demonstrated standing was directed. [9/]  <u>Wyoming Outdoor Council</u>, 156 IBLA at 385.

<u>IBLA 2002-303</u>:

WOC's protest arguments formed the basis for appellants' request for a stay, and the stay petition was incorporated as part of appellants' notice of appeal (NA/Petition) filed on May 8, 2002.

On June 6, 2002, Burlington Resources, Inc. (BRI), a successful bidder on 16 of the 35 parcels, moved to intervene, and on June 13, 2002, opposed the stay petition.  On July 11, 2002, EOG Resources, Inc. (EOG), the successful bidder on one of the 35 parcels, also moved to intervene.  On July 15, 2002, the Solicitor's Office filed notice that it concurred with BRI's arguments.  On July 31, 2002, the Board granted BRI's motion to intervene.

Also on July 31, 2002, the petition for stay was granted in part, to the extent WOC sought a stay of CBM exploration and development activity in the Pinedale Resource Area, and denied in part to the extent appellants sought to stay all oil and gas activity.  In so ruling, the Board determined that neither the Pinedale RMP nor the Environmental Assessment (EA) for the February 12, 2002, sale, discussed below, analyzed CBM activity, "the impacts of which differ significantly from those related to conventional oil and gas drilling."  [Citations omitted.]  We concluded that, in the context of a request for a stay, WOC had raised "substantial questions regarding BLM's compliance with NEPA and FLPMA that would require careful consideration and an opportunity to resolve them in a deliberative manner."  On that basis, we granted a partial stay.

On August 13, 2002, WOC filed a Motion for Leave to File a Consolidated Reply (to EOG's and BRI's submissions).  Among other things, ¶ 9 stated that "Appellants do not intend to file a separate [SOR] in this case and are relying on their

---

[8/]  Apart from those two motions to dismiss, counsel for BLM has filed nothing further in IBLA 2002-126.

[9/]  Those parcels are WY-0108-167, WY-0108-177, WY-0108-178, WY-0108-188, WY-0108-197, WY-0108-198, WY-0108-201, and WY-0108-202.

Request for Stay to serve as their opening brief." (Motion for Leave at 2.) On September 10, 2002, EOG moved to withdraw its motion to intervene.

Also on September 10, 2002, BRI filed its answer to WOC's NA/Petition and its Motion to Dismiss on the basis of the procedural argument that WOC had not timely filed an SOR, and its view that BLM had not violated NEPA or FLPMA in proceeding with the lease sale. By order dated October 17, 2002, the Board granted EOG's motion to withdraw, and on October 22, 2002, granted WOC's request to file a consolidated reply. On November 4, 2002, WOC opposed BRI's Motion to Dismiss, and also moved for a partial dismissal of its appeal: "Having been denied a stay of these leases for conventional oil and gas development, [WOC] hereby provides notice that it is voluntarily dismissing this aspect of its administrative appeal and does not seek a further ruling on the merits regrading whether these leases satisfy NEPA and FLPMA with respect to conventional oil and gas development." (Notice of Partial Voluntary Dismissal at 2.)

On October 6, 2004, the Board issued WOC an order to show cause why the appeal in IBLA 2002-303 should not be dismissed for lack of standing. [10] The Board received a telefaxed courtesy copy of WOC's response on October 29, 2004, in which the affidavit of Linda F. Baker was submitted. That affidavit established WOC's standing as to six parcels: WY-0202-147, -150, -160, -161, -162, and -166. Accordingly, WOC's appeal as it pertains to the remaining 29 parcels in the February 12, 2002, lease sale is herewith dismissed for lack of standing.

## Factual Background

### IBLA 2002-126:

We begin with the 1988 Pinedale RMP and its associated EIS (collectively RMP/EIS), which authorizes oil and gas exploration and development, among other things, in the Pinedale Resource Area. That land use decision was based on an RFD scenario that authorized the drilling of 45 wells per year, up to 900 wells in the Pinedale Resource Area. [11]

---

[10] In the past, the Board has issued orders to show cause, but it is not required to do so. Appellants are cautioned that, in the future, the Board will not hesitate to dismiss an appeal for lack of standing when the record contains no proper evidence of standing as of the date the Board first considers any aspect of the appeal for any purpose.

[11] The draft RMP/EIS did not employ the term "RFD scenario," although it is plain that the 900-well projection served much the same purpose as the RFD scenario.

(continued...)

IBLA 2002-126, 2002-303

More specifically, Table 39 of the draft RMP/EIS projected the drilling of 450 wells from 1985 through 1995, and the drilling of another 450 wells from 1985 through 2005 for the purpose of estimating short- and long-term cumulative impacts. (RMP/EIS at 190-91.)

BLM prepared EA No. WY100-EA2001-144, dated April 13, 2001 (April EA), to analyze the environmental impacts of offering the parcels in IBLA 2002-126 at the August 2001 lease sale.  The April EA was tiered to the Pinedale RMP/EIS. [12/]  The Decision Record and Finding of No Significant Impact (DR/FONSI) was issued on April 18, 2001.

