# EXHIBIT F9

# Becharof Corp.,
# 147 IBLA 117 (1998)

# 147 IBLA 117; 1998 IBLA LEXIS 187

Interior Board of Land Appeals

December 30, 1998, Decided

IBLA 95-333

*Department of Interior Board of Land Appeals      Decisions*

**Reporter**
147 IBLA 117 *; 1998 IBLA LEXIS 187 **

## BECHAROF CORP.

## Core Terms

site, guild, protest, occupancy, withdrawal, contest, acre, hunt, occupy, existing right, application to purchase, notice of location, convey, notice, manufacture, patent, claimant, fish, public land, tract, lake, confirm, memorandum, withdrawn, village, trophy, tent, headquarter, settlement, recommend

## Headnotes

1. Alaska: Trade and Manufacturing Sites--Contests and Protests: Generally--Rules of
Practice: Protests

A Native corporation need not satisfy the requirements of 43 U.S.C. § 270-4 (1982), when the objection it raises to BLM's proposed approval of an application to purchase a trade and manufacturing site is not an "adverse claim," within the meaning of that statute. Such an objection is properly treated as a protest made pursuant to 43 C.F.R. § 4.450-2.

2. Act of March 3, 1891--Alaska: Trade and Manufacturing Sites--Contests and
Protests: Generally

Where there was a pending protest at the conclusion of the 2-year period following payment of the final purchase price for a trade and manufacturing site, BLM was not required by section 7 of the Act of Mar. 3, 1891, as amended, 43 U.S.C. § 1165 (1994), to patent the land to the claimant.

3. Administrative Procedure: Standing--Alaska: [**2] Trade and Manufacturing Sites--Rules
of Practice: Appeals: Standing to Appeal

A Native village corporation will be deemed to have standing, under 43 C.F.R. § 4.410(a), to appeal a BLM decision approving an application to purchase a trade and manufacturing site and dismissing its protest to that approval, when it alleges that its shareholders use the claimed land for subsistence hunting and fishing and for access to water bodies for such purposes, [*118] that the land may be the location of the graves and cultural resources of the ancestors of its shareholders, and that it owns neighboring land, all of which may be adversely affected by conveyance of the claimed land out of Federal ownership, and subsequent development by the claimant.

4. Alaska: Trade and Manufacturing Sites--Res Judicata

Neither the doctrine of res judicata nor administrative finality bar this Board from reversing a decision by BLM approving an application to purchase a trade and manufacturing site pursuant to section 10 of the Act of May 14, 1898, as amended, 43 U.S.C. § 687a (1982), and 43 C.F.R. Subpart 2562, when the record clearly demonstrates that the claimant did not initiate qualifying use and **[**3]** occupancy on or before the date the land claimed was withdrawn from appropriation under that statute.

5. Alaska: Trade and Manufacturing Sites--Withdrawals and Reservations: Effect of

When land subject to a trade and manufacturing site claim is withdrawn from appropriation under the public land laws after the filing of a notice of location for a trade and manufacturing site, but prior to its use and occupancy for trade, manufacture, or other productive industry, the claim is invalid and may not be perfected by subsequent use and occupancy and the filing of an application to purchase.

## Counsel

APPEARANCES: Samuel J. Fortier, Esq., Anchorage, Alaska, for appellant; Thomas E. Meacham, Esq., Anchorage, Alaska, for Bernard R. Guild.

## Action

**[**1]**

**[*117]** Appeal from a decision of the Alaska State Office, Bureau of Land Management, approving in part the application to purchase land claimed as a trade and manufacturing site and dismissing protests thereto. AA-8433.

Motion to dismiss denied; BLM decision reversed; application to purchase denied.

**Opinion By:** TERRY

## Opinion

**Editor's Note: Reconsideration denied by order dated June 16, 1999**

OPINION BY ADMINISTRATIVE JUDGE TERRY

The **Becharof** Corporation (**Becharof**) [1] has appealed from a March 2, 1995, decision of the Alaska State Office, Bureau of Land Management (BLM), approving in part Bernard R. Guild's application to purchase his trade and manufacturing (T&M) site (AA-8433) and dismissing various protests thereto filed by individuals and entities, including **Becharof**. [2]

**[**4]**

On July 16, 1973, Guild filed a "Notice of Location of Settlement or Occupancy Claim" asserting the location of a T&M site, under the **[*119]** authority of section 10 of the Act of May 14, 1898, as amended, 43 U.S.C. § 687a (1982), [3] and 43 C.F.R. Subpart 2562, on a tract of unsurveyed public lands, described by metes and bounds, at

---

[1] **Becharof** is a Native village corporation organized under the authority of section 8 of the Alaska Native Claims Settlement Act (ANCSA), as amended, 43 U.S.C. § 1607 (1994).

[2] No appeals were filed by any of the other protestants.

the junction of the Egegik River and **Becharof** Lake. The record establishes that the irregular tract, which was denoted by Guild with posts placed at five of the six corners, encompassed approximately 80 acres of land situated in protracted fractional sec. 8, T. 25 S., R. 46 W., Seward Meridian, Alaska. It was bounded on the north by the river and the east by the lake. Guild stated, in his Notice, that his occupancy of the T&M site had commenced in October 1972, but no improvements had yet been placed on the land.

 [**5]

On August 14, 1973, Guild informed BLM that he intended to make "improvements" on his T&M site "in the immediate future," which would consist of the following:

> 1. Clearing ground of brush for a suitable base camp site.
>
> 2. Building a minimum of six (6) wooden walled and floored 10' x 12' tent camps to house and feed hunters and fishermen.
>
> 3. The construction of a clean water and a sanit[a]ry toilet system.
>
> 4. Bringing in boats and outboard motors suitable for swift river and large lake operations for safe transportation of paid clientel[e].

(Letter to BLM, dated Aug. 10, 1973.)

On September 20, 1973, in accordance with section 17(d)(1) of ANCSA, *43 U.S.C. § 1616(d)(1)* (1994), the Secretary of the Interior issued *Public Land Order (PLO) No. 5388, 38 Fed. Reg. 26370*, amending PLO No. 5181 of March 9, 1972 *(37 Fed. Reg. 5584 (Mar. 16, 1972))*, by adding certain lands, including the lands in question. The Secretary provided in PLO No. 5388 that, subject to valid existing rights, all the described lands would immediately become subject to the terms and conditions of PLO No. 5181, which had withdrawn **[**6]** certain described lands from all application and appropriation under the public land laws. [4]

 [*120]  On March 2, 1978, BLM received a letter from **Becharof** stating that Guild's T&M site was in conflict with "the village of Egegik's use of the land and that approval of Mr. Bernard Guild's application should not be made." BLM responded by letter dated March 10, 1978, stating: "Your letter will be placed in Mr. Guild's file and will be treated as a protest to issuance of patent." BLM further assured **Becharof**: "Your protest will be considered at such time as a contest complaint is initiated or final action is taken on Mr. Guild's application to purchase."

