PARSONS BEHLE & LATIMER
Jim B. Butler, Nevada Bar ID No. 8389
Ashley C. Nikkel, Nevada Bar ID No. 12838
50 West Liberty Street, Suite 750
Reno, NV 89501
Telephone: 775.323.1601
Facsimile: 775.348.7250
jbutler@parsonsbehle.com
anikkel@parsonsbehle.com

*Attorneys for Defendant*
*KG Mining (Bald Mountain) Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>INTERIOR BOARD OF LAND APPEALS, UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, and KG MINING INC.,<br><br>Defendants. | Case No.  3:25-cv-00039-ART-CSD<br><br><br>**KG MINING (BALD MOUNTAIN) INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, Defendant KG Mining (Bald Mountain), Inc.[1] ("KG Mining") hereby opposes Plaintiffs' Motion for Summary Judgment (ECF No. 43, "Motion") and cross-moves for summary judgment. This Court should affirm the decision of the Interior Board of Land Appeals ("IBLA" or "Board") dismissing Plaintiffs' challenge to the Bureau of Land Management's ("BLM's") decision approving an amendment to the plan of operations for the Bald Mountain Mine in White Pine County, Nevada for lack of standing. The Board's decision was consistent with applicable regulations; the Board did not act arbitrarily or capriciously; and the decision was in accordance with the law and was supported by substantial evidence.

---

[1] Plaintiffs have named "KG Mining Inc." as a Defendant, but no such entity exists.

This Opposition and Cross-Motion is based on the following memorandum of points and authorities, supporting exhibits, and all pleadings and papers on file herein.

**MEMORANDUM OF POINTS AND AUTHORITIES**

In August 2024, pursuant to 43 C.F.R. § 3809.801(1)(a), Wild Horse Education ("WHE"), Laura Leigh, and another member of WHE (Tammi Adams) filed a notice of appeal and petition for stay with the IBLA, challenging the BLM's July 8, 2024, Record of Decision. Appellants argued that BLM violated the National Environmental Policy Act ("NEPA") and the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act") by failing to adequately assess the project's impacts on wild horses. The IBLA granted KG Mining's motion to intervene. Both BLM and KG Mining filed motions to dismiss the appeal based on lack of standing in accordance with 43 C.F.R. § 4.410 (2024). Appellants filed responses to both motions with additional standing allegations. After considering the filings, the IBLA issued on Order on September 23, 2024, dismissing the appeal based on lack of standing. Plaintiffs appeal from that decision. This Court should affirm.

## I.    FACTUAL BACKGROUND

### A.    The Regulatory Framework and the NEPA Process.

The Bald Mountain Mine is an existing large-scale, open-pit gold mine located in White Pine County, Nevada, approximately sixty miles southeast of Elko. AR_252. The mine is located on land primarily managed by BLM and has been in continuous operation for more than 40 years. AR_252-53. The Bald Mountain Mine operates under mining plans of operations approved by BLM pursuant to its mining regulations at 43 C.F.R. Subpart 3809 ("the 3809 Regulations"). Those regulations regulate mining on public lands from "cradle to grave," that is from exploration, through development, construction, mining, reclamation and closure. *See* 65 Fed. Reg. 69998, 70013 (Nov. 11, 2000). Therefore, mine areas and facilities are in various stages of development, operation and reclamation. The mine is within the Bald Mountain Mining District, which has been subjected to mineral exploration and mining for more than 140 years. **Exhibit 1** (Final Environmental Impact Statement ("FEIS") Excerpts), p. 9.

BLM regulations require that a plan of operations include operator information, a detailed description of operations, a reclamation plan, a monitoring plan and an interim management plan

to be implemented if there is an unexpected temporary closure, a cost estimate for full reclamation of the mine and such "operational and baseline environmental information" as BLM may need to analyze potential environmental impacts of the mining plan. 43 C.F.R. § 3809.401. BLM will approve the plan when it determines that operations will comply with all federal and state environmental standards and any mitigation measures that may be imposed by BLM. 43 C.F.R. § 3809.420. An operator may not conduct operations under an approved plan until BLM has approved a financial guarantee that would "cover the estimated cost as if BLM were to contract with a third party to reclaim . . . operations according to the reclamation plan, . . ." 43 C.F.R. § 3809.552(a). The 3809 Regulations do not refer to or require any specific action relating to wild horses. The 3809 Regulations do require that operators "shall take such action as may be needed to prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations." 43 C.F.R. § 3809.420(b)(7).

Parties that are adversely affected by an agency decision under the 3809 Regulations have three options for appeal: first, a party may ask the BLM State Director to review the decision. 43 C.F.R. § 3809.800(a). Second, as happened here, a party may appeal the decision to the IBLA, pursuant to the regulations at 43 C.F.R. Part 4. 43 C.F.R. § 3809.800(b). Third, because a decision under the 3809 Regulations becomes immediately effective upon approval, 43 C.F.R. § 3809.803, such a decision is "final agency action" under the APA and subject to immediate judicial review without any further administrative proceedings. *See Chilkat Indian Village of Klukwan v. U.S. Bureau of Land Mgmt.*, 399 F.Supp.3d 888, 909 (D. Alaska 2019); BLM Handbook H-3809-1 – Surface Management (2012) (Handbook), pp. 4-15 (administrative review flowchart), 10-5 (same). Review by the State Director or the IBLA is <u>not</u> a prerequisite for judicial review. Handbook, pp. 10-10 to 10-14.