IBLA 2002-303:

BLM prepared EA No. WY100-EA2001-055, dated November 19, 2001 (November EA), to analyze the environmental impacts of offering the parcels in IBLA 2002-303 at the February 2002 lease sale.  (Intervenor's Ex. 2.)  The November EA also was tiered to the Pinedale RMP/EIS.  In addition, however, it incorporated by reference large portions of EA No. WY100-EA2001-022 (EA-022), a copy of which was appended to the November EA.   EA-022 was prepared for the February 2002

_____

[11/] (...continued)
  BLM's more recent NEPA documentation often refers to the RFD scenario as "reasonable foreseeable development."  The correct phrase is "reasonab*ly* foreseeable."  See 40 CFR Part 1508.  The phrase describes the obligation to analyze all impacts that reasonably can be foreseen at the time of the analysis.  The phrase appears in CEQ regulations at 40 CFR 1501.2, 1502.16, and 1502.22, and in the CEQ's definitions of *cumulative impact*, 40 CFR 1508.7; *effects*, 40 CFR 1508.8(b); *scope*, 40 CFR 1508.25(a)(3); and *significantly*, 40 CFR 1508.27(b)(7).  The concept of projecting reasonably foreseeable future actions or impacts, or, as it is more popularly termed, "reasonably foreseeable development," originates in two regulations.  The CEQ defines the scope of an EIS as consisting of the "range of actions, alternatives, and impacts to be considered," 40 CFR 1508.25, and these include direct, indirect, and cumulative effects, 40 CFR 1508.25(c).  A separate CEQ regulation requires agencies to consider the environmental consequences of a proposed action by examining direct and indirect effects.  40 CFR 1502.16.
[12/]  Parcels and portions of parcels that were identified in the PAP as not available for leasing, described below, were deleted from the sale.  (April EA at 1; see also n.13, *infra*.)

164 IBLA 91

lease sale, for certain other parcels. [13/]  (Intervenor's Ex. 2, App. 1.)  The DR/FONSI for the November EA was issued on November 20, 2001.

In November 1999, BLM, acting for the Department of the Interior as lead agency in a cooperative effort, released a draft environmental impact statement (DEIS) for the Pinedale Anticline Oil and Gas Exploration and Development Project (PAP/DEIS) in Sublette County. [14/]  The cooperating agencies were the U.S. Forest Service, Department of Agriculture; the U.S. Army Corps of Engineers; and the State of Wyoming.  The final EIS (PAP/FEIS) was issued in May 2000, and the Record of Decision (PAP/ROD) was issued in July 2000.  The purpose of the PAP/EIS was to analyze the proposal of a number of Pinedale Anticline operators to "provide for the continued exploration for natural gas and, where discoveries occur, the development of the gas resource by drilling up to 900 new wells to achieve 700 producing locations over the next 10 to 15 years."  (PAP/DEIS Abstract, unnumbered p. 1.)  In addition, the DEIS stated:

---

[13/]  EA-022 was prepared for parcels WY-0202-141 through -164, WY-0202-174, and WY-0202-176 through -181 "at the February 2001" lease sale, apparently a typographical error.  As recited in the November EA, EA-022 analyzed four alternatives.  The DR/FONSI selected Alternative 2 for implementation.  Parcels WY-0202-179, -180, and -181 were deleted under Alternatives 1 and 2 "due to a pending land exchange in the vicinity."  (November EA at 1.)  Later, it was determined that these parcels were more than two miles away from the closest portion of the land exchange, and, consequently, that leasing those parcels would have no effect on the exchange and should not have been eliminated from consideration in EA-022:  "Environmental Assessment WY100-2001-022 did not include an alternative that addressed leasing these parcels and still applied the additional mitigation for parcels 141-147 and 157 that were [sic] implemented through Alternative 2.  This EA [the November EA] is being developed to analyze an [sic] this alternative."  (November EA at 1.)

[14/]  The Pinedale Anticline Project Area (PAPA) is located in west-central Wyoming between Ts. 29 through 33 N., Rs. 107 through 110 W., 6th Principal Meridian and lies on a northwest-southeast strike, roughly between the Town of Pinedale and the Jonah II Field, 30 to 35 miles away.  The PAPA includes almost 200,000 acres consisting of primarily Federal land (80 percent), but it also includes State (5 percent) and private lands (15 per cent).  (PAP/DEIS at 1; Fig. 1-3; DEIS "Dear Reviewer" letter dated Oct. 28, 1999.)  All but approximately 7 (PAP/DEIS at 2-2) to 7.4 square miles of the PAPA have been leased.  (PAP/DEIS Executive Summary at 1.)  Some of the leases were issued in the 1950's and "few" of those contain no surface occupancy (NSO) stipulations or restrictions.  (PAP/DEIS at 2-2.)

> To date, 725 of the 900 additional wells have been drilled and are
> producing or have been obligated to a specific area (e.g., the Jonah II
> Field).  Therefore, in addition to analyzing impacts from future
> exploration and development activities in the PAPA and construction
> and operation of gathering and sales pipelines, <u>this EIS also provides
> analysis of a revised oil and gas reasonably foreseeable scenario for the
> Pinedale RMP as part of the cumulative impact analysis</u> (see
> Chapter 5).  The EIS looked at three scenarios: no action, project-wide
> development, and development only along the Anticline crest.

(PAP/DEIS, Fig. 1-1 at 1-3; emphasis added.)  In both appeals, WOC points to the
PAP as evidence of rapid growth in the Pinedale Resource Area (see NA/Petition in
IBLA 2002-303 at 15-16) and as an admission that the RFD scenario has been
exceeded in the Pinedale Resource Area, thus furnishing the predicate for WOC's
NEPA and FLPMA arguments (NA/Petition at 16-24.)