On June 30, 1978, prior to the expiration of the 5-year statutory life of his claim, Guild filed an "Application to Purchase **[**7]** Trade & Manufacturing Site," seeking to purchase the subject land, pursuant to section 10 of the Act of May 14, 1898, and 43 C.F.R. Subpart 2562. That statute provided, in pertinent part, that:

> Any citizen of the United States * * * in the possession of and occupying public lands in Alaska in good faith for the purposes of trade, manufacture, or other productive industry, may * * * purchase one claim only not exceeding eighty acres of such land * * * upon submission of proof that said area embraces improvements of the claimant and is needed in the prosecution of such trade, manufacture, or other productive industry[.]

*43 U.S.C. § 687a* (1982).

Guild asserted, in his application, that he had occupied the subject land since August 1973. [5] He set forth his early activity on the land in an attached letter:

---

[3] Section 10 of the Act of May 14, 1898, was repealed by section 703(a) of the Federal Land Policy and Management Act of 1976, *Pub. L. No. 94-579*, 90 Stat. 2789, effective Oct. 21, 1986, subject to valid existing claims.

[4] The lands were withdrawn for classification and study as a possible addition to the National Wildlife Refuge System and, on Dec. 2, 1980, Congress, pursuant to section 302(2) of the Alaska National interest Lands Conservation Act, *Pub. L. No. 96-487*, 94 Stat. 2385 (1980), became part of the **Becharof** National Wildlife Refuge.

I first used this area for hunting while employed as an assistant guide for Alaska Trophy Safaris in 1972-74. [6] In the fall of 1972 I camped at the Rapids for 8-days to hunt on my own. [7] In 1973, after completing a preparatory exploration, I filed for occupancy as per regulation.

 [*121] In the fall 1974 while again working for Alaska [**8] Trophy Safaris, I had two Michigan Hunters for caribou and moose * * *, along with an Egegik resident assistant guide named August Alto (since deceased). We hunted for caribou along the Egegik River and camped on the T & M site for 3 or 4 days.

In 1975 I secured employment with the U.S. Civil Service as a carpenter, but resigned this position in June 1977 and have operated *Becharof* Camps each season since that time. [8] During both 1975 and 76, being stationed at remote sites for the U.S. Air Force, I had ample opportunity to talk to military personnel about the camp, and arranged for 5 or 6 hunting parties (10 to 15 hunters) to use *Becharof* Camps at no charge because I couldn't be there at that time.

I have been adverti[s]ed in "WORLD'S OF ALASKA" Department of Tourism booklet since 1974 as *Becharof* Lodge & Camps, and I expect to build a 20-capacity lodge as soon as it becomes economically feasible.

(Letter to BLM, dated June 30, 1978, at 1.) Guild further stated, in his application, that the nature of his commercial operation was "Unguided Hunting, Sport Fishing, Wilderness Camping, River Boating, Scenic photography, hiking, Biological Study Workshop Camp." He also asserted that [**9] improvements, costing $35,250, had been placed on the site, notably a 12- by 12-foot cabin, a 16- by 16-foot shop/storage building for the storage of a four-wheel drive vehicle, boats, tents, and camping gear, four 10- by 12-foot tent platforms, and two outhouses. A sketch map depicting the location of the existing and proposed improvements and various landmarks was filed with the application.

 [**10]

By notice dated October 12, 1979, BLM informed Guild that he had failed to submit, with his application to purchase, proof that he had been actually using and occupying the subject land for the purpose of "trade, manufacture, or other productive industry." It required further information.

On November 13, 1979, Guild filed an affidavit, signed by him on November 5, 1979, along with extensive documentation of his activities on the T&M site.

In a May 5, 1980, memorandum, the Acting Chief, Branch of Lands and Minerals Operations, Alaska State Office, requested a field report [*122] on AA-8433. That memorandum [**11] contains a hand-written notation: "Also please address protests filed by * * * *Becharof* Corporation."

On May 21, 1980, Michael J. Thompson, a BLM realty specialist, accompanied by Guild, inspected the T&M site. Thompson reported, in a July 29, 1980, Land Report, that he had confirmed the presence of a cabin, a

---

[5] In his notice of location, Guild claimed occupancy from October 1972. He reaffirmed that his occupancy began in October 1972 at page 1 of a May 27, 1995, affidavit, filed with the Board on June 9, 1995, along with his Reply Brief in Support of Applicant's Motion to Dismiss Appeal (Reply Brief).

[6] Alaska Trophy Safaris was apparently owned and operated, during the relevant time period, by Dennis Harms, who was a "Registered Guide." See Letter to Guild from Harms, dated Sept. 15, 1974. According to copies of his State licenses for the years 1972 and 1973, filed with BLM on Aug. 14, 1973, Guild was an "Assistant Guide," which permitted him to guide hunters and/or photographers in the company of a registered guide.

[7] Guild identified the "Rapids" on a sketch map of his T&M site claim, submitted with his application to purchase. They were shown as a short section of the Egegik River where it exits from *Becharof* Lake, which is adjacent to part of the shoreline area of his claim.

[8] In a July 16, 1985, letter to Senator Ted Stevens, a copy of which is contained in the case file, Guild reported that "1977 was my first year of operation," noting that "in 1973-1976 my area was utilized by 2 or 3 guides."

shop/storage building, three tent frames, and two outhouses, all of which had been constructed by Guild during the summer of 1977. On that basis, he concluded that the **_Becharof_** protest was "unfounded." (Report at 3.) Thompson further concluded that Guild had established only one "productive industry" on the subject land, i.e., unguided hunting and sport fishing, during the 5-year statutory life of his T&M site claim, and had not demonstrated that all of the 80 acres were necessary in the prosecution of that activity. He, thus, recommended that Guild's purchase application be contested in its entirety should he decline to voluntarily reduce the acreage of his claim to encompass his existing improvements. The District Manager, Anchorage District, Alaska, BLM, concurred in Thompson's findings and recommendations on July 31, 1980. No mention is made in the Land Report of the 1973 **[\*\*12]** withdrawal.