In 2020, KG Mining proposed an amendment to the North Operations Area Plan of Operations to continue mining by creating and expanding mine components located within mine areas and conducting activities associated with mining, such as concurrent reclamation and ongoing exploration to extend the mine life by 11 years. Exhibit 1, p. 2. This plan amendment, referred to

as the Juniper Project,[2] proposed to disturb an additional 3,969 acres of public land (increasing the total disturbance under the mining plan to 14,752 acres). AR_253. Most of the proposed new disturbances are adjacent or near to existing mine facilities. Exhibit 1, p. 8.

When BLM acts under the 3809 Regulations, it must comply with NEPA. In this case, BLM determined that an environmental impact statement ("EIS") was required to analyze potential impacts and alternatives. Exhibit 1, p. 2. In compliance with NEPA regulations and guidance applicable at the time,[3] BLM conducted public scoping, inviting the public and other agencies to identify issues to be considered in the NEPA analysis. The scoping period was open from March 31 through May 2, 2022, and BLM hosted two virtual public scoping meetings. Exhibit 1, p. 17. BLM then prepared a draft environmental impact statement ("DEIS") for the Juniper Project that was released for a 45-day public comment period on August 18, 2023. BLM also held a public meeting in Ely and a virtual meeting to collect comments. Exhibit 1, p. 17. All comments received were considered, and revisions were made to the EIS as appropriate. Exhibit 1, p. 18. All substantive comments and responses were published together with the FEIS in May 2024. Exhibit 1, p. 20-25. Eight of the 263 substantive comments dealt with wild horse issues; all eight were submitted by the plaintiff. BLM responded specifically to those comments. *Id.*

The FEIS evaluated potential impacts in detail for 18 different resources. Exhibit 1, p. 5-7. The FEIS summarized the analysis of wild horse impacts as follows:

> Most of the extended NOA Plan boundary is within the Triple B Herd Management Area. Wild horse gathers conducted by the BLM have reduced the wild horse population in this area **but the population is still estimated to be double the appropriate management level established by the BLM to maintain a thriving ecological balance.** Signs of wild horse usage are present around springs and wetlands in the NOA. Removal of vegetation that may be browsed by wild horses and subsequent reclamation of a portion of the disturbed areas would have similar effects described above for livestock grazing. The proposed 3,969 acres of surface disturbance under the Proposed Action and 3,952 acres under Alternative A represent approximately 0.3% of the total area of the herd management area. KG-BM would continue to use fencing and other exclusion measures to prevent ingestion of diluted cyanide solution or entrapment of wildlife, which would also be

---

[2] Plaintiffs repeatedly refer to the "Jupiter Project." KG Mining construes this to mean "Juniper."

[3] Early last year, the Council on Environmental Quality ("CEQ") adopted an interim final rule rescinding the CEQ regulations. *See* 90 Fed. Reg. 10610 (Feb. 25, 2025). CEQ recently adopted that Interim Rule as final. *See* 91 Fed. Reg. 618 (Jan. 8, 2026).

PARSONS
BEHLE &
LATIMER

effective for wild horses. To reduce risk of wild horse-mine vehicle collisions, KG-BM employs ACEPM no. 143 that marks new fencing and installs road signs for safety of wild horses under situations where there is heavy or sustained traffic. Risk of wild horse-vehicle collisions would continue for an additional 11 years under the action alternatives. Overall, potential impacts on wild horses are anticipated to be minor, long term to permanent, and localized.

Exhibit 1, p. 3-4 (emphasis added).[4]

The NEPA regulations in place at the time of the Juniper Project EIS process required BLM to evaluate direct, indirect, and cumulative effects to each potentially impacted resource. Plaintiffs have muddled this analysis in a manner that mischaracterizes BLM's analysis and IBLA's decision. "Direct effects" are "those which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.1(g)(1). "Indirect effects" "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.1(g)(2). "Cumulative impact" is the "impact on the environment which results from the incremental impact of the action when added to other past, present or reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other action." 40 C.F.R. § 1501.1(g)(3).