The Parties' Arguments on Appeal

As stated, WOC has adopted most of its stay petitions in lieu of submitting
separate SORs.  In the request for a stay in IBLA 2002-126, WOC contended that all
oil and gas development on the parcels must be stayed.  It argued a likelihood of
success on the merits because the RFD scenario utilized in the RMP/EIS has been
exceeded, thus rendering continued oil and gas development on the challenged
parcels violative of both NEPA and FLPMA.  (NA/Petition in IBLA 2002-126 at
11-20.)  Further, WOC contended that, since BLM had begun the process of
"amending" the RMP, leasing the parcels while that process and the related NEPA
analysis unfolded violates NEPA's constraints on interim actions set forth in 40 CFR
1506.1(a), as well as BLM policy enunciated in its Handbook.  (NA/Petition in IBLA
2002-126 at 21-22.)  Although WOC acknowledged that under Instruction
Memorandum (IM) No. 2001-191, issued on August 6, 2001 (NA/Petition in IBLA
2002-126, Ex. 29), leasing during the RMP amendment process is allowed, WOC
nonetheless contended that BLM had failed to first determine that continued leasing
in the interim would not constrain the choice of reasonable alternatives under
consideration, as IM No. 2001-191 requires.  (NA/Petition in IBLA 2002-126 at
22-23.)

Alternatively, WOC argued that it had a likelihood of success on the merits
relative to CBM extraction and development, even if its arguments are not sustained
as to all oil and gas leasing.  Specifically, WOC argued that CBM extraction and
development will violate NEPA and FLPMA because such activity does not conform to
the RMP, and that its unique environmental effects have never been adequately
analyzed.  (NA/Petition in IBLA 2002-126 at 24-26.)

164 IBLA 93

In IBLA 2002-303, in their Motion for Leave to File a Consolidated Reply, in which appellants adopted the stay request as their SOR, WOC did not specifically exclude any portion of its stay as it did in IBLA 2002-126.  Nonetheless, the arguments are virtually identical, and we will not repeat them.

Also in IBLA 2002-303, in its Motion to Dismiss and Answer, BRI argued that WOC's notice that it was adopting its stay petition in lieu of filing an SOR was untimely, having waited over three months to give notice without obtaining an extension of time.  (BRI Motion to Dismiss at 5.)  BRI further contends that, as WOC had not offered any arguments or information regarding conventional oil and gas leasing not raised when the Board considered WOC's stay petition, the Board should deny the appeal to the extent of conventional oil and gas leasing.  (BRI Motion to Dismiss at 6.)  BRI's third argument is a reiteration of its view that the EA in IBLA 2002-303 complies with NEPA.  Specifically, BRI states that WOC has "identified no environmental impacts associated with conventional oil-and-gas development that have not been analyzed in a NEPA document.  Neither has WOC demonstrated that the BLM committed a clear error of law."  (BRI Motion to Dismiss at 7-8.)  BRI disputes WOC's assertion that all oil and gas leasing must cease until the RMP is amended (BRI Motion to Dismiss at 8-9), as it disputes WOC's conclusions regarding the significance of the RFD (BRI Motion to Dismiss at 9-10).

WOC responds by noting that BRI had intervened with respect to conventional oil and gas leasing only, and had explicitly stated that it advocated no position regarding CBM activity; that the arguments articulated in the Motion to Dismiss appear to relate only to conventional oil and gas leasing; and that WOC's stay request served as its SOR, a practice the Board has accepted in the past.

<u>Analysis</u>

We first address BRI's Motion to Dismiss the appeal in IBLA 2002-303.  Despite the technical merits of BRI's arguments regarding the sufficiency and timeliness of WOC's determination to adopt the petition for stay as their SOR, we decline to dismiss WOC's appeal on this basis.  To constitute an acceptable SOR, a notice of appeal must affirmatively point out error in the decision challenged.  <u>Burton A. McGregor</u>, 119 IBLA 95, 98 (1991).  This does not mean that the appellant must persuasively establish that BLM actually committed error in its decision.  Instead, the appellant must offer reasons in support of his contention that BLM erred, and thus articulate some basis for the Board to review the propriety of the challenged decision.  It must do more than simply assert, in a conclusory fashion, that error was committed.  <u>See</u> <u>United States v. Fisher</u>, 92 IBLA 226, 227 (1986).  If the Board can fairly discern the reasons an individual has appealed a BLM decision, it typically will decline to dismiss the appeal.  <u>See</u>, <u>e.g.</u>, <u>Eric E. Wieler</u>, 160 IBLA 284, 286 n. 4 (2004); <u>MSVR Equipment Rentals</u>, 160 IBLA 95, 97-98 (2003); <u>Bruce M. Lewis</u>,

156 IBLA 287, 293 (2002); J.W. Weaver, 124 IBLA 29, 31 (1992); Robert A. Erkins, 121 IBLA 61, 63 (1991).  In this case, the stay petition in IBLA 2002-303 more than adequately articulated the reasons for appealing the BLM decision.  Although WOC obviously should have declared its intention within the period when an SOR must be filed, or any extension thereof, BRI is not prejudiced by the tardiness of WOC's action.  BRI's motion to dismiss on this basis is therefore denied.

We similarly are not persuaded to grant the motion on BRI's substantive grounds, which BRI incorporates in its opposition to the stay petition.  In that pleading, BRI unambiguously states that it had no position with respect to appellants' arguments regarding CBM (Opposition to Stay at 3), because BRI

> currently has no plans to develop any gas reserves similar to the coal bed methane development occurring in the Powder River Basin, i.e., BR has no plans to dewater coal formations nor to dispose of produced water on the surface.  [Citation omitted.]  In fact, encountering water would substantially decrease or eliminate the development potential of BR's wells.  The only development that will take place in the foreseeable future on these parcels is conventional oil and gas development of the kind identified, analyzed and evaluated in the Pinedale RMP and its associated NEPA documents and again in the Lease EA.