Thereafter, BLM forwarded a copy of a draft contest complaint to the Office of the Solicitor. Therein, BLM proposed to challenge the claim on the basis of failure to use and occupy the lands. In a memorandum dated September 1, 1981, the Office of the Solicitor responded that the proposed complaint was not legally sufficient and should be redrafted. It stated that "Mr. Guild's activity during the 5-year statutory prove-up period, as evidenced by the material submitted and by the field examination * * * would seem to establish that Mr. Guild has in fact met the requirements of the law." It also stated that it was "unclear" from a review of the Land Report precisely how many of the 80 acres were "actually used during the statutory life of the claim." It recommended that Guild be approached about voluntarily reducing the claimed acreage. The September 1, 1981, memorandum from the Office of the Solicitor made no mention of the 1973 withdrawal.

BLM and Guild attempted to settle his T&M site claim in a manner that would afford him a portion of the land sought by him. Guild offered to accept the eastern 40-acre half of his claim, but BLM rejected that offer, agreeing instead to **[\*\*13]** convey the westernmost 10 acres, which contained his cabin and shop/storage building, since it "more accurately describes the land used and occupied." (Letter to Guild from Chief, Lands Section, Alaska, BLM, dated Mar. 8, 1984, at 2.) Guild rejected BLM's offer of settlement.

Absent a settlement, BLM, on September 21, 1984, filed a contest complaint, charging, inter alia, that Guild had failed to establish his entitlement under section 10 of the Act of May 14, 1898, to 70 of the 80 acres of land sought by him. BLM asserted that he had not actually used and occupied that land for the purpose of trade, manufacture, or other productive industry during the 5-year statutory life of his claim or at the **[\*123]** time his application to purchase was filed on June 30, 1978, as required by the Act and _43 C.F.R. § 2562.3(d)_. BLM did not challenge Guild's entitlement to the remaining 10 acres, which constituted the land BLM had earlier offered to convey to him. There is no evidence of service of the contest complaint on **_Becharof_**, despite BLM's assurance in its March 10, 1978, letter to **_Becharof_** that "[y]our protest will be considered at such time as a contest is initiated."

Thereafter, on August **[\*\*14]** 28 and 29, 1989, Administrative Law Judge Harvey C. Sweitzer, conducted a hearing on the complaint in Anchorage, Alaska. In a decision dated May 31, 1990, Judge Sweitzer determined that, by contesting only 70 of the 80 acres of Guild's T&M site claim, BLM had conceded that Guild had satisfied the T&M site requirements. [9] Thus, according to Judge Sweitzer, the only question concerned the extent of Guild's use and occupancy of the 70 acres in issue.

---

[9] Judge Sweitzer had earlier ruled on the legal question of whether the contest was barred by section 7 of the Act of Mar. 3, 1891 (Confirmation Act), as amended, _43 U.S.C. § 1165_ (1994), because BLM had failed to bring it within 2 years of the filing of Guild's T&M site application on June 30, 1978. He did so in a July 19, 1985, Order, concluding, in reliance on Board precedent, that the contest was not barred absent proof that Guild had either paid or tendered the purchase price for his T&M site claim more than 2 years before the filing of the complaint on Sept. 21, 1984. See also _Brandt-Erichsen v. United States, 999 F.2d 1376, 1381 (9th Cir. 1993)_, cert. denied, **115 S. Ct. 92 (1994)**; _United States v. Boyd, 39 IBLA 321, 328-29 (1979)_. Judge Sweitzer certified his interlocutory ruling and Guild appealed to the Board pursuant to _43 C.F.R. § 4.28_. In a June 15, 1987, Order, we denied Guild permission to appeal, concluding that the legal question must be addressed after the hearing, which would address the factual question whether Guild had paid or tendered the purchase price more than 2 years before the filing of the complaint. Noting that Guild had conceded in his post-hearing brief that the evidence adduced at the August 1989 hearing did not establish that he had tendered the payment more than 2 years before the complaint was filed (Administrative Law Judge

**[**15]**

Judge Sweitzer found that, during the statutory life of his claim, Guild had actually used and occupied 22 of the original 80 acres of land, including 12 of the 70 acres subject to the contest, as a "rustic campground for hunting and fishing parties." (ALJ Decision at 7.) He directed BLM to approve Guild's application to the extent of those 22 acres, and convey that land to him. There is no record of service of Judge Sweitzer's May 1990 decision on *Becharof*.

BLM and Guild both timely appealed from Judge Sweitzer's May 1990 decision, and the Board docketed the case as United States v. Guild, **[*124]** IBLA 90-437. Thereafter, the parties sought to settle the case, by agreeing on the exact tract of land that could be conveyed to Guild such that his T&M site claim would be satisfied in conformance with Judge Sweitzer's May 1990 decision. [10] Agreement was reached, and BLM undertook to survey the tract of land, which would encompass both the noncontested area, the shoreline area containing the tent frame structures, and the northern trail-road connecting these two areas. Corners were marked by BLM with the assistance of Guild on September 13, 1990, proposed instructions for surveying **[**16]** the T&M site claim (including a metes-and-bounds description) were prepared on October 3, 1990, and approved by the District Manager on October 15, 1990, and BLM requested that its Cadastral Survey Division prepare official survey instructions on October 24, 1990.

On December 3, 1990, Guild informed the Board that, in light of the agreement between the parties, he would not be filing a statement of reasons (SOR) for his appeal, and asked that the Board dismiss both appeals because of this and the fact that BLM had failed to timely file an SOR for its appeal. **[**17]** No filing was made by BLM. By order dated February 19, 1991, the Board dismissed the two appeals.

BLM surveyed the 22 acres of land, which are described as Lots 1 through 3 of U.S. Survey No. 10862, Alaska, situated on the left bank of the Egegik River near the outlet of *Becharof* Lake, about 23 miles southeasterly of the village of Egegik, Alaska. [11] The survey was accepted by the Acting Deputy State Director for Cadastral Survey, Alaska, BLM, on November 20, 1991, and officially filed on December 3, 1991. As surveyed, the 22-acre tract of land was placed by BLM within protracted secs. 7 and 8, T. 25 S., R. 46 W., Seward Meridian, Alaska.

**[**18]**

On September 30, 1992, BLM issued two notices, one conforming the description of the land subject to Guild's T&M site application to the official survey plat, subject to any objection by him within 30 days of receipt of the notice, and the other directing Guild to publish a notice **[*125]** of the filing of his application to purchase the T&M site for a period of 9 consecutive weeks, and to post a copy of his application, the survey plat, and the published notice at a conspicuous place on the land. [12]

---

(ALJ) Decision at 8 (citing Contestee's Post-Hearing Brief at 5 (referring to Tr. 362, 438-45))), Judge Sweitzer reaffirmed his July 1985 ruling that the Confirmation Act did not bar the contest.