To evaluate cumulative impacts, BLM identified a cumulative effects study area ("CESA") for each resource and then identified the reasonably foreseeable past, present and future actions ("RFFA's") that might be added together with the direct and indirect impacts to a particular resource. Here, Plaintiffs make a fundamental factual error. BLM identified the CESA for wild horse impacts as the 1,232,717-acre Triple B Herd Management Area. Exhibit 1, p. 11-12. Plaintiffs confuse this with Figure 3.1-1 of the FEIS where BLM identified the locations of reasonably foreseeable future actions within the "maximum CESA." *See* Exhibit 1, p. 10. The "maximum CESA" is the boundary for all resources—not just wild horses. Because the largest CESA boundary is for evaluating cumulative air quality impacts, the "maximum" CESA boundary is identical to the

---

[4] The "ACEPM" referenced in the EIS is an Applicant Committed Environmental Protection Measure—a mitigation measure that KG Mining has incorporated into the plan of operations. These ACEPMs accumulate and are revised as the plan of operations is amended and reviewed. A table including the 164 ACEPMs incorporated into the North Operations Area plan was included in the FEIS and also attached to the Record of Decision ("ROD"). Four ACEPMs address wild horses. **Exhibit 2**, (ROD, Attachment 1 at pp. 21-22).

air quality CESA. A review of the legend to Figure 3.1-1 and the shading of the map confirms that

the CESA for wild horse impacts is the Triple B Herd Management Area:



Figure 3.11-1
Wild horses study area and CESA

Exhibit 1, p. 12.

/ / /

/ / /

/ / /

/ / /

The "Maximum CESA" referenced by Plaintiffs is the CESA identified by BLM to evaluate potential impacts to air quality and greenhouse gas emissions:



Figure 3.1-1
Locations of reasonably foreseeable future actions within the maximum CESA

Exhibit 1, p. 10. The air quality CESA is the only CESA that extends to the Idaho and Utah borders. Exhibit 1, p. 16.

PARSONS
BEHLE &
LATIMER

7

1

**B.      The IBLA's Decision to Dismiss the Appeal.**

2

On September 23, 2024, the Board issued an Order granting both motions to dismiss and

3

dismissing the appeal for lack of standing. AR_252.

4

In its Order, the Board properly identified the regulatory provision governing standing in

5

front of the IBLA: 43 C.F.R. § 4.410.[5] That provision provided:

6

**4.410 Who may appeal.**

7

(a) Any party to a case who is adversely affected by a decision of the Bureau or
office or an administrative law judge has the right to appeal to the Board. . . .

8

9

(b) A party to a case, as set forth in paragraph (a) of this section, is one who has
taken action that is the subject of the decision on appeal, is the object of that
decision, or has otherwise participated in the process leading to the decision under
appeal, e.g., by filing a mining claim or application for use of public lands by
commenting on an environmental document or by filing a protest to the proposed
action. . . .

10

11

12

(d) A party to a case is adversely affected, as set forth in paragraph (a) of this section,
when that party has a legally cognizable interest, and the decision on appeal has
caused or is substantially likely to cause injury to that interest.

13

14

In other words, as the Board recognized, there are two requirements for standing under

15

Board regulations: the appellant must be (1) a "party to a case" and (2) "adversely affected."

16

AR_254. These two requirements are conjunctive, and if either element is lacking, the appeal must

17

be dismissed. *Id.* (citing *WildLands Defense*, 192 IBLA 209, 214 (2018) (2018 WL 2089399)).

18

Importantly, this standing requirement is defined in the IBLA regulations and developed in IBLA

19

case law. To be "adversely affected," in a decision challenging a land use decision, an appellant

20

must show both a causal and a geographic nexus to the impacts of the decision.

21

The Order concluded that Leigh and Adams submitted comments on the DEIS, so each

22

satisfied the party-to-a-case requirement. AR_255. But they were unable to make a showing

23

sufficient to satisfy the "adversely affected" requirement under IBLA precedent. *Id.* The Board

24

recognized that both Leigh and Adams asserted a strong interest in wild horses and that they had

25

visited the Triple B Complex to view wild horses in the past—as well as planning to visit the

26

Complex in the future. AR_256. The Triple B Complex consists of three Herd Management Areas

27

---

28

[5] Since the date of the Order, IBLA has revised its procedural rules in 43 C.F.R. Part 4. This
Opposition refers to the regulations as they existed prior to the revision.

PARSONS
BEHLE &
LATIMER

(HMAs): Triple B, Maverick-Medicine, and Antelope Valley HMAs. Exhibit 1, p. 11. It is significantly larger than the Triple B HMA and also larger than the CESA for wild horses. *Id.* The Board quoted Leigh's and Adams' contentions about the "imminent harm" they faced from the Juniper Project given the impacts on the Triple B Complex (not Triple B HMA) wild horses:

> [t]he cumulative impacts from [Juniper Project] significantly increases [*sic*] the potential for wild horse gathers and removals, permanent sterilization and application of a plethora of fertility control procedures, and interferes with and adversely affects [our] recreation and enjoyment of the Triple B Complex wild horses . . . significantly diminishing the enrichment of [our] lives.

AR_256 (citing AR_15). Notably, Leigh's emphasis is on the larger Triple B ***Complex***, not the smaller Triple B ***HMA***. Leigh also contended that because she previously was found to have standing in federal court to challenge decisions affecting wild horses, she should have standing here as well. *Id.* (citing AR_155-56).

The Board easily rejected Leigh's contention that, because she had standing in the past, she had standing to challenge the Juniper Project, especially where the cited cases involved wild horse gathers (which were not part of the mine plan approval). AR_256-57.