(Opposition to Stay at 4.)  As WOC notes, the arguments in BRI's Opposition relate exclusively to conventional oil and gas leasing.  Moreover, appellants explicitly withdrew their appeal to the extent that it pertained to conventional oil and gas leasing, so that the only issues that remain before us concern CBM.  Accordingly, BRI's Motion to Dismiss is denied, and, as BRI has averred that it has no position on the topic of CBM, we will not consider its arguments further.  We now turn to the merits of WOC's CBM arguments under FLPMA and NEPA.

To reiterate, WOC questions whether CBM extraction and development conform to the Pinedale RMP/EIS, either because current projections of oil and gas development have exceeded that projected in the RMP/EIS, so that it logically must follow that BLM could not have adequately analyzed CBM impacts, or because CBM is so unique that the impacts thereof are beyond those associated with conventional oil and gas exploration and development.  WOC further contends that no CBM activity should be allowed to go forward until the RMP is amended.  Whether CBM activity conforms to the RMP is a land use issue that arises under FLPMA.  Though couched in FLPMA terms and designed to demonstrate the inadequacy of the RMP/EIS so as to mandate a halt of all CBM activity until the RMP is revised, WOC's contentions with respect to the effect of exceeding the RFD scenario projected in the

164 IBLA 95

RMP/EIS and the uniqueness of CBM impacts in fact are NEPA issues. We will approach our task accordingly.

The 1988 RMP/EIS and ROD clearly determined that the Pinedale Resource Area was generally to be "open for consideration for exploration, leasing, and development for all leasable minerals, which include oil, gas, coal, oil shale, and geothermal steam, in accord with all applicable prohibitions (e.g., restrictions, prohibitions)." (RMP/ROD at 15.) In fact, the RMP refers to gas production in the form of $CO_2$, methane, $H_2S$, nitrogen, and helium gases. (Draft RMP/EIS at 186.) CBM extraction and development activity is a type of oil and gas leasing activity, and to that extent, is in conformity with that general land use decision. 43 CFR 1610.5-3(a); see also Southern Utah Wilderness Association, 159 IBLA 220, 234 (2003); Southern Utah Wilderness Association, 158 IBLA 215, 216-17 (2003); Marathon Oil Co., 139 IBLA 347, 356 (1997); Sierra Club Legal Defense Fund, Inc., 124 IBLA 130, 140 (1992); High Plains Petroleum Corp., 125 IBLA 24, 26 (1992). Since the choice of whether to allow oil and gas leasing in the Pinedale Resource Area was made in 1988, [15/] no violation of FLPMA is established by reason of the interest in exploring for and developing CBM gas resources in the Pinedale Resource Area.

Notwithstanding that the Pinedale RMP permits oil and gas exploration and development, WOC argues that CBM extraction and development does not conform to the RMP, either because current projections of oil and gas development have exceeded that projected in the RMP/EIS's RFD scenario, or because CBM extraction and development generates unique impacts beyond those associated with conventional oil and gas exploration and development. According to WOC, it must logically follow that BLM could not have adequately analyzed CBM impacts, fundamentally NEPA issues that require a "plan amendment" (see, e.g., NA/Petition at 12-13) pursuant to 43 CFR 1610.5-5, a FLPMA issue.

As stated, under the RMP, 450 wells per decade, or up to 900 wells for the life of the RMP were projected in 1988. In their stay petitions, appellants stated that, with the issuance of the PAP/ROD, up to 900 additional well locations have been approved, resulting in a revised RFD scenario for the RMP/EIS of 1,944 oil and gas wells for the Pinedale Resource Area. WOC characterizes the Pinedale

_____

[15/] To the extent that WOC challenges that decision to allow oil and gas exploration and development, the time for appeal has long since passed. Even were it a viable argument at this point in time, however, approval and amendment of land use planning determinations, i.e., resource management plans, are not actions appealable to this Board. Rio Grande Rapid Transit, 161 IBLA 225, 227 (2004); Friends of the River, 146 IBLA 157, 163-64 (1998); Wilderness Society, 90 IBLA 221, 224 (1986). See 43 CFR 1610.5-2.

Resource Area as one "which has been relatively undisturbed by development for natural gas." (NA/Petition in both appeals at 3-4.) WOC further argues that Wyoming bears a disproportionate share of onshore leasing with approximately 20 of approximately 41 million acres of public land leased (NA/Petition in both appeals at 5); it notes that leasing is occurring at a "feverish pace" (NA/Petition in both appeals at 5); and argues that southwestern Wyoming and the Greater Green River Basin, which includes the Pinedale Resource Area, is "at risk for CBM extraction" (NA/Petition in IBLA 2002-126 at 6; in IBLA 2002-303 at 7), as demonstrated by the authorization of the Riley Ridge project and another that, according to BLM, was then "in the works" (May 2001 Energy Development and Natural Resource Management published by BLM, Ex. 17 to NA/Petition in IBLA 2002-126 at 6; in IBLA 2002-303 at 7-8.) Additionally, in IBLA 2002-303, WOC states that of 1.2 million acres of public lands in the Pinedale Resource Area, 1.14 million are under lease or closed to leasing, so that only 60,000 acres remain that have not been leased, and of those acres open to leasing, only 10,000 acres remain to be leased. (NA/Petition in IBLA 2002-303 at 6.)