[10] According to the record, the Deputy State Director for Conveyance Management, Alaska, BLM, had recommended to the Regional Solicitor, by memorandum dated July 16, 1990, that he not pursue the appeal. Likewise, the Acting Regional Director, Region 7, Fish and Wildlife Service, U.S. Department of the Interior, which manages the *Becharof* National Wildlife Refuge, had recommended, in an Aug. 2, 1990, memorandum to the Regional Solicitor, that he not pursue the appeal.

[11] The noncontested area, containing 10 acres, was designated by the survey as Lot 1, and a 9.99-acre area to the east, encompassing the tent frame structures and adjacent to Egegik River to the north (but not *Becharof* Lake to the east), was designated as Lot 2. Connecting the two areas was an elongated 2.01-acre area designated as Lot 3, which area included the northern trail-road and, in accordance with Judge Sweitzer's May 1990 decision, was "of sufficient width to accommodate reasonable vehicular traffic," i.e., 25-feet wide. (ALJ Decision at 9.)

[12] Publication and posting were intended, in accordance with *43 U.S.C. § 270-4* (1982), to afford those "having or asserting any adverse interest in, or claim to" the 22-acre tract of land to file with BLM, during the publication period or within 30 days thereafter, an "adverse claim," and within 60 days thereafter to initiate a quiet title action in a court of competent jurisdiction, whose final decree would control any resulting patent of the land.

Guild was also directed by BLM to pay the purchase price at the conclusion of the publication period. Guild did **[\*\*19]** not object to the survey, effected publication and posting, providing suitable proof thereof to BLM, and paid the purchase price on October 27, 1992.

In a December 23, 1992, letter and a January 25, 1993, document styled a "protest," **Becharof** objected to Guild's application to purchase the 22-acre T&M site, contending that BLM was barred from conveying the land to Guild because it had been withdrawn from location and purchase under section 10 of the Act of May 14, 1898, by PLO No. 5388 on September 20, 1973, prior to the time he first began actually using and occupying his T&M site in 1977. [13] **Becharof** argued:

> Although Mr. Guild's notice of location was filed two months before P.L.O. 5388 was issued, it is well established in IBLA case law that the mere filing of a notice of location for a T&M site creates no interest in the land and does not segregate it from other appropriation. * * *
> * * * * * * *
>
> Thus, although the Secretary's 1973 withdrawal of the land was subject to valid existing rights, Mr. Guild had obtained no rights whatsoever in the land. Such rights could only be obtained by use and occupancy of the land for T&M (productive) **[\*126]** purposes, and that had not occurred **[\*\*20]** by the time of the withdrawal. When the land was withdrawn by the Secretary it became impossible for Mr. Guild to perfect his claim.

(Protest, dated Jan. 25, 1993, at 3-4.)

**Becharof** further contended that BLM could not convey the land because it had failed to comply with section 106 of the National Historic Preservation Act (NHPA), as amended, 16 U.S.C. § 470f (1994), by **[\*\*21]** failing to determine the effect of conveyance on historic (including prehistoric archaeological) properties, [14] and with the Native American Graves Protection and Repatriation Act (NAGPRA), as amended, 25 U.S.C. §§ 3001-3013 (1994), by failing to ensure that the conveyed land does not contain Native American human remains and associated funerary objects, which are the property of the lineal descendants, or (if not known) the Indian tribe with the closest cultural affiliation, and are subject to protection by the United States. [15]

**[\*\*22]**

**Becharof** argued that, while the T&M site is not yet known to contain any historic properties or Native American graves, the "general area" of the site, at the place where **Becharof** Lake empties into the Egegik River, has been a "stopping off point for Egegik people and their ancestors since time immemorial," and there are Native American graves and two archaeological sites in that area. (Protest, dated Jan. 25, 1993, at 2, 7.)

---

[13] The letter received by BLM on Dec. 23, 1992, was filed solely by **Becharof**. The subsequent protest received on Jan. 25, 1993, was filed on behalf of **Becharof** and the Egegik Village Council (EVC), which was described as follows: "Egegik is a Native community on the Alaska Peninsula at the mouth of the Egegik River, about 23 miles from the Guild T&M Site. The Egegik Village Council is the federally recognized tribal government of the village, which is unincorporated under state law." The protest was also in support of an earlier protest filed by EVC on Dec. 21, 1992. In its March 1995 decision, BLM dismissed EVC's protest, along with **Becharof**'s, but EVC took no appeal to the Board.

[14] Section 106 of the NHPA provides, in pertinent part, that a Federal agency, having jurisdiction, "shall, prior to the approval of the expenditure of any Federal funds on [an] undertaking * * *, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]." 16 U.S.C. § 470f (1994).

[15] NAGPRA governs the "ownership or control of Native American cultural items which are excavated or discovered on Federal * * * lands after November 16, 1990," the date of enactment of the statute, and provides for "discovery, study, or removal" of the items under limited circumstances. 25 U.S.C. § 3002 (1994).

Finally, **Becharof** asserted that conveyance of the 22 acres of land subject to the T&M site would adversely affect local Native residents, by substantially diminishing subsistence hunting and fishing supplies, and the corporation, by promoting extensive intrusion on its nearby land.

In its March 1995 decision, BLM dismissed **Becharof**'s protest, in its entirety. It stated that, in issuing his May 1990 decision, Judge Sweitzer had been "cognizant of the use and occupancy requirements as enumerated in [*Vernard E. Jones] 106 IBLA 230*[, *95 I.D. 314 (1988)]*" and had concluded "that the applicant had met the actual use requirements." (Decision at 3.) BLM thus effectively held that Judge Sweitzer's decision constituted final **[*127]** agency **[**23]** action on the issue of use and occupancy, which would not be reexamined. BLM also rejected **Becharof**'s challenges on the basis of the NHPA and NAGPRA, concluding that, in view of Judge Sweitzer's May 1990 decision, it no longer had any discretionary authority regarding the approval of Guild's T&M site application and patenting of the land. **Becharof** appealed timely from BLM's March 1995 decision. [16]

On April 27, 1995, Guild filed a motion to dismiss **Becharof**'s appeal alleging that **Becharof** failed to perfect its right to protest Guild's T&M site claim under *43 U.S.C. § 270-4* (1982); BLM was obligated to patent the land to Guild under the Confirmation Act; and **Becharof** lacked standing under *43 C.F.R. § 4.410(a)* to pursue the appeal. [17] For the reasons stated below, we deny the motion on all grounds.