But the IBLA also determined that the Leigh and Adams failed to show a legally cognizable interest in these particular lands:

> [T]here is no evidence that Leigh or Adams has ever visited or viewed wild horses at or near the Mine or the public lands that may be impacted by the Juniper Project. Rather, the evidence shows only that Leigh and Adams have visited the Triple B Complex to view wild horses. That Complex, however, consists of the Triple B, Maverick-Medicine, and Antelope Valley HMAs and encompasses 2,059,987 acres, while the Juniper Project affects approximately 4,000 acres, a small fraction of that.

Dec. at 6 (footnotes omitted).

The IBLA's conclusion was inescapable given a prior IBLA order involving the same appellants. Leigh, WHE and another person, Elyse Gardner Walsh, challenged a BLM decision approving a mining plan of operations for another mine in Nevada, the Gold Bar Mine. AR_258. In that case, the IBLA found that Walsh had standing because she "visited the project area and had seen evidence of wild horses from neighboring HMAs." In contrast, Leigh did not meet the test for standing "because, although she had visited the neighboring HMAs that 'encompass roughly 200,000 acres,' she had never visited the project area." *Id.* This order, issued by the IBLA in 2018,

1  gave Plaintiffs clear direction on how IBLA would view their standing allegations in similar

2  appeals, yet they failed to allege that they had visited the Bald Mountain Project area or the areas

3  that BLM had identified potential impacts to wild horses.[6]

4  ## II.    STANDARD OF REVIEW

5        Under the Administrative Procedure Act ("APA"), the Court defers "to the decisions of the

6  Interior Board of Land Appeals, and we will set aside an IBLA decision only if it is arbitrary,

7  capricious, otherwise not in accordance with law, or not supported by substantial evidence."

8  *Corrigan v. Haaland*, 12 F.4th 901, 906 (9th Cir. 2021); *Akootchook v. United States*, 271 F.3d

9  1160, 1164 (9th Cir. 2001).

10  ## III.    ARGUMENT

11        In their Motion, Plaintiffs argue the IBLA committed significant procedural, factual, and

12  legal errors in its dismissal of their challenge for lack of standing. Plaintiffs contend the Board

13  improperly identified the scope of the Juniper Project's impacted area without the benefit of

14  complete briefing or the administrative record, ignored material facts about the wild horses'

15  movement throughout the Triple B Complex, and failed to articulate a rational connection between

16  the facts and its ruling.

17        These arguments lack merit. The Board considered the evidence provided by Leigh in the

18  form of a declaration that notably diverges in key aspects from the one now presented in this

19  litigation. After evaluating that evidence in the context of IBLA's precedent, the Board reasonably

20  concluded that Leigh was missing a key element of standing that its body of caselaw requires: a

21  connection to the lands or resources that the project will impact.

22        Generalized interest in the two-million-acre Triple B Complex is simply not enough under

23  this administrative body's existing interpretation of its regulations. This Court should therefore

24  defer to IBLA's reasonable conclusions, affirm its decision, and reject Plaintiffs' attempts to

---

[6] As noted *supra*, Leigh's attempts to change the record with visits to the Project area after the appeal was filed, should fail. Similarly, her claim that "had the Board asked for clarification," she could have provided "further details" is both too late and not credible. Given her personal participation in the 2018 Gold Bar Mine decision and her frequent appearances before the IBLA, she knew or should have known that the IBLA was asking her to document her visits to the Project area.

inappropriately introduce new information and conflate IBLA standing with Article III standing jurisprudence.

**A.    The Court Should Disregard Leigh's Declaration Submitted with Plaintiffs' Motion, as Well as New Arguments Not Made Before IBLA.**

As an initial matter, Plaintiffs have improperly attempted to introduce new arguments and documents that were not before the Board. "When a plaintiff challenges a final agency action, judicial review normally is limited to the administrative record in existence at the time of the agency's decision." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000). While some exceptions exist, none of them apply here. *See id.* Further, if a petitioner fails to raise an issue before an administrative tribunal, it cannot be raised on appeal from that tribunal. *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004) ("It is a well-known axiom of administrative law that 'if a petitioner wishes to preserve an issue for appeal, he must first raise it in the proper administrative forum.'" (citations omitted)).

Here, Plaintiffs have included substantial new information and argument that were not in front of the IBLA when it made the decision they now appeal from. A federal court review action is not an opportunity for Plaintiffs to get a second bite at the apple—this Court must limit its review to the documents before the IBLA when the decision was made. *Friends of the Clearwater*, 222 F.3d at 560. This is the same administrative record that Plaintiffs had the opportunity to object to by July 14, 2025, (*see* ECF No. 40) but did not.