With those factual assertions as background, WOC maintains that "[w]hen an RFD scenario has been exceeded, all oil and gas operations (and particularly leasing) must stop because the impacts of the new wells implicated by new leases have not been addressed in a resource area[-]wide NEPA document, usually the EIS accompanying the RMP." (NA/Petition in IBLA 2002-126 at 11; IBLA 2002-303 at 15.) [16] WOC argues that even assuming that issuance of the PAP/ROD properly revises the RFD scenario projected in the RMP/EIS, the revised RFD scenario of 1,944 wells resulting from the PAP/EIS was exceeded in 1999. WOC derived this figure by adding the numbers of wells allowed under the RFD scenarios for the "Hoback Basin (MA 21), Upper Green River (MA 72), Soda Unit, Castle Creek Unit, Riley Ridge, CAP [Coordinated Activity Plan], Jonah II, Burley, Bird Canyon, and PAP," which, "when added to the approved wells for the Anticline," [17] totaled 3,151 wells within the Pinedale resource area. See Exhibit

---

[16] In considering this line of argument to rule on the stay petition, the Board noted its assumption that BLM would address WOC's concern at the appropriate time, that is, if and when development activities are proposed on leases issued for the challenged parcels. In the limited context of a request for a stay, where a party's showing must address a number of elements to persuade the Board that a stay should be granted, see 43 CFR 4.21(b), that conclusion sufficed.

[17] Contrary to the suggestion that might be implied by WOC's phrasing, the projection of well numbers for purposes of developing an RFD scenario does not constitute a blanket approval to drill. Actual drilling is authorized only by approval of an Application for Permit to Drill. 43 CFR 3162.3-1.

164 IBLA 97

24 at 5-3." [18/]  (NA/Petition in IBLA 2002-126 at 14-15; in IBLA 2002-303 at 18.)
WOC questions whether an RFD scenario properly can be updated, and whether
the need to update an RFD scenario necessarily vitiates the environmental analysis
to which it is connected.  (NA/Petition in IBLA 2002-126 at 12-14; in IBLA 2002-
303 at 16-18.)

     As an initial matter, we are puzzled by WOC's figure of a total of 3,151
wells, which presumably was derived from Table 5-1.  As we see it, the ROD's for
the ten projects identified by WOC (and this includes the PAP/ROD) allow up to
2,071 wells, of which 1,762 remained that could be drilled as of November 1999.
For its argument, WOC uses the higher total of 900 wells for the PAP, but as the
PAP/ROD states, BLM

> recognizes that in order to develop 700 productive well pads in the
> PAPA, as many as 900 well pads may need to be constructed and
> drilled and that as many as 200 of these well pads may be plugged,
> abandoned and reclaimed because the wells would be dry holes or
> uneconomical to produce.  The ROD also recognizes that not all of
> the well pads will be located on Federal lands/minerals.  Therefore,
> monitoring for project consistency with the scope of the EIS analysis
> will be based on the total of 700 producing well pads.

(PAP/ROD at 1.)  We note, moreover, that the State of Wyoming Oil and Gas
Conservation Commission, the Office of State Lands and Investments, BLM, and
some PAP operators "believe that drilling results to date suggest a more likely level

---

[18/]  Ex. 24 in IBLA 2002-126 is Table 5-1 from the PAP/DEIS at 5-3.  That Table was
provided as Ex. 28 in IBLA 2002-303.  Table 5-1 lists every oil and gas development
project in the Pinedale Resource Area, including CBM projects; the date each project
ROD was signed; the number of existing wells as of the date of each project EIS; the
number of wells anticipated in each project ROD; the number of wells drilled since
each ROD; the number of dry hole, depleted, or plugged and abandoned wells for
each project; the number of completed but not producing wells for each project; the
number of producing wells for each; and the number of remaining wells that can still
be drilled under each project RFD scenario.
    The number of wells that could be drilled under each project RFD scenario is
equal to the number of existing wells as of the date each project EIS was written
added to the number of wells projected under each project ROD, less the number of
producing wells.  In other words, dry, depleted, or plugged wells are not counted in
the number of projected wells remaining to be drilled under an RFD scenario.  More
to the point, Table 5-1 shows that as of November 1999 when the PAP/DEIS was
prepared, 7,711 out of a total of 8,791 wells estimated for all the project RFD
scenarios in southwestern Wyoming remained to be drilled.

of development in the PAPA of 300 to 350 producing well pads."  (PAP/DEIS at 2-2.)  BLM opted to analyze the higher projection of 500 to 700 producing well pads to ensure adequate disclosure of impacts.  Thus, it is not at all clear that the RFD scenario, whether viewed in terms of anticipated but not yet drilled wells, or more concretely as numbers of wells drilled to date, has actually been exceeded in the Pinedale Resource Area, and if the scenario has been exceeded, when it might have occurred, because what is before us is data as of November 1999, when the PAP/DEIS was prepared.

[1]  Putting aside the unanswered question of whether the RFD scenario has actually been exceeded, however, implicit in WOC's argument is the conviction that the RFD scenario establishes a point past which further exploration and development is prohibited, and the assumption that the underlying environmental analysis has no validity beyond the RFD scenario.  We do not agree.  A tool prepared by an interdisciplinary group of technical and scientific specialists, the RFD scenario serves as an analytical baseline for identifying and quantifying direct, indirect, and cumulative impacts, which provides the premise for formulating alternatives to a proposed action and strategies for mitigating adverse impacts.  Recently, in IM No. 2004-89 (January 16, 2004), [19/] BLM explained the RFD scenario:

> A "Reasonably Foreseeable Development Scenario" (RFD) for oil and gas is a long-term projection (scenario) of oil and gas exploration, development, production, and reclamation activity.  The RFD covers oil and gas activity in a defined area for a specified period of time.  The RFD projects a baseline scenario of activity assuming all potentially productive areas can be open under standard lease terms and conditions, except those areas designated as closed to leasing by law, regulation or executive order.  The baseline RFD scenario provides the mechanism to analyze the effects that discretionary management decisions have on oil and gas activity.  The RFD also provides basic information that is analyzed in the National