 **[**24]**

[1] Guild contends in his motion that **Becharof** is barred from pursuing this appeal because it failed to perfect, in accordance with *43 U.S.C. § 270-4* (1982), its right to protest his T&M site. **Becharof**'s right to protest the approval of Guild's application is not dependent upon compliance with the dictates of *43 U.S.C. § 270-4* (1982). That statutory provision states, in pertinent part, that any person "having or asserting any adverse interest in, or claim to, the tract of land or any part thereof sought to be purchased, may file in the land office where such application is pending, under oath, an adverse claim" during the period of posting/publication or within 30 days thereafter, and "within 60 days of filing such adverse claim" initiate a quiet title action in a court of competent jurisdiction. That provision further states that "no patent shall issue for such claim until the final adjudication of the rights of the parties, and such patent shall then be issued in conformity with the final decree of the court."

As the court said in *Hinchman v. Ripinsky, 202 F. 625, 627* (9th **[**25]** Cir.), cert. denied, *234 U.S. 759 (1913)*, concerning *43 U.S.C. § 270-4* (1982): "The statute has in purview, no doubt, adverse claimants who are <u>seeking title</u> from the government to the same parcel of government land, and it **[*128]** is incumbent upon the contestants to show by what right they respectively claim superiority each over his adversary." (Emphasis added.) **Becharof** is not asserting an adverse claim under any public land law to the land in question. Rather it is asserting a broad based interest in the land. Under 43 C.F.R. § 4.450-2, it has a right to protest in order to protect that interest.

The regulation, 43 C.F.R. § 4.450-2 provides that "any objection raised by any person to any action proposed to be taken in any proceeding before [BLM] will be deemed to be a protest." In *Helit v. Gold Fields Mining Corp., 113 IBLA 299, 315-17, 97* I.D. 109, 118 (1990), BLM properly treated the assertion of an "adverse claim" in response to posting/publication of notice of filing of a patent application as a protest under 43 C.F.R. § 4.450-2 because the protestant held conflicting **[**26]** mill sites. Because mill sites may only embrace nonmineral land, the Board

---

[16] By order dated June 2, 1995, we stayed, at **Becharof**'s request, the effect of BLM's March 1995 decision, pending our disposition of its appeal, in order to preserve the status quo.

[17] Guild also filed with the Board on Apr. 27, 1995, a "Notice of Cross-Appeal," noting that it was filed "in support of the Decision dated March 2, 1995, * * *, and in opposition to the appeal of that decision filed by * * * **Becharof**." Id. at 1. Because there is no indication that Guild objects to BLM's decision dismissing **Becharof**'s protest, we construe Guild's entry of appearance and various filings in this case as a request to intervene, as a matter of right, as a full party to the present proceeding. We grant the request because he will be directly affected by any action taken by the Board on **Becharof**'s appeal, and otherwise could have independently maintained an appeal from the March 1995 decision. See Sierra Club - *Rocky Mountain Chapter, 75 IBLA 220, 221-22 n.2 (1983)*.

stated at 113 IBLA at 316, 97 I.D. at 118: "The issue whether land is mineral or nonmineral in character is within the exclusive jurisdiction of the Department of the Interior and for this reason a conflict between mineral and nonmineral claimants does not raise an 'adverse claim' as the term is used in 30 U.S.C. §§ 29, 30 (1982)." We conclude that BLM properly treated **Becharof**'s filings as protests under 43 C.F.R. § 4.450-2.

[2] We also reject Guild's contention that BLM is required by the Confirmation Act to patent the land to him since more than 2 years have elapsed since he paid the final purchase price for his T&M site claim on October 27, 1992. Guild recognizes that the Act requires BLM to issue a patent to a T&M site claimant after the lapse of 2 years from payment of the purchase price only "when there shall be no pending contest or protest against the validity of [his] entry," and that **Becharof**'s protest was filed on December 23, 1992, and remained pending thereafter. 43 U.S.C. § 1165 (1994). However, [**27] he argues that, since the protest had not been perfected pursuant to 43 U.S.C. § 270-4 (1982), and thus became "void," during the 2-year period, it could not preclude application of the Confirmation Act at the time BLM issued its March 1995 decision. (Motion to Dismiss at 8.)

Because we conclude that **Becharof** had the independent right to protest pursuant to 43 C.F.R. § 4.450-2, the protest did not become void for failure to abide by 43 U.S.C. § 270-4 (1982). That statute was not applicable to the protest.

**Becharof**'s protest pursuant to 43 C.F.R. § 4.450-2 constituted a "protest" within the meaning of the Confirmation Act. 43 U.S.C. § 1165 (1994). As the U.S. Supreme Court stated in Lane v. Hoglund, 244 U.S. 174, 178 (1917), in holding that there must be an actual proceeding against the entry at issue, and not just the suggestion of one:

> As applied to public land affairs the term 'contest' has been long employed to designate a proceeding by an adverse or intending claimant conducted in his own interest against the [*129] entry of another, [**28] and the term 'protest' has been commonly used to designate any complaint or objection, whether by a public agent or a private citizen, which is intended to be and is made the basis of some action or proceeding in the public right against an existing entry.

Thus, there was a "pending" protest at the conclusion of the 2-year period on October 27, 1994, and that protest was not resolved until March 2, 1995. [18] BLM was, therefore, not required by the Confirmation Act to patent any land to Guild in satisfaction of his T&M site entry. See 43 U.S.C. § 1165 (1994); United States v. Jones, 106 IBLA at 253, 95 I.D. at 327.

[3] We turn to the question of **Becharof**'s standing to appeal. **Becharof**'s submission of a protest, which was dismissed by BLM in its March 1995 decision, makes it a party to the case, within the meaning of 43 C.F.R. § 4.410(a). See Colorado Open Space Council, 109 IBLA 274, 279 (1989). [**29] That fact Guild does not dispute. Instead, Guild contends that **Becharof** has no legally cognizable interest that is "adversely affected" by BLM's March 1995 decision to approve his purchase application, and thus fails to satisfy this the requirement for standing set forth at 43 C.F.R. § 4.410(a). (Motion to Dismiss at 3, 4.)