Plaintiffs have also appended a new declaration from Laura Leigh (ECF No. 43-1) that includes substantially different information than her declarations that were presented to the Board. *Compare* ECF No 43-1 (eleven-page Declaration filed in federal court action) *with* AR_165 (Declaration in Response to BLM Motion to Dismiss); AR_209 (Declaration in Response to KG Mining Motion to Dismiss); AR_022-23 (Declaration in Support of Statement of Reasons). The new declaration includes (inaccurate) information about the maximum cumulative effect study areas; BLM wild horse gathering and removal activities ("gathers") as they relate to complexes; environmental analyses of gather plans; specifics of Leigh's visits to the Triple B Complex; her new allegations about visits to the Triple B HMA; WHE volunteer observation of gathers in the

Triple B Complex; Leigh's September 1, 2024, and spring 2025 visits to the Triple B HMA; as well as additional argument framed in terms of what Leigh "tried to explain" in the IBLA briefing. *See* ECF No. 43-1.

This gamesmanship should be summarily rejected. It was Plaintiffs' burden to present this information to the administrative decisionmaker at the time the Motions to Dismiss were pending.[7] To consider the new material at this stage would be unfair, prejudicial, and inconsistent with precedent, and KG Mining objects to it.[8]

### B.    Plaintiffs Failed to Establish Standing Under IBLA's Framework.

Both of Plaintiffs' standing sections (ECF No. 43, p. 11-15, Section IV "Administrative Procedure Standing" and Section V, "Article III Standing") fail to articulate the appropriate standard. Those sections do not address the IBLA regulation that guided the Board's standing analysis (43 C.F.R. § 4.410 (2024)). In doing so, Plaintiffs convert a narrow review of an administrative standing determination into a sprawling inquiry more appropriate for a direct federal court challenge to the underlying authorization.

IBLA has been crystal clear on this issue: it is "not bound by Constitutional principles of standing and [it does] not require appellants to satisfy the zone-of-interests test. Rather, standing to appeal to this Board is governed exclusively by our regulations and our decisions interpreting those regulations." *Bassler* 197 IBLA 280, 285 (2021) (citing *Animal Protection Institute of America*, 118 IBLA 63, 66 (1991)) (1991 WL 255485) ("Standing before the Board of Land Appeals is governed by [then] 43 C.F.R. § 4.410(1) and is not governed by Section 702 of the Administrative Procedure Act.").

---

[7] In her new declaration, Leigh presents information about her activities in September 2024 and early 2025, which are *after* the BLM decision and the IBLA decision. *See* ECF No. 43-1, p. 7 (28.d-e). The BLM's decision approving the Juniper Project was July 8, 2024. But a legally cognizable interest must exist at the time the decision being challenged was issued. *See Bassler*, 197 IBLA 280, 285 (2021) (citing *Wilderness Workshop*, 189 IBLA 221, 224 (2017) (2017 WL 1065399) (holding that "[t]he legally cognizable interest must be shown to have been held by the appellant at the time of the decision that it seeks to appeal."). KG Mining objects to the declaration, and the Court should ignore or strike the allegations that postdate the BLM decision.

[8] To the extent Plaintiffs present any arguments that were not made to the Board, they should also be rejected.

PARSONS
BEHLE &
LATIMER

The case in front of the Court is straightforward: IBLA applied its standing regulation (43 C.F.R. § 4.410 (2024)), evaluated all of the facts alleged by appellants in support of standing, and relied on clear IBLA precedent interpreting the regulation. In addition, it considered a particularly relevant unpublished order for its factual similarity. *See* Order, *Elyse Garner Walsh*, IBLA 2018-0035, Appeal by Laura Leigh and Wild Horse Education Dismissed; Petition for Stay Denied (Jan. 23, 2018) ("*Walsh*") (*see* ECF No. 44-2, Exhibit F15). IBLA's analysis reasonably recounted and applied its precedent to reach the conclusion that, based on the information and argument provided by Plaintiffs, they could not demonstrate a legally cognizable interest under the applicable regulations. The IBLA's findings and reasoning provide ample justification for this Court to affirm under the APA's deferential standard of review. Questions of APA and Article III standing are outside the scope of this review, and the Court should disregard them.

### 1.     *Plaintiffs' interest in a two-million-acre area lacks the causal connection necessary create standing.*

As IBLA made clear in its Order, to demonstrate a legally cognizable interest under its standing formulation, the appellant "must make colorable allegations, supported by specific facts set forth in an affidavit, declaration[,] or other statement, that establish the causal relationship between the approved action and alleged injury to a legally cognizable interest." *Ctr. for Biological Diversity*, 195 IBLA 298, 302 (2020); *see also* AR_255. The crux of the Plaintiffs' argument in this federal litigation is that the Board erred by failing to formulate the causal relationship between the approved action and the injury alleged broadly enough to suit their purposes. Plaintiffs fault the Board for not diluting the causal-connection requirement by zooming out to the entire northwestern quarter of White Pine County (not one, but three HMAs) or entertaining speculative impacts from the Juniper Project in that area that are hypothetical in timing and scope (gathers, forage, and water).