---

[19/] IM No. 2004-089 expires on Sept. 30, 2005.  It replaced BLM Manual Section 1624 and the related Handbook, H-1624-1, Planning for Fluid Mineral Resources (Rel. 1-1583 (May 7, 1990)), which was deleted with the issuance of IM No. 96-147 (July 26, 1996):  "The BLM Handbook H-1624-1, Planning for Fluid Mineral Resources[,] was reviewed to determine areas in need of replacement or revision, and recommendations were made for an action plan to accomplish those changes.  As a result of those recommendations, the decision was made to update and clarify Chapter III of Manual H-1624-1.  The revised technical policy for developing, reporting and using an RFD scenario is here provided (Attachment 1)."  (IM No. 2004-089 at 1.)

Environmental Policy Act (NEPA) document under various alternatives.

The RFD is a technical report typically referenced in the NEPA document.
* * *

The RFD is neither a planning decision nor the "No Action Alternative" in the NEPA document.  In the NEPA document, the RFD baseline scenario is adjusted under each alternative to reflect varying levels of administrative designations, management practices, and mitigation measures.  Under each alternative, the new adjusted level of projected oil and gas activity then leads to an analysis of related environmental effects in the "Environmental Consequences" section of the NEPA document * * *.

(Attachment 1-1 to IM No. 2004-089 at 1-1.)  More specifically, an RFD scenario is

based on a review of geological factors that control the potential for oil and gas resource occurrence and past and present technological factors that control the type and level of oil and gas activity.  The RFD also considers petroleum engineering principles and practices and economics associated with discovering and producing oil and gas.  The RFD projection can range from speculative estimates in unexplored frontier areas to estimates with higher levels of confidence in maturely developed producing areas.

Because the potential for oil and gas occurrence and development is rarely the same from one planning area to the next, the level of detail and type of information included in an RFD is determined on a case-by-case basis.

(Attachment 1-1 at 1-3, which also individually lists functions of the oil and gas RFD scenario.) [20]

_____

[20]  We note, moreover, that this policy is consistent with broader action to articulate the nature and uses of RFD scenarios.  See, e.g., the Final Draft of the Interagency Reference Guide, "Reasonably Foreseeable Development Scenarios and Cumulative Effects Analysis For Oil and Gas Activities On Federal Lands In the Greater Rocky Mountain Region" (Aug. 30, 2002), authored by the Rocky Mountain Federal Leadership Forum (IRG).  That Forum consisted of representatives from BLM, the U.S. Environmental Protection Agency, the U.S. Fish & Wildlife Service, the National

(continued...)

164 IBLA 100

WOC concedes that the impacts of various projects have been analyzed on a project-specific basis, but insists that the RMP's RFD scenario has been exceeded by the cumulative number of wells projected for various projects, that there has been no meaningful analysis of cumulative impacts on a Resource Area-wide basis, and that all CBM activity must be halted until the RMP is amended. BLM responded to that argument by denying that the RFD scenario had been exceeded, on the theory that it was "updated" by the analysis contained in the PAP/EIS and elsewhere. See Decision in IBLA 2002-126 at 2. WOC challenges BLM's assertion that the PAP/EIS can lawfully "update" the RMP/EIS, arguing that, pursuant to FLPMA and implementing regulation 43 CFR 1610.4, changes in RFD scenarios can be achieved only by an RMP amendment that analyzes the entire resource area. [21] (NA/Petition in IBLA 2002-126 at 12-14; in IBLA 2002-303 at 15-17.) BLM denies that it has attempted to amend or modify the RMP: "The analysis documented in the Pinedale Anticline EIS updates the oil and gas reasonably foreseeable development scenario and the air quality cumulative impact analysis of the EIS for the Pinedale RMP." (PAP/ROD at 34; Decision at 2.) WOC advances the related argument that the number of additional wells authorized by the PAP/EIS does not

---

[20] (...continued)
Park Service, and the U.S. Department of Agriculture, Forest Service. Noting that an "RFD describes net disturbances, not just numbers of wells" (IRG at 10), the IRG states:

> An RFD is a vital and necessary tool for
> - Determining to what extent a management plan might need to be updated or revised[;]
> - Providing technical information for analyzing direct, indirect, and cumulative effects from oil and gas activity that reasonably could be expected as a result of a leasing decision;
> - Serving as a context for more localized site-specific decisions on proposed exploration or development projects; and
> - Making informed planning (leasing) decisions on management of oil and gas resources balanced with management of other resources.

(IRG at 12.)

[21] We agree that the RFD scenario utilized in the PAP/EIS technically cannot "update" the RFD scenario utilized in the RMP/EIS, in the sense that the regulations admittedly do not address or recognize "updates" of RFD scenarios by means of the environmental analysis that authorizes expansion of the very activity that causes the RFD scenario to be exceeded. Although WOC does not acknowledge it, the PAP/EIS examined the environmental consequences of drilling up to 900 additional wells in the Pinedale Resource Area, and, as part of that analysis, considered the incremental effects of the proposed PAP added to the effects of all other projects in the Resource Area. See Chapter 5 of the PAP/EIS.

conform to the RMP, and therefore the RMP must be changed before leasing can proceed.