It is well settled that a putative appellant will be deemed to be "adversely affected," within the meaning of 43 C.F.R. § 4.410(a), only where it has suffered, or is substantially likely to suffer, some sort of injury to a "legally cognizable interest." Storm Master Owners, 103 IBLA 162, 177 (1988); see Donald K. Majors, 123 IBLA 142, 143 (1992). It is undisputed that **Becharof** asserts no competing claim to or property interest in the 22-acre tract of land at issue here. Nonetheless, standing does not rest alone on whether the appellant has a competing claim to or a property interest in the land at issue. Rather, we have long held that it may be based on a cultural, recreational, or aesthetic interest in the use and enjoyment of the land (or its resources) or even an interest in adjacent land (or its [**30] resources). See Southern Utah Wilderness Alliance (SUWA), 127 IBLA 325, 327 (1993); National Wildlife Federation, 82 IBLA 303, 308 (1984). There must also be colorable allegations of adverse effect which identify the

---

[18] Arguably, **Becharof** had a protest pending even before Guild submitted his purchase price in 1992. BLM never adjudicated the protest filed by **Becharof** in March 1978.

specific facts giving rise to the allegation. SUWA, 127 IBLA at 327. However, the appellant need not prove that an adverse effect will in fact occur. Donald K. Majors, 123 IBLA at 145.

*Becharof* has made a sufficient showing here. It asserts that its shareholders, who are Alaskan Natives, hunt and fish on the 22-acre tract of land for subsistence purposes and/or use a trail that crosses the land for access to the Egegik River and *Becharof* Lake for these purposes, and that their ability to do so may be lost or impaired should the land be **[*130]** conveyed into private ownership as a result of BLM's approval of Guild's T&M site application. (Reply to Opposition to Petition for Stay at 7; Opposition to Motion to Dismiss at 1, 3; SOR at 2, 6-7, 21; Response to Guild's SOR at 1-2.) As we said in *Predator Project, 127 IBLA 50, 53 (1993)*: **[**31]** "[The appellant's] allegation that its members use the area affected by [BLM's action] is an adequately specific, colorable allegation of adverse effect." See also *Audubon Society of Portland, 128 IBLA 370, 373-74 (1994)*; *Powder River Basin Resource Council, 124 IBLA 83, 88, 89 (1992)*. That is the case here.

*Becharof* also states that its ownership of neighboring land will be adversely affected by a conveyance of the T&M site, elsewhere noting that it fears that development of that land will promote intrusion by others onto its lands. (Opposition to Motion to Dismiss at 1; SOR at 6; Protest, dated Jan. 25, 1993, at 2.) This allegation, even absent conclusive proof that any intrusion will in fact occur, is also sufficient to afford standing to appeal to *Becharof*.

We turn to the merits of the instant controversy.

[4] BLM, in its March 1995 decision, responded to *Becharof*'s assertion, in its protest, that Guild did not have a "valid existing right" to the land at the time of its withdrawal, as follows:

> It must be noted * * * that a number of issues in the Jones case, parallel to th[is] issue * * *, were before IBLA for review **[**32]** as a result of an appeal. The most relevant issues, addressed in this appeal, were the effect of notices of location, use and occupancy, and withdrawals. The ALJ held the contest proceedings, pertaining to T&M Site AA-8433, in abeyance pending the outcome of IBLA's review. On December 29, 1988, a decision in the Jones case was rendered by IBLA, and the ALJ resumed the contest proceedings.
>
> Therefore, after close analysis of this issue, it has been determined that the ALJ was cognizant of the use and occupancy requirements as enumerated in *106 IBLA 230*, and concluded, in the decision of May 31, 1990, that [Guild] had met the actual use requirements of *43 CFR 2562.3(d)(1)*. He instructed the BLM to approve a 22-acre parcel [of land.] [Footnotes omitted.]

(Decision at 3.) Thus, BLM, in essence, concluded that Judge Sweitzer, by determining that Guild had used and occupied 12 of the 70 acres under contest in compliance with the T&M site law, had resolved the 1973 withdrawal issue with finality. BLM reached such a conclusion even though Judge Sweitzer did not expressly rule on that issue. BLM's conclusion is contrary to the law.

It is well established that, **[**33]** even though a T&M site (or other like) claimant may have ultimately satisfied the requirements of the statute and regulations under which he claims title to the public lands, absent satisfactory proof that he was engaged in qualifying use and occupancy **[*131]** and had timely filed a notice of location (or application to purchase), in accordance with *43 U.S.C. § 687a-1* (1982), at the time of withdrawal of the land (subject to valid existing rights), the withdrawal would have taken effect and thereafter precluded his entitlement to the land. He would not have had a "valid existing right" excepted, by the terms thereof, from the withdrawal.

Clearly, by filing his notice of location on July 16, 1973, Guild did not acquire a "valid existing right," excepted from the September 20, 1973, withdrawal of the affected land. See *Allan D. Hodge, 22 IBLA 150, 151 (1975)*; *Elden L. Reese, 21 IBLA 251, 252 (1975)*; David G. Marks, A-31082 (Jan. 27, 1970), at 2. As the Board said in *Margaret L. Klatt, 23 IBLA 59, 62 (1975)*: "The mere filing of a notice of location **[**34]** for a trade and manufacturing site creates no rights in the land." (Emphasis added.) See also *Agnes Mayo Moore (On Judicial Remand), 102 IBLA 147, 149 (1988)*; *John W. Eastland, 24 IBLA 240, 244 (1976)*. Rather, the existence of any rights in the land, and thus a valid existing right at the time of the September 1973 withdrawal, depended entirely "'upon the acts performed in occupying, possessing and improving [the] land and their relationship to the requirements of law under which the settler seeks to obtain title,'" i.e., the initiation of qualifying use and occupancy under section 10 of the

Act of May 14, 1898, and its implementing regulations. Margaret L. Klatt, 23 IBLA at 62 (quoting from Vernard E. Jones, 76 I.D. 133, 137 (1969)); see also Agnes Mayo Moore (On Judicial Remand), 102 IBLA at 149; John W. Eastland, 24 IBLA at 244; Allan D. Hodge, 22 IBLA at 151; Elden L. Reese, 21 IBLA at 252; David G. Marks, supra at 2. Where such use and occupancy had not **[\*\*35]** been initiated, no rights, and thus no valid existing right, arose, regardless of whether the notice of location was duly filed with BLM. As the Board also said in Margaret L. Klatt, 23 IBLA at 62 n.3 (again quoting from Vernard E. Jones, 76 I.D. at 137): "[T]he acceptance for recordation of a notice of location is not a bar to a subsequent finding that, in fact, no rights were established in the attempted settlement.'"