As IBLA has repeatedly held, the "threat of injury and its effect on the appellant must be more than hypothetical." *Wilderness Workshop*, 189 IBLA at 224. It must be "real" and "immediate" – "speculation that injury may occur in the future will not suffice." *Id.* (quoting *Legal & Safety Employer Research Inc.*, 154 IBLA 167, 172 (2001); *Colorado Open Space Council*, 109 IBLA 274, 280 (1989) (1989 WL 2555323)). In this regard, the appellant's showing is critical:

> The information provided in support of an appellant's standing must "'provide as much specific evidence as possible about what interests are allegedly injured and what the connections are between those interests and the decision [the organization] seeks to appeal.'" What is key is that an appellant must demonstrate a connection between a member's activities and interests, ***and the lands subject to the decision*** on appeal, and we have held that an organization does not have standing when it does not establish that a member "has used or in the future will use" the lands impacted by the decision on appeal.

*Wildlands Defense*, 192 IBLA 209, 217-18 (2018) (2018 WL 2089399) (citations omitted) (emphasis added). The appellant in *Wildlands Defense* successfully established standing by addressing the specific questions of "who, what, where, when, and why" in a supporting declaration. *Id.* at 218-19. The appellant identified the specific areas encompassed within the project area for particularized purposes, including precise dates. *Id.* And in that case, the project at issue was a BLM District-wide Roadside Fuel Break Hazardous Fuels Reduction Project, authorizing the establishment and maintenance of fuel breaks along existing roads on a total of 30,000 acres of public lands within four counties. *Id.* at 212-13.

Here, Leigh's declarations in support of her standing statement before the IBLA (AR_022-23; 164; 209) failed to offer any specificity more than the repeated references to the two-million-acre Triple B Complex and generalized "movement between the Complex HMAs." Leigh attests that "multiple times each year, I visit the Triple B Complex herds and write of the experience," (AR_022) and she "has been visiting the Triple B Complex horses once per month for the last 10-years" (AR_164). These allegations fell clearly short of the standard IBLA had established to show an interest in the "lands subject to the decision." *See* AR_022. BLM's analysis of direct, indirect, and cumulative effects identified no impacts to the vast "Triple B Complex." Even cumulative effects were limited to the Triple B HMA, and Plaintiffs did not provide evidence to the IBLA that they ever visited that area, let alone the smaller area near the mine site where the FEIS identified potential direct and indirect impacts to wild horses. An even more reasonable interpretation of the area impacted, consistent with the Gold Bar Mine decision, would be the project area and the approximately 4,000 acres of direct disturbance.

Plaintiffs identify only speculative harms (besides gathers, which will be addressed below) to forage and water. ECF No. 43, p. 8-9. But it strains credulity to argue that the water resources

and forage will be impacted in a two-million-acre area as a result of disturbance on four thousand acres adjacent to an existing mine, the vast majority of which is in and around existing facilities. *See* Exhibit 1, p. 13; *see also* ECF No. 43 at 15 ("The appellants asserted that the area impacted by the Jupiter [sic] Project includes the entirety of the Triple B Complex."). Plaintiffs argue without support that these are the "best" lands for horses, but this assertion directly conflicts with BLM's impacts assessment (and common sense). *See* Exhibit 1, p. 8. Before the IBLA, Plaintiff failed to establish that the Juniper Project's impacts on water and vegetation would be causally connected to their interests in the entire Triple B Complex. Plaintiffs' list of purported factual and legal errors (ECF No. 43, pp. 17-29) do not cure this defect.

### 2. *Approval of the Juniper Project is not causally connected to increased gathers.*

Plaintiffs argue that the cumulative impacts from the Juniper Project significantly increase the potential for wild horse gathers and removals, permanent sterilization, and application of fertility control procedures. ECF No. 44, p. 26. They contend that those cumulative impacts interfere with and adversely affect their recreation and enjoyment of the Triple B Complex Wild Horses, and therefore they have established standing. *Id.* The Board correctly rejected this argument, because the Juniper Project makes no decisions related to wild horses. AR_257.

"Gathers" are planned operations where the federal agency collects and removes excess wild horses and burros on public lands. *See* 16 U.S.C. § 1333 (b)(2) (removal of excess wild horses and burros from public lands); 43 C.F.R. § 4720.1 (same). As the Board indicated, Plaintiffs' arguments concerning the connection between the Project and increased likelihood of gathers are tenuous. *See* AR_256. For BLM to conduct a gather, it must evaluate the range and population conditions, propose to gather and remove the excess wild horses and burros, and conduct the appropriate level of NEPA analysis on that proposal. *See Fund for Animals v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 16 (D.C. Cir. 2006); *see also* Permanent Instruction Memorandum, PIM 2019-004, Issuance of Wild Horse and Burro Gather Decisions (March 15, 2019). Once the agency authorizes the gathering, that action may be independently reviewed and challenged. *See Fund for Animals*, 460 F.3d at 16; *Front Range Equine Rescue*, 187 IBLA 28 (2016) (2016 WL 1624047).