[2]  We see no proper basis for accepting a characterization of the RFD scenario that requires us to jettison, in its entirety, BLM's expertise and view of the proper scope and role of an RFD scenario, as expressed in IM 2004-089.  Nor are we persuaded that we must here decide the implied question of whether the RFD scenario can or should be deemed to constitute a land use decision within the meaning of the 43 CFR Subpart 1610.  The better question is whether in any given case an exceeded RFD scenario demonstrates that further environmental analysis is required, a question that must be determined on a case-by-case basis. [22]/

WOC is correct that RMP's are to be changed only in accordance with the provisions of 43 CFR Subpart 1610.  It is also true that the term "update" does not appear in the relevant regulations, 43 CFR 1610.5-4 (maintenance of RMP's), 1610.5-5 (amendments of RMP's), or 1610.5-6 (revision of RMP's) in describing either the process or the result.  The RFD scenario admittedly plays a vital role in land use planning and impacts analysis, but it is not an RMP.  To come directly to the point, however, as WOC acknowledges, the RMP is being revised in accordance with 43 CFR Subpart 1610, [23]/ and that plan revision was prompted by the recognition that "multiple issues, including oil & gas, coalbed methane, [and] urban interface," must be addressed in the Pinedale Resource Area.  (IM No. 2002-081 (February 4, 2002)). [24]/  As the RMP is in the process of being revised, we find

_____

[22]/  We express no opinion at this time regarding whether a need for further environmental analysis also compels a plan amendment or revision.

[23]/  The Pinedale RMP was among a number of RMP's BLM identified in IM 2002-081 (Feb. 4, 2002) as time-sensitive and a "top priority" for initiation, revision, amendment, or assessment.  The Pinedale RMP was to be "revised" pursuant to 43 CFR 1610.5-6 rather than "amended" pursuant to 43 CFR 1610.5-5, with a target completion date in October 2004.  By its terms, IM 2002-081 expired on Sept. 30, 2003.  The present status of the Pinedale RMP amendment does not appear from the record before us.

[24]/  We note also that BLM has imposed a moratorium with respect to other future actions.  The PAP/ROD states:

> **Future Pinedale RMP Updates:**  The Wyoming State Director has placed a moratorium on Federal mineral leasing and associated and similar activities (e.g., rights-of-way) on all Federal lands and minerals that are unleased and/or that have expired leases in the Hoback Basin, southern foothills of the Gros Ventre Range, and the Wind River Front (see Figure 9).  The moratorium will remain in effect until the impacts

(continued...)

it unnecessary to further consider or to decide the merits of WOC's contentions in support of that outcome.  WOC's other FLPMA arguments regarding notice in the <u>Federal Register</u> and public comment accordingly are moot.  We now turn to WOC's second line of argument.

[3]  We begin by acknowledging that

> [t]he appropriate time for considering the potential impacts of oil and gas exploration and development is when BLM proposes to lease public lands for oil and gas purposes because leasing, at least without NSO [no surface occupancy] stipulations, constitutes an irreversible and irretrievable commitment to permit surface-disturbing activity, in some form and to some extent.

<u>Western Slope Environmental Resource Council</u>, 163 IBLA 262, 285 (2004) <u>citing Wyoming Outdoor Council</u>, 156 IBLA at 379; <u>Colorado Environmental Coalition</u>, 149 IBLA 154, 156 (1999), and cases cited; <u>see also</u> <u>Sierra Club v. Peterson</u>, 717 F.2d 1409, 1414-15 (D.C. Cir. 1983).

WOC contends that CBM exploration and development results in impacts so unique they require separate consideration and analysis.  In its pleadings, WOC enumerates these impacts. [25/]  WOC concludes that since there is no pre-leasing NEPA analysis that covers these unique impacts, no lease can be sold that could be

---

[24/]  (...continued)
of leasing these lands for mineral development can be addressed in a planning review and update to the 1988 Pinedale RMP and the Bridger-Teton Leasing EIS has been completed (see DEIS Chapter 5).  The RMP planning review for the identified areas will address any needed update of the analysis for Federal mineral leasing in these areas to reflect present day information and public input on air quality values, protection of the mountain range scenic values, protection of the new and/or more densely populated rural subdivisions occurring on private surface underlain by Federal minerals, and other resource concerns.  Pending budget allocations, the planning review and update process is expected to be conducted from the fall of 2000 through 2005.
(PAP/ROD at 34.)

[25/]  The Board is well aware of the significant environmental consequences that can be associated with CBM extraction and development.  These may include high volumes of produced water and related disposal issues, depletion of aquifers, impeded water rechargeability, high sodium adsorption rate in soils, increases in total dissolved solids, the suitability of produced water for irrigation and human consumption, erosion, and the possibility of underground fires.

164 IBLA 103

developed for CBM.  (NA/Stay Petition in IBLA 2002-126 at 28.)  More than a general recitation of possible CBM-related impacts is necessary to discharge the burden of proof on appeal.  The Board will look for objective indications of the potential for CBM on the specific parcels at issue.  Assuming that a parcel may contain CBM, the Board will not simply further assume that any such potential *ipso facto* will result in development or that any development will necessarily occur in circumstances rivaling those found in the Powder River Basin or a comparably productive basin.

In IBLA 2002-126, the April EA characterized conditions on the eight parcels as follows:

> Geology/Minerals:  The geology will vary from parcel to parcel.  Parcels 167, 177, 178, 188, 200, 201, 205 and 207 lie in the tight-gas sand play of the Lance and Mesaverda formations (like the Pinedale Anticline and Jonah Fields).  Depths would typically be greater than 8000 feet.  The rest of the parcels are located within the Wyoming Range Overthrust Belt.  <u>The most probable mineral (oil/gas) target for these overthrust parcels is natural gas</u> from subthrust Frontier or deeper formations (Nugget & Madison).  Mark Strahn of Hanson and Strahn, Lease Brokers, stated that target formations for the South LaBarge parcels was the Hilliard, Frontier, Nugget, and Madison.