In another line of cases beginning with Kennecott Copper, 8 IBLA 21, 31, 79 I.D. 636, 641 (1972), the Board held that a T&M site applicant, who used and occupied land prior to a withdrawal, but who did not file a notice of location or application to purchase prior to a withdrawal, did not have a valid existing right excepted from a withdrawal of the land. That line of cases was set forth and discussed with approval in Ramstad v. Hodel, 756 F.2d 1379 (9th Cir. 1985), aff'g in part, rev'g in part, Stuart Grant Ramstad, 55 IBLA 223 (1981). [19] See 756 F.2d at 1385.

**[\*\*36]**

**[\*132]** Whether a T&M site claimant has a valid existing right depends not only on whether it can be given credit for its use and occupancy predating the withdrawal, but also on whether that use and occupancy comports with the statutory requirements. See John W. Eastland, 24 IBLA at 242; Donald J. Thomas, 22 IBLA 210, 211-12 (1975) (headquarters site); Donald Richard Glittenberg, 15 IBLA 165, 168-69 (1974) (headquarters site). In other words, a claimant will be deemed not to have a valid existing right when, even though it is engaged in qualifying use and occupancy, it has failed to timely file a notice of location. Ramstad v. Hodel, 756 F.2d at 1385, and cases cited therein. Likewise, the same is true when a claimant has filed a notice of location, but is not engaged in any qualifying use and occupancy prior to withdrawal. No valid existing right is created merely by the filing of a notice of location.

Judge Sweitzer's decision in this case is not final on the issue of use and occupancy because, when the Department discovers that a pending public land grant **[\*\*37]** may not be in accordance with the terms and conditions set forth by Congress, the Department's authority to act to ensure that no public land is conveyed to a party not entitled to receive that land, so long as legal title remains in the Government, is well-established, and the Secretary is not estopped by principles of res judicata or finality of administrative action from correcting or reversing an erroneous decision by his subordinates or predecessors. Knight v. United Land Association, 142 U.S. 161, 178 (1891); Schade v. Andrus, 638 F.2d 122, 124-25 (9th Cir. 1981); Ira Wassillie (On Reconsideration), 111 IBLA 53, 57 (1989); United States Fish & Wildlife Service, 72 IBLA 211, 220-21 (1983).

Thus, even if we were to find that Judge Sweitzer's decision specifically addressed the issue raised by **Becharof**'s protest, that decision does not constitute a bar to consideration of the merits of **Becharof**'s protest. BLM had an obligation to determine if Guild had established a valid existing right to a T&M site prior to the 1973 withdrawal.

However, we need not return **[\*\*38]** the case to BLM for its determination on that issue or refer the case to the Hearings Division for a hearing on the issue. The reason is that Guild had an ample opportunity to provide evidence of his use and occupancy in written submissions to BLM and in oral testimony at the hearing. In reviewing the record de novo, and taking as true, Guild's evidence, which is more contemporaneous than any that could now be provided, we find, for the reasons stated below, that he did not occupy, possess, or improve any of the land claimed by him, to any degree, at any time before September 20, 1973, the date of withdrawal, and, thus, did not establish a valid existing right to his T&M site, which survived the withdrawal.

---

[19] In Ramstad, the court upheld the Board's legal conclusion that Ramstad was not legally entitled to perfect a T&M site claim because, even though he had established a hunting and fishing camp and guide service on the land, he did not attempt to file his notice of location until a month after the land had been withdrawn. However, it concluded, under the circumstances of that case, that Ramstad was entitled to equitable adjudication of his claim.

Under section 10 of the Act of May 14, 1898, in order to be entitled to a patent, the T&M site claimant must be "in the possession of and occupying public lands in Alaska in good faith for the purposes of trade, manufacture, or other productive industry," and must demonstrate that the area claimed by him, not to exceed 80 acres, "embraces [his] improvements * * * **[*133]** and is needed in the prosecution of such trade, manufacture, or other productive industry." *43 U.S.C. § 687a* **[**39]** (1994). In the words of *43 C.F.R. § 2562.3(d)*, a claimant must show that the land was, at the time of application, "actually used and occupied for the purpose of trade, manufacture or other productive industry," which, under Departmental precedent, requires a bona fide commercial enterprise from which he could reasonably have hoped to derive a profit. See *John C. Phariss, 134 IBLA 37, 42 (1995)*; *United States v. Hodge, 111 IBLA 77, 86 (1989)*; *United States v. Ward, 43 IBLA 333, 337 (1979)*; United States v. Boyd, 39 IBLA at 330.

At the hearing, Guild testified, as follows, regarding his activity on his T&M site from the initiation of his claim:

> Q. [By Mr. Meacham] Regarding this particular T and M site for which you are an applicant, could you take me year by year in your activities on the site? And let's start, I assume, with the year 1972 when you assert that your occupancy began on that site?
>
> A. One of the things while I was writing and in photography and so forth, I got a job and qualified for -- as an assistant hunting guide, hunting and fishing guide. **[**40]** And I worked for Alaska Trophy Safaris. One of the parties that we had was at the head of the Egegik River at the height of the caribou migration, and that was my first look at that site at **Becharof** Lake.
>
> The thing that impressed me most, of course, was the utter wildness and the remoteness. The only way you can get to it is to fly in. You cannot drive to it. Consequently there were very few people there. * * *
>
> So after hunting on that piece of land in that area, I came into Anchorage. This was in '73. And it was after a wilderness experience that I'd had in 1973 in Amiak, I kept thinking about this piece of land there at **Becharof**. And so I went into the land office and requested an application to apply for a T and M site.
>
> * * * * * * *
>
> * * * And so I filled out my application and did a metes and bounds as was first described in my application to settle on that.
>
> * * * * * * *
>
> Q. Okay. Following your filing of the location notice in 1973, could you tell me what occurred on the site in that year or, if nothing further happened in that year, what happened in 1974?
>
> A. Well, I had occasion to be down there in King Salmon, in the King Salmon area in 1973, and I made an initial -- after **[*134]** I filed **[**41]** I made the initial staking on the corners. Again, I was guiding for Dennis Ha[rm]s, Alaska Trophy Safaris. The corners that I put in were, as described, four by four posts. * * *
>
> Q. Okay. What did you do then in '74? Did you visit the site in '74?
>
> A. Yes, I had some hunters, and we camped on the site and hunted.
>
> Q. You didn't have any physical facilities then?
>
> A. No facilities.
>
> Q. And what about 1975?
>
> A. It wasn't until 1977 that I built the actual facilities.