In *Colorado Open Space Council*, IBLA considered a similar argument by the challengers. That appeal concerned the continuation of an oil and gas lease. The appellants argued that the continuation of the lease injured their interest in having the land within a wilderness study area eventually designated as a wilderness area." 109 IBLA at 280. But IBLA concluded the appellants were not adversely affected because "in some theoretical sense, the decision makes it less likely that the land will be included in the wilderness system. *Id.* The appellant would only be able to challenge a decision where "in a real an immediate way, the decision authorizes physical actions which, in and of themselves" adversely affect the appellants' "enjoyment of the lands involved." *Id.* at 281-82. The continuation of the leases did not mean that they would be developed (which could result in Congress eventually finding the area was no longer suitable as a wilderness area), and therefore the causal chain between interest and adverse impact was too tenuous to support standing. *Id.* at 282-83.

Here, BLM's decision to approve the Juniper Project does not authorize or cause any change in wild horse numbers or management, nor does it indicate that any such action might be needed as a result of the Juniper Project. AR_257. The trigger for a gather is an over-population of horses, not the existence of a mine expansion. The FEIS acknowledges that the Bald Mountain HMA has excess horses. AR_138 (citing FEIS p. 3-239). Therefore, future gathers in that HMA are to be expected with or without the expansion of the Bald Mountain Mine.

Like the distinction between the continuation and development of the leases in *Colorado Open Space*, here BLM may perform a gather even if the Juniper Project was never approved—and it would have to comply with NEPA before doing so. And that decision would be subject to challenge, with any harm redressable in that context. Therefore, Plaintiffs' arguments that they are adversely affected by the Juniper Project's purported effect of increasing the probability of a gather are entirely speculative and hypothetical, ignore IBLA precedent, and do not support standing before the Board.

### 3. *The Board correctly applied its precedent.*

Plaintiffs make much ado about the Board's application of *Western Watersheds Project* and *Cascadia Wildlands*, and its use of *Walsh*, to no avail. First, Plaintiffs attempt to distinguish

*Western Watersheds Project* because that appellant did not raise cumulative impacts as Plaintiffs have here. ECF No. 43, p. 21-24. But as discussed above, Plaintiffs are missing the essential causal-connection element, which undermines this attempted distinction.

The appellant in *Western Watersheds Project* submitted a remarkably similar declaration to those Plaintiffs submitted before the Board, noting general visits in a half million-acre project area, but missed the "who, what, where, when, why" part of IBLA's standing requirements. *Western Watersheds Project*, 185 IBLA 293, 300 (2015) (2015 WL 4160693) ("He does not set forth the date(s) of his visits, where he was, what he did, or otherwise place himself in, adjacent to, or near any of the identified treatment areas."). That lack of specificity paired with the tremendous geographic scope led the Board to conclude that no causal connection showing had been made. *Id.* The required showing will vary depending on the circumstances in each case, but even if Plaintiffs contend theirs is a cumulative effects case, there is still no reasonable connection between the interest and the purported harms. Their allegations are outside the area BLM reasonably identified as the potential for cumulative effects.

Next, the attempt to distinguish *Cascadia Wildlands* only drives home the similarities between that case and the instant matter. In *Cascadia Wildlands*, the appellants generally discussed "the project area," "the project area where timber sale activities are proposed," or the "Salem District." 188 IBLA 7, 11-12 (2016) (2016 WL 4061818). In its motion to dismiss, BLM clarified that the "project area" referred to 1,168 acres analyzed for timber harvest in the environmental assessment, while the timber sale covered 344 acres (locked behind a gate). *Id.* at 11-12. Without specific facts showing the appellants' use of the 344 acres to be sold, they could not establish standing. The Board stressed that "[t]he information provided by a member of an organization must 'provide as much specific evidence as possible about what interests are allegedly injured and what the connections are between those interests and the decision [the organization] seeks to appeal." *Id.* at 10. But like the appellants in *Cascadia Wildlands*, here Plaintiffs have generally discussed the Triple B complex while failing to establish a connection between that large area and the impacts from the BLM's decision that extend only to a much smaller area.

The Board's use of *Walsh* was entirely appropriate and recognized the order was

informative, not precedential. AR_258. Involving the same appellants, there the Board concluded Leigh's declaration lacked sufficient details of the "who, what, where, and when" in the vicinity of the project area to establish standing. The reasons why Leigh failed to file supplemental declarations to correct the deficiencies identified by the Board in *Walsh* are not relevant in this review. *See* ECF 43, p. 33. What is relevant is that deficiencies were similar to those in this case since the appellants in both cases "established only that they have visited wild horses within a large area containing the project but not the project area itself." AR_258. The causal connection was inadequate in *Walsh*, and it is here, too.

Finally, *Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992), offers analogous reasoning to reject Plaintiffs' standing claim by establishing that mere interest in a species is insufficient without showing a concrete connection to the specific area affected.[9] The *Lujan* Court rejected standing based on "some day intentions" without concrete plans, which parallels Plaintiffs' general assertions about visiting the Triple B Complex without demonstrating specific use of the Juniper Project area. IBLA's precedent is consistent with these elements of *Lujan*, as observers must show a connection to the particular portion of the habitat directly affected by the project.

The Board's use, interpretation, and application of these cases were all well within the bounds of reasonability for an administrative agency interpreting its own regulations and caselaw.