> <u>Coal bed methane development is not anticipated on PFO-August parcels</u>.  Based on current sub-surface geological information the coal beds are either too deep, the seams too thin, or in the case of the South LaBarge parcels 212-221 and 226-235 the coal-bearing Cretaceous Formations are typically eroded and absent.

> Parcels 167, 177, and 178 would be located in the vicinity of existing oil and gas development, i.e., producing wells in the Jonah Field and on the Mesa portion of the Pinedale Anticline.  <u>The rest of the parcels would be several miles or more from the nearest producing well</u>.

(EA at unnumbered page 15; emphasis added.)

It thus appears that none of the eight parcels in IBLA 2002-126 shows any serious promise of CBM development.  Given the individualized assessment of CBM potential, the burden falls upon WOC to come forward with objective, countering evidence to show, as to each parcel, that BLM erroneously relied on the RMP/EIS's environmental analyses to support the decision to offer these parcels for sale.  When BLM has identified the specific factors that support its conclusion that

164 IBLA 104

existing impacts analysis encompasses the leasing decision, appellants' burden is not discharged by referring to the interest that industry has shown in the PAPA or by pointing to the number of wells that might be drilled pursuant to the PAP/ROD, because these parcels are not in the PAPA, and the three that are "in the vicinity of existing oil and gas development" are near conventional gas operations.  In light of the apparent absence of any serious potential for CBM development, BLM properly relied on the RMP/EIS analysis contained in the RMP to fulfill its pre-leasing NEPA obligation. [26]/

[4]  In IBLA 2002-303, neither the November EA nor EA-022 contains an assessment of CBM potential on the 35 leases offered in the February 12, 2002, lease sale:  EA-022 provided only that "[l]easing, where determined to be appropriate, would allow parcels to potentially be explored and/or developed for the production of any underlying hydrocarbon resources to meet national needs." (EA-022 at unnumbered page 3.)  None of the descriptions of conditions on the individual parcels mentioned CBM, and only one of the six leases remaining in contention is subject to an NSO stipulation, because it is in the bed of the Green River.  (EA-022 at unnumbered page 6.)  As we have noted, neither the Pinedale RMP nor its EIS, to which EA-022 is tiered, specifically discussed CBM, the impacts of which can significantly differ from those associated with conventional oil and gas.  However, appellants allege that the six parcels are likely to be developed for the CBM resources they contain, and that the unique impacts like those associated with CBM development in the Powder River Basin, for example, are likely to materialize.

---

[26]/  WOC's argument to the contrary notwithstanding, nothing in 43 CFR Part 1610 or in CEQ regulations requires BLM to suspend leasing until a plan revision is concluded:

> In Sierra Club Legal Defense Fund, Inc., 124 IBLA 130, 140 (1992), the Board rejected the argument that BLM must suspend action in conformance with an existing land use plan when it decides to prepare a new plan.  The Board has also held that 40 CFR 1506.1(c) does not apply where the proposed action is covered by an existing environmental statement, thus repudiating the contention that ongoing environmental studies bar BLM from acting until such studies have been completed.  In Re Bryant Eagle Timber Sale, 133 IBLA 25, 29 (1995).  This precedent undermines WOC's contention that BLM violated NEPA and FLPMA by offering the parcels for leasing during the amendment process for the existing RMP.  See also ONRC Action v. BLM, 150 F.3d 1132, 1140 (9th Cir. 1998) ("because the RMPs are outdated, they cannot be existing program plans as stated in NEPA") .

Wyoming Outdoor Council, 156 IBLA at 384-85.

164 IBLA 105

IBLA 2002-126, 2002-303

Neither BLM nor BRI, on whose pleadings BLM relied as its response to WOC's SOR, has disputed that critical assertion. Indeed, BRI -- and thus BLM -- expressly confined its concerns to conventional oil and gas development, and BLM has submitted nothing further on appeal that might illuminate matters differently. WOC's contention therefore stands unrefuted, circumstantially buttressed by the fact that the RMP is presently being revised to address, among other things, CBM development in the Pinedale Resource Area, and by BLM's admissions and actions in other contexts. [27/]  We must conclude that the RMP did not provide the pre-leasing analysis for the sale of those parcels that NEPA requires.  Pennaco Energy, Inc. v. U.S. Department of the Interior, 377 F.3d 1147, (10th Cir. 2004); Western Slope Environmental Resource Council, 163 IBLA at 285, and cases cited; Wyoming Outdoor Council, 156 IBLA 347, 357 (2002).  BLM's decision dismissing WOC's protest on the basis of a conclusion to the contrary therefore is reversed and the case will be remanded for further action.

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decision in IBLA 2002-126 is affirmed; the appeal in IBLA 2002-303 is dismissed to the extent it pertained to conventional oil and gas activity, and is otherwise reversed and remanded for further action.

_____
T. Britt Price
Administrative Judge

I concur:


_____
James F. Roberts
Administrative Judge

_____
[27/]  In a report to Congress, BLM acknowledged the inadequacy of its planning documents, particularly as they relate to interest in CBM.  Projecting 8,600 new applications to drill CBM wells between 1999 and 2003, BLM stated that revised or amended land use planning and NEPA compliance to meet this need was essential. (See NA/Petition in IBLA 2002-303, Ex. 31, Report to Congress, Land Use Planning for Sustainable Resource Decisions, Executive Summary at unnumbered pages 6, 7 (February 2000).)  See also nn. 22 and 23, *supra*.

164 IBLA 106