(Tr. 347-50.)

Thus, Guild admitted in his testimony that he placed no improvements on the land until 1977, having waited until he had obtained the necessary funding. (Tr. 350-53, 355-56, 370, 425; see also Tr. 315-16.) Posting the corners of a claim does not establish use and occupancy. Donald Richard Glittenberg, 15 IBLA at 168.

Guild's testimony is consistent with his November 5, 1979, affidavit submitted to BLM in which he reported that he first discovered the subject land in 1972, while employed by Harms as an assistant guide, and "spent * * * from

October 1 to the 10th at the edge of what is now **_Becharof_** Camps." (Affidavit, dated Nov. 5, 1979, at 4.) [20] He later conceived, during the **[**42]** winter of 1972-73, the idea for developing land at the junction of Egegik River and **_Becharof_** Lake as the site of a commercial enterprise. Id. at 7. During 1973, the sum total of his activity on the subject land was the following: "I camped and guided again for Dennis Harms in 1973 from late August through September * * *. Again just as in 1972, I hunted and fished in the **_Becharof_** Camps area from about October 1 to October 10." Id. [21]

**[**43]**

**[*135]** Guild's only use and occupancy of the land on or before September 20, 1973, was for personal purposes. [22] See Tr. 347-48, 349-50. Personal use does not qualify as a productive industry under section 10 of the Act of May 14, 1898, and its implementing regulations. _Thomas B. Craig, 134 IBLA 145, 153 (1995)_ (headquarters site); _United States v. Beaird, 31 IBLA 203, 207-08, 209 (1977)_, aff'd, Beaird v. Andrus, No. F77-32 (D. Alaska June 11, 1979) (headquarters site); _Kathleen M. Smyth, 8 IBLA 425, 426-27 (1972)_ (headquarters site); David G. Marks, supra at 1-2 (occupancy as fishing/hunting camp).

**[**44]**

There is no evidence that, prior to September 20, 1973, Guild guided someone to the land for hunting, fishing, or other purposes or undertook other activity as a part of his own bona fide business enterprise from which he derived income, or that he otherwise conducted any sort of productive industry on the land during that time period. See Tr. 73-85, 122, 263.

Guild demonstrated that, on or before September 20, 1973, the land was suitable for use and occupancy in connection with a prospective business and that his sole activity, other than personal use, had consisted of assessing its potential and formulating plans to that end. (Affidavit, dated Nov. 5, 1979, at 7.) Such activity does not qualify as use and occupancy under section 10 of the Act of May 14, 1898, and its implementing regulations, which require that the land be actually used and occupied, in some manner, in connection with a viable business. United States v. Hodge, 111 IBLA at 90; United States v. Ward, 43 IBLA at 337; United States v. Boyd, 39 IBLA at 331; _United States v. Hill, 33 IBLA 395, 399-400 (1978)_; **[**45]** _Thelma S. Butcher, 7 IBLA 48, 49-50 (1972)_.

Therefore, the record shows that Guild failed to demonstrate that he was engaged in qualifying use and occupancy of the site in question, in accordance with section 10 of the Act of May 14, 1898, and its implementing regulations, on or before the September 20, 1973, withdrawal. See United States v. Boyd, 39 IBLA at 329; Hershel E. Crutchfield, A-30876 (Sept. 30, 1968), at 4. Thus, he did not have a "valid existing right" at the time of the withdrawal, and he was thereafter precluded from obtaining any rights to the land under that statute. See John W. Eastland, 24 IBLA at 244; Allan D. Hodge, 22 IBLA at 151-52; Elden L. Reese, 21 IBLA at 252; David G. Marks, supra at 2.

[5] Guild's asserts that any further Departmental adjudication of his entitlement under section 10 of the Act of May 14, 1898, and its **[*136]** implementing regulations, to the 22-acre tract of land is effectively barred, because he

---

[20] Even if Guild had provided evidence of qualifying occupancy of the site in 1972, which he did not, such evidence could not have been considered under _43 C.F.R. § 2562.1(c)_. That regulation provides, in accordance with _43 U.S.C. § 687a-1_ (1982), that, unless the notice of location is filed within 90 days of the initiation of use and occupancy, "no credit shall be given for occupancy of the site prior to filing of notice in the proper office, or application to purchase, whichever is earlier." Since Guild did not file his location notice until July 1973, he admittedly could not be given credit for any occupancy prior thereto.

[21] These representations track those made by Guild in the June 30, 1978, letter attached to his application.

[22] There is the suggestion in the record that, prior to Sept. 20, 1973, Guild may have also used and occupied the subject land in conjunction with his employment as an assistant guide for Alaska Trophy Safaris. See, e.g., Tr. 347-48, 349-50. However, such activity was not qualifying because he was not conducting his own commercial enterprise, but merely acting on behalf of his employer.

perfected his T&M site claim with the filing of his purchase application on June **[\*\*46]** 30, 1978. Guild argues that he became "vested" with "equitable property rights" at that time, and thus entitled to a patent of the land. He further argues that such rights "related back" to the date he filed his notice of location with BLM on July 16, 1973, before the September 20, 1973, withdrawal. (Opposition to Petition for Stay at 9; Reply Brief at 8.) Guild concludes, therefore, that even though the United States still holds legal title to the land, BLM now has only the ministerial duty of issuing him a patent. (SOR at 16.)

We reject Guild's argument. The withdrawal attached to the land prior to Guild's use and occupancy of his site. As we stated in Allan D. Hodge, 22 IBLA at 151: "Where land within a trade and manufacturing site is withdrawn for appropriation prior to its occupancy and possession for purposes of trade and manufacture, the invalid claim cannot be perfected." See also *Ramstad v. Hodel, 756 F.2d at 1383*. Thus, Guild was not legally entitled to perfect his claim.

Having determined that Guild did not establish any entitlement to the land under the T&M site law, we need not address the question whether any **[\*\*47]** conveyance of any land to him would, without more, comport with either section 106 of the NHPA or the NAGPRA. These issues have been rendered moot.

Accordingly, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, *43 C.F.R. § 4.1*, Guild's motion to dismiss **Becharof**'s appeal from the March 1995 BLM decision is denied; the decision is reversed; and Guild's T&M site application to purchase is denied.

James P. Terry, Administrative Judge

**Concur By:** HARRIS

**Concur:**

I concur:

Bruce R. Harris, Deputy Chief Administrative Judge

Department of Interior Board of Land Appeals            Decisions

---

End of Document