**C.    IBLA Properly Evaluated the Threshold Standing Issue Based on the Information Submitted by the Parties.**

Plaintiffs argue IBLA improperly adjudicated the merits of their claim without complete briefing or the administrative record. ECF 44, p. 16-17. In doing so, they contend IBLA determined the geographic scope of impacts by selectively citing to the BLM's EIS before the complete administrative record was available, violating procedural requirements under 43 C.F.R. § 4.406 (2024) and 5 U.S.C. § 706(2)(D). *Id.*

The IBLA appropriately considered this threshold standing issue based on the information submitted by the parties and available to the Board. The Board correctly recognized that standing

---

[9] The Board cited *Lujan* with a "*Cf.*," indicating the support was indirectly and through analogy. In doing so, it did not invoke Article III or APA standing caselaw.

PARSONS
BEHLE &
LATIMER

is a preliminary question that must be addressed before turning to the merits of the challenge. The Board reasonably relied on the FEIS (which was cited by Plaintiffs, BLM, and KG Mining) to understand the basic parameters of the project area. Plaintiffs cite no authority indicating that practice is impermissible for standing determinations under the Board's regulations or precedent. Further, the citations to the DEIS that Plaintiffs take issue with are taken out of context. *See* ECF 44, p. 16-17. The Board used those citations simply to establish that the DEIS included discussion of impacts to wild horses, and that WHE submitted comments in response to that analysis. AR_253-54. This was relevant to the first part of the standing test, i.e., that the plaintiffs had participated in the proceedings. The acreage amounts cited with reference to the DEIS reflect the same numbers in the FEIS, so even if this were error, it would be harmless. AR_138 (citing FEIS p. 3-239 with this acreage).

The Board did not need the complete administrative record to determine that Plaintiffs failed to demonstrate they visited the specific project areas or nearby or adjacent lands likely to be affected by the Juniper Project. In its analysis, it focused on the deficiencies of Leigh's declaration, using the agency's FEIS for appropriate context and as referenced by the other parties, and applied its precedent within reason. The Board's handling of this issue can hardly be found to be arbitrary or capricious.

## IV.    CONCLUSION

Plaintiffs were unable to make an adequate showing to the Board under applicable regulations and precedent governing standing. Plaintiffs failed to establish an adequate causal and geographic nexus between their general interests in wild horses in northern Nevada and the specific lands potentially impacted by BLM's decision to approve the Juniper Project. Their arguments concerning forage and water are attenuated, and their arguments concerning gathers are speculative. Labelling the impacts as cumulative does not fix this fatal flaw.

/ / /

/ / /

/ / /

/ / /

PARSONS
BEHLE &
LATIMER

1    The standard of review here requires deference to an agency that correctly identified the

2 applicable guidelines, applied them within reason and the bounds of the law, and concluded that

3 Plaintiffs did not meet the criteria. Accordingly, this Court should affirm IBLA's dismissal.

4    DATED this 9th day of February, 2026.

5                                        PARSONS BEHLE & LATIMER

6

7                                        /s/ Ashley C. Nikkel
                                         Jim B. Butler, Nevada Bar ID No. 8389
8                                        Ashley C. Nikkel, Nevada Bar ID No. 12838
                                         50 West Liberty Street, Suite 750
9                                        Reno, NV 89501
                                         (775) 323-1601
10                                       jbutler@parsonsbehle.com
                                         anikkel@parsonsbehle.com
11
                                         *Attorneys for Defendant KG Mining (Bald*
12                                       *Mountain) Inc.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARSONS
BEHLE &
LATIMER

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am an employee of the law firm of Parsons Behle & Latimer and that on the 10th day of February, 2026, I filed a true and correct copy of the foregoing document, **DEFENDANT KG MINING (BALD MOUNTAIN) INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT,** with the Clerk through the Court's CM/ECF system, which sent electronic notification to all registered users as follows:

Brent M. Resh, Esq.
Brent Resh Law, PLCC
2104 La Solana Way
Las Vegas, NV 89102
Email: brent@brentreshlaw.com

*Attorneys for Plaintiffs*

Jessica L. Blome, Esq.
J. Rae Lovko, Esq.
Greenfire Law, PC
2748 Adeline St., Suite A
Berkeley, CA 94703
Email: jblome@greenfirelaw.com
Email: rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

Sue Fahimi, Esq.
Nicole Leibow, Esq.
United States Attorney's Office
501 Las Vegas Blvd., Suite 1100
Las Vegas, NV 89101
Email: nicole.leibow@usdoj.gov

*Attorneys for Federal Defendants*

    */s/ Nancy A. Prout*
Employee of Parsons Behle & Latimer

1

## <u>INDEX OF EXHIBITS</u>

2

| <u>Exhibit</u> | <u>Description</u> | <u>Pages</u> |
|---|---|---|
| 1 | Final Environmental Impact Statement ("FEIS") Excerpts | 25 |
| 2 | Record of Decision ("ROD") Excerpts | 3 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Parsons
Behle &
Latimer