# EXHIBIT 1

FINAL ENVIRONMENTAL IMPACT
STATEMENT
(Excerpts)

# EXHIBIT 1





**U.S. Department of the Interior
Bureau of Land Management**

# Bald Mountain Mine Plan of Operations Amendment Juniper Project

## Final Environmental Impact Statement

DOI-BLM-NV-L060-2021-0013-EIS

U.S. Department of the Interior
Bureau of Land Management
Bristlecone Field Office
702 North Industrial Way
Ely, Nevada 89301

**May 2024**

001

# EXECUTIVE SUMMARY

## INTRODUCTION

KG Mining (Bald Mountain) Inc. (KG-BM) owns and operates the Bald Mountain Mine (BMM), a large-scale, open-pit gold mine primarily on public lands administered by the Bureau of Management (BLM) Bristlecone Field Office. The BMM is in northwestern White Pine County, Nevada, approximately 60 miles southeast of the city of Elko, Nevada and 60 miles northwest of Ely, Nevada. The BMM operates on patented and unpatented Federal mining claims owned, leased, or otherwise controlled by KG-BM. The BMM has been in continuous operation for more than 40 years; therefore, mine areas, components, and facilities are in various stages of development, operation, and reclamation. The BMM is subdivided into two plan of operation areas, which consist of the North Operations Area (NOA) and South Operations Area (SOA). KG-BM is proposing to amend its plan of operations for the NOA (NOA Plan) to enable continued mining, processing, exploration, and reclamation of the open-pit mining operations and to reestablish underground mining.

KG-BM's objective for its proposal to amend the NOA Plan—referred to as the Juniper Project—is to continue mining by creating and expanding mine components located within mine areas and conducting activities associated with mining, such as concurrent reclamation and ongoing exploration activities in the NOA. The proposed expansion and development of mining components and extension of the mine life by 11 years would enhance operational efficiencies and increase extraction of ore for processing and gold recovery in a cost-effective, optimal, and profitable manner.

The BLM determined that the Juniper Project requires preparation of an environmental impact statement (EIS) for an appropriate level of analysis under the National Environmental Policy Act. The preparation of this EIS is intended to assist the BLM in the decisionmaking process through the identification, analysis, and public disclosure of potential impacts of the Juniper Project on the environment, including environmental, social, and economic impacts. The BLM has identified Alternative A, which was developed to address refinements to two designated mule deer migration corridors through the western portion of the NOA, as its Preferred Alternative for implementation.

This EIS also analyzes effects associated with KG-BM's applications to the U.S. Fish and Wildlife Service (USFWS) for an eagle take permit. The applications cover the Juniper Project and authorized mining activities in both the NOA and the SOA. Under the USFWS Preferred Alternative for KG-BM's applications for an eagle take permit, the USFWS would issue a permit with increased take authorizations and experimental compensatory mitigation measures.

This EIS and additional information about the Juniper Project are available on the BLM National ePlanning website—https://go.usa.gov/xAm2g.

Impacts from injury and mortality of wildlife species from mining activities and associated vehicle traffic, and disruption from human presence and noise, would continue similar to existing levels but for an 11 additional years under the action alternatives.

## USFWS Golden Eagle Take Permit

To assess risk to eagles, the USFWS reviewed the Juniper Project footprint and activities planned each year proximate to known eagle breeding territories and their nest sites, and also evaluated available data and information for each breeding territory using the nest site location, survey data, and conservation measures detailed in KG-BM's Eagle Conservation Plan (Appendix E) and Bird and Bat Conservation Strategy. The USFWS determined project activities that occur during the nesting season within an eagle nest buffer would likely result in take from disturbance that prevents a breeding pair from producing young in the given Project Year. The USFWS expects two golden eagle breeding territories would be lost due to the combination of nest removals, incidental disturbance, and loss of habitat. The USFWS anticipates up to 27 additional instances of take from disturbance involving four other breeding territories and accounting for the potential that up to two additional territories could become established within the NOA or SOA over the life of the mine and reclamation processes.

## Livestock Grazing

Additional proposed surface disturbance within the extended NOA Plan boundary is estimated to be equivalent to a loss of 300 animal unit months for the Proposed Action and 299 animal unit months for Alternative A. Forage loss from the action alternatives could increase grazing pressure on remaining forage but the BLM does not anticipate changing the amount of animal unit months permitted within the affected Warm Springs or Maverick Springs allotments based on the allotment capacities and herd sizes. The estimated new surface disturbance within each allotment represents 1% or less of the total allotment acreages and successful revegetation of previously disturbed areas would restore forage for livestock over time (no less than 3 to 5 years to reestablish grasses and forbs), such that impacts are anticipated to be negligible to minor, long term to permanent, and localized.

KG-BM would continue to communicate with grazing permittees to maintain separation between livestock and active mine areas and implement measures to protect livestock from mine-related hazards. KG-BM will evaluate the water supply and circumstances to determine the options for a replacement well and inform the BLM in advance of the construction of the Royale RDA.

## Wild Horses

Most of the extended NOA Plan boundary is within the Triple B Herd Management Area. Wild horse gathers conducted by the BLM have reduced the wild horse population in this area but the population is still estimated to be double the appropriate management level established by the BLM to maintain a thriving ecological balance. Signs of wild horse usage are present around

springs and wetlands in the NOA. Removal of vegetation that may be browsed by wild horses and subsequent reclamation of a portion of the disturbed areas would have similar effects described above for livestock grazing. The proposed 3,969 acres of surface disturbance under the Proposed Action and 3,952 acres under Alternative A represent approximately 0.3% of the total area of the herd management area. KG-BM would continue to use fencing and other exclusion measures to prevent ingestion of diluted cyanide solution or entrapment of wildlife, which would also be effective for wild horses. To reduce risk of wild horse-mine vehicle collisions, KG-BM employs ACEPM no. 143 that marks new fencing and installs road signs for safety of wild horses under situations where there is heavy or sustained traffic. Risk of wild horse-vehicle collisions would continue for an additional 11 years under the action alternatives. Overall, potential impacts on wild horses are anticipated to be minor, long term to permanent, and localized.

## Paleontological Resources

Although proposed disturbances in geologic units with a Potential Fossil Yield Classification of 3 or 4 indicate the potential for impacts on significant paleontological resources, the absence of any significant paleontological resources being discovered in the course of KG-BM's past mining operations at the BMM suggest that they may not be abundant or present locally within the NOA. Based on these considerations, the impacts of surface disturbance on paleontological resources are anticipated to be negligible to minor, permanent, and localized. However, the 3,969 acres of new surface disturbance under the Proposed Action and 3,952 acres under Alternative A could result in the irreversible loss of paleontological resources present in these areas. If paleontological resources of potential scientific interest are encountered, they would be left intact and KG-BM would immediately notify the BLM authorized officer.

## Cultural Resources

Surface disturbance under the action alternatives has the potential to affect 187 known cultural resources, none of which are eligible for the National Register of Historic Places (i.e., historic properties). As-yet unknown historic properties could be destroyed or removed from their original setting during construction, resulting in a major, permanent, and localized impact and an irreversible loss of information that may have otherwise been available for future recovery. However, in the event of an unanticipated cultural resources discovery, BLM and KG-BM's ACEPM no. 10 directs KG-BM to cease all activities within 100 meters and immediately notify the BLM for full evaluation of the resource. If the resource is deemed eligible for the National Register of Historic Places, implementation of a required treatment plan in accordance with the State of Nevada Protocol Agreement between the Bureau of Land Management, Nevada, and the Nevada State Historic Preservation Office. KG-BM's ACEPM no. 9 affirms the requirement to record significant historical information in a manner that could be retrieved for future study.

# TABLE OF CONTENTS

**CHAPTER 1.   INTRODUCTION** ................................................................................ 1-1
   1.1.   Identifying Information ............................................................... 1-1
   1.2.   Background ................................................................................. 1-5
   1.3.   Summary of the Proposed Action ............................................... 1-5
        1.3.1.   Proposed NOA Plan Amendment (Juniper Project) ............. 1-5
        1.3.2.   Eagle Take Permit ......................................................... 1-6
   1.4.   Purpose and Need ....................................................................... 1-7
        1.4.1.   BLM ............................................................................. 1-7
        1.4.2.   USFWS ......................................................................... 1-7
        1.4.3.   KG-BM Objective ......................................................... 1-7
   1.5.   Decisions to Be Made ................................................................. 1-7
        1.5.1.   BLM ............................................................................. 1-7
        1.5.2.   USFWS ......................................................................... 1-8
   1.6.   Relationship to BLM and Non-BLM Policies, Plans, and Programs ................. 1-9
        1.6.1.   Resource Management Plan Conformance ........................... 1-9
        1.6.2.   Federal Regulations, Statutes, and Policies ....................... 1-10
        1.6.3.   Bald and Golden Eagle Protection Act ............................ 1-11
        1.6.4.   State and Local Land Regulations and Policies .................. 1-12
        1.6.5.   Permits and Approvals ................................................. 1-13
**CHAPTER 2.   ALTERNATIVES** ............................................................................. 2-1
   2.1.   BLM Alternatives ...................................................................... 2-1
        2.1.1.   No-Action Alternative ................................................... 2-1
        2.1.2.   Proposed Action ............................................................ 2-6
        2.1.3.   Alternative A (BLM Preferred Alternative) ...................... 2-35
   2.2.   USFWS Eagle Permit Decision Alternatives ............................... 2-46
        2.2.1.   USFWS No-Action Alternative ..................................... 2-47
        2.2.2.   USFWS Action Alternatives .......................................... 2-47
   2.3.   Alternatives Considered but Eliminated From Detailed Analysis .................... 2-55
        2.3.1.   Complete Backfill of Underground Workings ................... 2-56
        2.3.2.   Complete Backfilling of Open Pits ................................ 2-56
        2.3.3.   No or Minimal Surface Disturbance Increase in Ruby Valley Hydrographic Basin .................................................. 2-57
        2.3.4.   No New Water Production Wells in Ruby Valley Hydrographic Basin ........................................................................ 2-57
        2.3.5.   No New Surface Disturbance in Ruby Lake National Wildlife Refuge Viewshed ........................................................ 2-58
**CHAPTER 3.   AFFECTED ENVIRONMENT AND ENVIRONMENTAL CONSEQUENCES** ................................................................................. 3-1
   3.1.   Introduction .............................................................................. 3-1
   3.2.   Geology and Mineral Resources .................................................. 3-4
        3.2.1.   Affected Environment .................................................... 3-4
        3.2.2.   Environmental Consequences ........................................ 3-13
   3.3.   Water Quality and Quantity ...................................................... 3-24
        3.3.1.   Affected Environment .................................................. 3-24

*Table of Contents*

|  |  |  |  |
|---|---|---|---|
|  | 3.3.2. | Environmental Consequences | 3-46 |
| 3.4. | Soils and Reclamation | | 3-84 |
|  | 3.4.1. | Affected Environment | 3-86 |
|  | 3.4.2. | Environmental Consequences | 3-92 |
| 3.5. | Vegetation, Special Status Plants, and Wetlands | | 3-98 |
|  | 3.5.1. | Affected Environment | 3-98 |
|  | 3.5.2. | Environmental Consequences | 3-104 |
| 3.6. | Noxious Weeds and Nonnative Invasive Plant Species | | 3-115 |
|  | 3.6.1. | Affected Environment | 3-117 |
|  | 3.6.2. | Environmental Consequences | 3-117 |
| 3.7. | Wildlife and Fisheries Resources | | 3-120 |
|  | 3.7.1. | Affected Environment | 3-120 |
|  | 3.7.2. | Environmental Consequences | 3-139 |
| 3.8. | Special Status Wildlife Species | | 3-164 |
|  | 3.8.1. | Affected Environment | 3-166 |
|  | 3.8.2. | Environmental Consequences | 3-168 |
| 3.9. | USFWS Golden Eagle Permit Decision | | 3-209 |
|  | 3.9.1. | Affected Environment | 3-209 |
|  | 3.9.2. | Environmental Consequences | 3-217 |
| 3.10. | Livestock Grazing | | 3-227 |
|  | 3.10.1. | Affected Environment | 3-229 |
|  | 3.10.2. | Environmental Consequences | 3-233 |
| 3.11. | Wild Horses | | 3-239 |
|  | 3.11.1. | Affected Environment | 3-239 |
|  | 3.11.2. | Environmental Consequences | 3-241 |
| 3.12. | Paleontological Resources | | 3-243 |
|  | 3.12.1. | Affected Environment | 3-244 |
|  | 3.12.2. | Environmental Consequences | 3-248 |
| 3.13. | Cultural Resources | | 3-251 |
|  | 3.13.1. | Affected Environment | 3-253 |
|  | 3.13.2. | Environmental Consequences | 3-257 |
| 3.14. | Native American Traditional Values | | 3-260 |
|  | 3.14.1. | Affected Environment | 3-260 |
|  | 3.14.2. | Environmental Consequences | 3-261 |
| 3.15. | Air Quality and Greenhouse Gas Emissions | | 3-263 |
|  | 3.15.1. | Affected Environment | 3-263 |
|  | 3.15.2. | Environmental Consequences | 3-270 |
| 3.16. | Land Use and Access | | 3-279 |
|  | 3.16.1. | Affected Environment | 3-281 |
|  | 3.16.2. | Environmental Consequences | 3-283 |
| 3.17. | Recreation | | 3-285 |
|  | 3.17.1. | Affected Environment | 3-285 |
|  | 3.17.2. | Environmental Consequences | 3-288 |
| 3.18. | Social and Economic Conditions | | 3-292 |
|  | 3.18.1. | Affected Environment | 3-293 |
|  | 3.18.2. | Environmental Consequences | 3-312 |

3.19.    Environmental Justice ....................................................................................3-321
          3.19.1.    Affected Environment.....................................................................3-321
          3.19.2.    Environmental Consequences ..........................................................3-330
3.20.    Visual Resources ............................................................................................3-334
          3.20.1.    Affected Environment.....................................................................3-335
          3.20.2.    Environmental Consequences ..........................................................3-359
3.21.    Hazardous Materials, Solid Wastes, Sanitation, and Public Health and
          Safety ................................................................................................................3-370
          3.21.1.    Affected Environment.....................................................................3-370
          3.21.2.    Environmental Consequences ..........................................................3-375
3.22.    Irreversible and Irretrievable Impacts, and Short-term Uses Versus Long-
          term Productivity ..............................................................................................3-381
          3.22.1.    Geology and Mineral Resources ......................................................3-381
          3.22.2.    Water Quality and Quantity ............................................................3-381
          3.22.3.    Soils and Vegetation .......................................................................3-382
          3.22.4.    Wildlife and Special Status Species.................................................3-382
          3.22.5.    USFWS Golden Eagle Take Permit .................................................3-383
          3.22.6.    Livestock Grazing and Wild Horses ................................................3-383
          3.22.7.    Paleontological Resources ...............................................................3-383
          3.22.8.    Cultural Resources ..........................................................................3-384
          3.22.9.    Air Quality and Greenhouse Gas Emissions.....................................3-384
          3.22.10.  Recreation ......................................................................................3-384
          3.22.11.  Social and Economic Conditions .....................................................3-384
          3.22.12.  Visual Resources ............................................................................3-384
          3.22.13.  Hazardous Materials, Solid Wastes, Sanitation, and Public
                        Health and Safety ...........................................................................3-385
CHAPTER 4.    CONSULTATION AND COORDINATION ...............................................4-1
4.1.      Public Participation.............................................................................................4-1
          4.1.1.    Scoping ..............................................................................................4-1
          4.1.2.    Public Review of the Draft EIS ..........................................................4-2
4.2.      Consultation and Coordination with Federal, State, and Local Agencies ..........4-2
4.3.      Consultation with Tribes.....................................................................................4-3
4.4.      List of Preparers.................................................................................................4-5



Figure 1.2
Overview of proposed North Operations Area
Plan boundary extensions and new disturbance

## 1.2. BACKGROUND

KG-BM owns and operates the BMM, a large-scale open-pit gold mine primarily on public lands administered by the BLM Bristlecone Field Office (Figure 1.1). The BMM operates on patented and unpatented Federal mining claims owned, leased, or otherwise controlled by KG-BM. The BMM has been in continuous operation for more than 40 years; therefore, mine areas and facilities are in various stages of development, operation, and reclamation. The BMM is within the Bald Mountain Mining District, which has been subjected to mineral exploration and mining continuing on a small scale for more than 140 years.

The BMM is subdivided into two plan of operation areas, which consist of the NOA (BLM case number NVN-082888/Reclamation Permit No. 0025) and SOA (BLM case number NVN-090443/Reclamation Permit No. 0033). The BMM Regional Exploration Plan boundary (BLM case number NVN-078825/Reclamation Permit No. 0235) surrounds both the NOA and the SOA. The Juniper Project would occur within the extended NOA Plan boundary. KG-BM's applications for an eagle take permit cover the Juniper Project and authorized mining activities in both the NOA and the SOA.

## 1.3. SUMMARY OF THE PROPOSED ACTION

KG-BM's Proposed Action consists of two components, as summarized below.

### 1.3.1. Proposed NOA Plan Amendment (Juniper Project)

In October 2020, KG-BM submitted the *North Operations Area (NVN-082888/Reclamation Permit No. 0025) Plan of Operations Amendment #6 and Reclamation Permit Application Juniper Project* (KG-BM 2020) describing proposed activities collectively referred to as the Juniper Project in this EIS. The Juniper Project is summarized briefly here and in greater detail in Section 2.1.2, *Proposed Action*, and Appendix B, *Detailed Description of Proposed Action and No-Action Alternative*.

In general, the Juniper Project involves:

- Extension of the NOA Plan boundary in five areas (shown on Figure 1.2) resulting in an increase of 3,425 acres;
- Expansion, elimination, or creation of mine areas and mine components (shown on Figure 1.2) resulting in net surface disturbance increase totaling 3,969 acres;
- New and realigned infrastructure (such as power lines, buildings, fencing, and wells);
- Reestablishment of the Top Pit underground mine;
- Sequencing and a backfill schedule for the authorized Poker Flats Pit;
- Planned concurrent reclamation; and
- Extension of the NOA mine life by 11 years.



**Figure 3.1-1**
**Locations of reasonably foreseeable future actions within the maximum CESA**

010

## 3.11. WILD HORSES

The study area for wild horses is the portion of the Triple B Herd Management Area (HMA) overlapped by the extended NOA Plan boundary, totaling 33,508 acres as shown on Figure 3.11-1. The CESA for wild horses is the BLM-designated Triple B HMA, totaling 1,232,717 acres as shown on Figure 3.11-1. This area was selected as the CESA because it is the geographic unit within which the BLM manages horse herds that could be affected by proposed mining activities.

## 3.11.1. Affected Environment

### 3.11.1.1. Appropriate Management Levels and Rangeland Health

The BLM manages wild horse herds within geographic units called HMAs, which are delineated based on unique terrain features, local climate, and natural resources. The Triple B HMA is 1,232,717 acres and part of the 2,059,987-acre Triple B Complex, which contains the Triple B, Maverick-Medicine, and Antelope Valley HMAs (BLM 2008). Wild horses move freely throughout the complex and the adjacent Cherry Springs Wild Horse Territory, which is managed by the U.S. Forest Service. The BLM established an appropriate management level of 250 to 518 wild horses for the Triple B HMA and 482 to 821 wild horses for the Triple B Complex to achieve a thriving natural ecological balance and sustained rangeland health (BLM 2008, 2017, 2022).

Wild horse gathers were conducted in the Triple B Complex, including the Triple B HMA, in 2018, 2019, and 2022. The estimated population for the Triple B Complex prior to the 2022 gather was 3,475 wild horses, not including the 2022 foal crop (BLM 2022). In 2022, the BLM gathered 1,897 excess wild horses from public lands in the Triple B Complex. The BLM released back into the complex approximately 50 mares treated with the population suppression vaccine GonaCon-Equine and 50 stallions.

The presence or absence of water resources may influence wild horse usage of an area. Degradation of seep and spring sources and structures, and trampling of surrounding vegetation, by wild horses has been observed during surveys conducted near the BMM (ICF 2021). Wild horses may also drink from ephemeral drainages when water is present. Prior to conducting the gathers in the Triple B Complex in 2018 and 2019, the BLM observed heavy and increasing trailing by wild horses between limited water sources and foraging areas, contributing to reduced herbaceous vegetative cover and deteriorated habitat conditions around water sources and specific upland areas (BLM 2019a).



**Legend:**

Extended North Operations Area Plan Boundary/Study Area
South Operations Area Plan Boundary
Herd Management Area/ Cumulative Effects Study Area
U.S. Hwy
State Hwy
County Road

Source: BLM 2020.

0    5    10 Miles
1:550,000

N

**Figure 3.11-1
Wild horses study area and CESA**

012

## 3.11.1.2.    Injury and Toxicity Hazards

Collisions between wild horses and vehicles (both mine-related traffic and non-mining traffic) have been known to occur within the study area. Since 2016, 15 collisions with wild horses have been reported on roads used by mine-related traffic to access the NOA. All but one of the collisions occurred on County Road 1000 (SRK Consulting 2020).

KG-BM maintains 8-foot-high wildlife exclusion fencing around HLFs, process ponds, process buildings, RIBs, and stormwater/event ponds throughout the BMM, including within the NOA, which excludes wild horses and eliminates risk of cyanide ingestion and entrapment. The Ely District RMP requires road signs for the safety and protection of wild horses for any projects that involve heavy or sustained traffic (BLM 2008).

## 3.11.2.  Environmental Consequences

### 3.11.2.1.    Proposed Action

Construction or modification of mine components under the Proposed Action would result in surface disturbance that removes forage that may otherwise be available for wild horses. Proposed surface-disturbing activities would affect approximately 3,969 acres within the extended NOA Plan boundary, of which 2,906 acres would be long term and 1,063 acres would be permanent. Long-term surface disturbance would be reclaimed and revegetated through concurrent reclamation during mine operations or final reclamation after mine closure. Successful revegetation of previously disturbed areas would restore vegetation that may be foraged by wild horses. Grasses and forbs may establish within 3 to 5 years, while mature shrub species are anticipated to require between 15 and 50 years. Permanent surface disturbance from creation or expansion of open pits not backfilled or backfilled below the pit rim would result in the permanent loss of forage. The proposed 3,969 acres of surface disturbance within the portion of the Triple B HMA overlapping the extended NOA Plan boundary represents approximately 0.3% of the total area of the HMA. Impacts on wild horses from surface disturbance are anticipated to be minor, long term to permanent, and localized.

Areas of surface disturbance and adjacent undisturbed lands are susceptible to establishment and spread of noxious weeds and nonnative invasive plant species, which can displace native vegetation foraged by wild horses. With implementation of KG-BM's *Integrated Weed Management Plan* (Stantec Consulting Services, Inc. 2020), which is designed to control and manage these species within the NOA, the impacts of noxious weeds and nonnative invasive plant species on wild horses are anticipated to be minor, long term, and localized. See Section 3.6.1, *Affected Environment*, for more information about noxious weeds and nonnative invasive plant species.

See Section 3.3, *Water Quality and Quantity*, for information about the potential effects of the Proposed Action on natural water sources and water-related range improvements that may be

used by wild horses. The Proposed Action is not anticipated to reduce baseflows in seeps and springs or affect water quality in water sources used by wild horses in the vicinity of the Juniper Project based on the analysis described in Section 3.3.

The continued implementation of KG-BM's *Traffic Management Plan* (KG-BM 2020), which requires ongoing compliance with posted speed limits and other traffic-control measures, would minimize the risks associated with potential wild horse-vehicle collisions; however, these risks would continue for an additional 11 years of mine operations. KG-BM would continue to install range and wildlife fencing in areas identified as posing a risk to wild horses from either physical injury or contact with potentially toxic fluids, such as HLFs and process ponds. These measures would minimize and mitigate potential injury or health effects on wild horses due to collisions with vehicles and exposure to mine components, resulting in minor, long-term, and localized impacts.

### 3.11.2.2.    Alternative A (BLM Preferred Alternative)

Effects on wild horses from Alternative A would be the same as described for the Proposed Action with the following exception. Alternative A would result in 16.3 fewer acres of long-term surface disturbance and 1.1 fewer acres of permanent surface disturbance than the Proposed Action within the Triple B HMA. This would maintain slightly more vegetated area than under the Proposed Action that may be foraged by wild horses. Overall, impacts on wild horses from surface disturbance are anticipated to be as described for the Proposed Action—minor, long term to permanent, and localized.

### 3.11.2.3.    No-Action Alternative

Under the No-Action Alternative, the Proposed Action would not be developed and associated impacts on wild horses would not occur. KG-BM would continue its operation, closure, and reclamation activities, including construction of authorized mine components, within the NOA Plan boundary in accordance with permits and approvals from Federal and State authorities. Impacts on wild horses would be as described in the 2016 FEIS (BLM 2016) and the *Bald Mountain Mine Saga Pit/Mooney Pad 8 Amendment Final Environmental Assessment* (BLM 2019b) for the continuation of the authorized mining operations, which would conclude 11 years earlier than under the Proposed Action. The BLM would generally continue to manage wild horses within the Triple B HMA as described for the affected environment in Section 3.11.1.

### 3.11.2.4.    Cumulative Effects

Appendix F, Table F.3, identifies RFFAs that may occur within the CESA and their potential to contribute to cumulative effects. Temporary to long-term surface disturbance associated with the Greenlink North and Southwest Intertie Project would reduce forage available for wild horses, if present in the vicinity of the affected areas, until disturbed areas are revegetated.

The Humboldt-Toiyabe National Forest Forest-wide Prescribed Fire, Invasive Plant Control Projects Using Aerial Application of Herbicide, Nationwide Aerial Application of Fire Retardant on National Forest System Land, and Long and Ruby Valleys Watershed Restoration projects are intended to reduce the potential for large-scale wildland fires and restore and enhance vegetation communities, which could increase forage availability for all grazing species, including wild horses, over the long term.

As summarized in Appendix F, Section F.3.5, the effects of climate change may result in higher than normal growing season temperatures, contraction or expansion of some existing vegetation communities, expansion of existing noxious weed populations, and introduction of noxious weed species previously undocumented. These effects may reduce forage availability over time.

As shown in Table 3-35, the estimated cumulative surface disturbance in the CESA contributed by past, present, and RFFAs is 108,169 acres or 9% of the total area of the CESA. The Proposed Action would contribute an additional 3,969 acres of surface disturbance compared to the No-Action Alternative that would reduce the availability of forage for wild horses and potentially contribute to spread of noxious weeds. Incremental effects from Alternative A would be similar to those of the Proposed Action, with 17.4 fewer acres of surface disturbance and associated loss of potential forage. Temporary to short-term surface disturbance from RFFAs would contribute to forage loss in combination with the alternatives but would cumulatively account for only a small area of the total forage available in the Triple B HMA. Overall, cumulative effects on wild horses would generally be as described for the Proposed Action—minor, long term, and localized.

**Table 3-35.   Estimated acres of surface disturbance from past, present, and RFFAs in the wild horses CESA**

| Disturbance from Past and Present Actions | Disturbance from Juniper Project Proposed Action | Potential Disturbance from RFFAs[1] | Total Disturbance[2] |
|---|---|---|---|
| 10,553 acres | 3,969 acres | 93,647 acres | 108,169 acres |

[1] Developed and disturbed land cover types from the LANDFIRE Existing Vegetation Type geospatial dataset produced by the USGS (2016) were used as a proxy for existing, unreclaimed surface disturbance on the landscape.
[2] Geospatial representation of surface disturbance based on KG-BM and SRK Consulting 2023.
[3] Acreage excludes prescribed fire and vegetation treatments.
[4] With ongoing reclamation and uncertainty associated with RFFA timing and implementation, the total acreage is not expected to be disturbed at a single point in time.

### 3.11.2.5.    Monitoring and Mitigation Measures

The BLM has not identified any monitoring and mitigation measures for the Proposed Action or alternatives for the Juniper Project.

# 3.12.    PALEONTOLOGICAL RESOURCES

The study area for paleontological resources is the extended NOA Plan boundary, totaling 34,997 acres as shown on Figure 3.2-1. The CESA for paleontological resources is the BMM



Extended North Operations Area Plan Boundary/Study Area
South Operations Area Plan Boundary
Cumulative Effects Study Area
 - Air Quality and Greenhouse Gas Emissions
— Interstate Hwy
— U.S. Hwy
-- State Hwy

Source: ESRI 2013.

0   10   20 Miles
1:2,000,000

**Figure 3.15-1**
**Air quality and greenhouse gas emissions study area and CESA**

016

# CHAPTER 4.   CONSULTATION AND COORDINATION

## 4.1.    PUBLIC PARTICIPATION

This chapter documents the BLM's public involvement, consultation, and coordination efforts during preparation of the draft EIS, including involvement by the tribes; Federal, State, and local government agencies; cooperating agencies; and other parties. This chapter also lists all preparers and reviewers that contributed to the development of the EIS.

### 4.1.1.   Scoping

Scoping is a requirement under NEPA defined in Council on Environmental Quality (CEQ) regulations at 40 Code of Federal Regulations (CFR) 1501.9 as "an early and open process for determining the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues." The formal public scoping process for the Juniper Project EIS began with publication of a notice of intent in the *Federal Register* on March 31, 2022 (62 *Federal Register* 06744). The notice of intent informed the public of the BLM's intent to prepare an EIS, provided information about the Proposed Action, and explained how to submit comments. The BLM invited the public to submit comments within the 32-day scoping period from March 31, 2022, through May 2, 2022. The BLM also mailed a Dear Interested Party letter containing similar information as the notice of intent to interested parties, cooperating agencies, and tribes.

During the scoping period, the BLM hosted two virtual public scoping meetings to provide information and answer questions about the Juniper Project EIS. The scoping meetings were held on April 19, 2022, and April 21, 2022, via the Zoom Webinar software platform. An estimated eight individuals (not including BLM staff, KG Mining [Bald Mountain] Inc. [KG-BM] staff, or consultants working on the EIS) signed into the virtual meetings: four individuals attended the April 19, 2022, virtual meeting and four individuals attended the April 21, 2022, virtual meeting.

The scoping meetings gave agencies, organizations, the public, and other interested parties an opportunity to learn and ask questions about the Juniper Project EIS. Each virtual scoping meeting consisted of an approximately 30-minute presentation followed by a question-and-answer session. Interested individuals could register for the virtual meetings and submit questions in advance via a link on the BLM National ePlanning website—https://go.usa.gov/xAm2g. The BLM also advertised the scoping meetings through a press release on the BLM Ely District Office website, advertisements in the local newspaper (*High Desert Advocate* on April 15, 2022), and Facebook (March 31, April 3, and April 6, 2022) and Twitter posts (April 17 and 19, 2022). Video recordings of both virtual meetings were posted to the BLM's project website.

The BLM received 19 unique submittals during the public scoping period. Of the 19 submittals, 10 were received by email, 8 were received by ePlanning—the BLM's online comment

platform—and 1 submittal was received by postal mail. The BLM used a systematic process to index submittals and bracket and assign discrete comments to categories. All comments received were considered in the development of the draft EIS and informed the issues analyzed in detail in the EIS and the alternatives to the Proposed Action.

## 4.1.2.    Public Review of the Draft EIS

A notice of availability was published in the *Federal Register* on August 18, 2023, announcing availability of the draft EIS for public review and comment. During the approximately 45-day public comment period for the draft EIS, which extended through October 5, 2023, the BLM held two public meetings and sent electronic notifications to interested individuals and organizations.

An in-person public meeting for the draft EIS was held on September 19, 2023, at the BLM Ely District Office in Ely, Nevada. There were six attendees excluding agency, KG-BM, and consultant presenters and panelists. A virtual public meeting for the draft EIS was held on September 21, 2023, via the Zoom Webinar software platform. Attendance for the virtual meeting peaked at approximately 31 people.

The public meetings provided agencies, organizations, the public, and other interested parties with an opportunity to ask questions about the Juniper EIS and engage in discussions with BLM specialists. Both the in-person and virtual scoping meetings consisted of an approximately 30-minute presentation followed by a question-and-answer session. Interested individuals could register for the virtual meetings and submit questions in advance via a link on the BLM National ePlanning website—https://go.usa.gov/xAm2g. No registration was required for the in-person meeting. A video recording of the virtual meeting was posted to the BLM's project website.

The BLM received a total of 376 comment submittals during the public comment period, which included 69 unique submittals, 300 copies of one form letter in support of the Juniper Project, 6 copies of a second form letter in support of the Juniper Project, and 1 duplicate comment. Of the 376 submittals, 305 were received by postal mail, 47 were received by ePlanning, and 24 were received by email. The BLM used the same systematic process as applied during the public scoping period to index submittals and bracket and assign discrete comments to categories. All comments received were considered and revisions were made to the EIS as appropriate. Please see Appendix J for additional information, including responses to all substantive written comments submitted during the public comment period for the draft EIS.

## 4.2.    CONSULTATION AND COORDINATION WITH FEDERAL, STATE, AND LOCAL AGENCIES

The BLM invited several Federal, State, and local government agencies having jurisdiction or special expertise to become cooperating agencies and actively participate in the preparation of

*Chapter 4. Consultation and Coordination*

| Name | Agency |
|------|--------|
| Jennifer Lee | City of Ely |

**Table 4-3.     Third-party contractor: ICF**

| Name | Role |
|------|------|
| Scott Duncan | Project director/project manager |
| Dan Nally | Assistant project manager |
| William Ericson | Project coordinator |
| Brent Read | Geographic information systems lead |
| Saadia Byram | Editing and publications lead |
| Tamar Grande | Editing and publications |
| Jennifer Piggott | Public outreach |
| Tiffany Mendoza | Public outreach |
| Drew Williams | Public outreach |
| David Ernst | Air quality |
| Jenna Wheaton | Cultural resources, Native American traditional values, paleontological resources |
| Ben Stutts | Socioeconomics, environmental justice |
| Scott Effner | Geology and minerals, water quality and quantity |
| Dan Nally | Hazardous materials, solid wastes, sanitation, public health and safety, land use and access, livestock grazing |
| William Ericson | Recreation, visual resources |
| Katie Wilson and Abby Potts Mouch | Vegetation, wetlands, soils |

# Appendix J

# Responses to Comments on the Draft EIS

*Appendix J. Responses to Comments on the Draft EIS*

| Name and Affiliation | Comment ID | Category | Comment Text | Comment Response |
|---|---|---|---|---|
| | | | Use, of the Eureka County Code (Eureka County 2018)." | |
| Jean Prijatel U.S. Environmental Protection Agency | S-051, C-006 | Financial assurance | Adequate and viable funding for long-term post-closure management can be a critical factor in whether or not a project is environmentally acceptable – especially in considering long-term post closure operations, maintenance, and monitoring. Although the BLM will require the applicant to secure a bond for reclamation work (p. 3-218), it is unclear what funding mechanism would be utilized for post-closure management, including the Bald Mountain Mine water quality monitoring program (WRMP p. 23). Disclosing financial information would support the likelihood that mitigation measures will be adopted or enforced (40 CFR Part 1502.16(7)). Inclusion of this information in the Final EIS would also assist with efficient and enforceable mitigation and increase transparency to the public. The EPA recommends including a more detailed assessment of post-closure measures and identifying the financial assurance mechanism(s) in the Final EIS. | The bond amount will be determined in coordination with the NDEP and BLM after the BLM's identification of the preferred alternative in this final EIS. NDEP and BLM review of the reclamation cost estimate and associated financial assurances are evaluated through a separate regulatory process and as a matter of practice and timing are not addressed in the EIS, but will be explained in the ROD. KG-BM has an authorized Reclamation Plan for the NOA. As explained in Section 3.10 of Appendix B, the Reclamation Plan for the Juniper Project is essentially the same, but with the inclusion of the reclamation of the Top underground mining and RIBs. No change was made to the final EIS. |
| Tammi M. Adams and Laura Leigh Wild Horse Education | S-050, C-001 | Cumulative impacts | Given the information presented by BLM and KG Mining (KG-BM) during public Zoom meetings, and in BLM BFO Scoping and Draft EIS documents, the extent of negative cumulative impacts to water resources, the ecosystem, wildlife, aesthetic landscape, wild horses and burros, and human quality of life associated with #6 Juniper Project, it would be arbitrary and environmentally irresponsible for Nevada BLM BFO to approve this project in any format. The only environmentally responsible and sustainable decision DOI BLM can make, and comply with NEPA, WFRHBA, federal laws, and Agency policies, is the "No Action" alternative. The | The BLM's decision regarding the authorization of the Juniper Project and the USFWS's decision to issue an eagle take permit will be made based on consideration of relevant environmental information, as presented in this EIS, and with disclosure of relevant information to the public through the procedural requirements of NEPA. The BLM and USFWS have considered input from federally recognized tribes, cooperating agencies, and the public in developing the preferred alternative and analyzing potential effects. Requirements to fulfill ACEPMs, permit conditions, and agency-identified mitigation measures would minimize potential adverse effects on the human environment. We note that the impacts of climate change and drought, as well as cumulative effects, are discussed as |

| Name and Affiliation | Comment ID | Category | Comment Text | Comment Response |
|---|---|---|---|---|
| | | | negative environmental destruction and anticipated/unanticipated negative cumulative impacts significantly outweigh any benefit from continued operations and additional expansion of the Bald Mountain gold mine. Specifically, the negative cumulative impacts to the entire ecosystem; all life that requires the land to survive and migrate through, and the people of Nevada and creatures who rely on surface and groundwater for their personal use and existence. Particularly considering climate change/drought and the cumulative impact concerns not provided in this Draft EIS but encompassed in the following comments. | appropriate throughout the EIS. In particular, Appendix F identifies past and present actions and trends, with specific discussion of climate change in Section F.3.5, *Climate, Vegetation, and Wildland Fire Trends*. Additionally, each issue discussed in Chapter 3 includes a cumulative impact subsection, which references the past and present actions and trends detailed in Appendix F as appropriate. No change was made to the final EIS. |
| Tammi M. Adams and Laura Leigh Wild Horse Education | S-050, C-008 | Cumulative impacts | It is arbitrary, unsustainable, and indefensible for the DOI BLM to approve groundwater rights for this Proposed Plan, ignoring climate change/drought and the needs and wellbeing of taxpaying residents and tribes of Nevada. It is arbitrary, unsustainable, and indefensible for the DOI BLM to omit any evaluation or analysis of arsenic (and other mining contaminants) present to date in soils and forage within and surrounding Bald Mountain for this Proposed Plan. It is arbitrary, unsustainable, and indefensible for the DOI BLM to not provide historic ambient air monitoring and drift data and analysis for arsenic and other mining contaminants for this Proposed Plan and in this Draft EIS, ignoring cumulative impacts from the Bald Mountain processing plants. The most reasonable and responsible Action provided in this Draft EIS is the "No Action" alternative, specifically considering climate change/drought and cumulative impacts to water resources in the southwestern US, specifically Nevada. | The NDWR is responsible for reviewing and approving water rights. See response to Comment S-054, C-006 and Section 3.3.2.1.2 of the EIS for more information regarding water rights. See response to Comment S-050, C-006 and Section 3.3.2.1.3 of the EIS for additional discussion of arsenic in water and air. In brief, concentrations of arsenic predicted to exceed the regulatory threshold would migrate up to approximately 1,000 feet east of the Top Pit underground mine workings and would not extend outside the footprint of the Top Pit and, therefore, are not anticipated to affect downgradient water quality. Additionally, the potential emissions of arsenic are below the major HAP emission threshold of 10 tons per year per HAP. No change was made to the final EIS. |

*Appendix J. Responses to Comments on the Draft EIS*

| Name and Affiliation | Comment ID | Category | Comment Text | Comment Response |
|---|---|---|---|---|
| Tammi M. Adams and Laura Leigh Wild Horse Education | S-050, C-010 | Cumulative impacts | The BLM violates NEPA by failure to consider cumulative impacts to ambient air, drinking water resources, soils, groundwater availability, and any past, present, and future impacts from potential contamination to Nevada's surface and groundwater supplies. Please provide this data and analysis information prior to in any forthcoming Final EIS, Decision, and FONSI. The BLM BFO violates NEPA and Agency policies by failure to consider past, present, and future cumulative impacts from mining contaminants (i.e., arsenic) to human health and the environment. Please provide, at a minimum, past and present analyses of arsenic in soils, surface water, groundwater, rangeland forage, and game animals (mule deer) from within and surrounding the existing and proposed action areas within any forthcoming Final EIS, Decision, and FONSI. | The EIS provides analysis of cumulative impacts on each of the resources mentioned in the comment at a level commensurate with the anticipated scale and intensity of the impacts, as directed by NEPA. Please see resource-specific discussions of cumulative impacts in Section 3.15.2.4 (*Air Quality and Greenhouse Gas Emissions*), Section 3.3.2.4 (*Water Quality and Quantity*), Section 3.4.2.4 (*Soils*), Section 3.10.2.4 (*Livestock Grazing*), and Section 3.7.2.4 (*Wildlife and Fisheries Resources*). See response to Comment S-050, C-006 and Section 3.3.2.1.3 of the EIS for additional discussion of arsenic in water and air. In brief, concentrations of arsenic predicted to exceed the regulatory threshold would migrate up to approximately 1,000 feet east of the Top Pit underground mine workings and would not extend outside the footprint of the Top Pit and, therefore, are not anticipated to affect downgradient water quality. Additionally, the potential emissions of arsenic are below the major HAP emission threshold of 10 tons per year per HAP. No change was made to the final EIS. |
| Tammi M. Adams and Laura Leigh Wild Horse Education | S-050, C-012 | Cumulative impacts | The responsibility of an EIS is to provide data and analyses of the amount of forage lost to the Triple B wild horses (specifically permanently lost forage capacity of the HMA, which also impacts livestock AUM allocations) and baseflows in the seeps and springs (i.e., water quantity and quality data). BLM BFO's anticipation of such limited cumulative impacts to the Triple B wild horses and burros, golden eagles, and Greater Sage Grouse is arbitrary, unreasonable, and out-of-date. BLM BFO violates NEPA by failure to consider and actually provide meaningful and available ENVIRONMENTAL DATA TO DISCERN ACTUAL CUMULATIVE ENVIRONMENTAL IMPACTS to forage and water resources for the Triple B wild horses and burros, golden eagles, | Section 3.11.2 of the EIS estimates that the Proposed Action would contribute an additional 3,969 acres of surface disturbance, of which 2,906 acres would be long term and 1,063 acres would be permanent, compared to the No-Action Alternative. This would reduce the availability of forage for wild horses within the Triple B HMA. However, the estimated cumulative surface disturbance in the Triple B HMA contributed by past, present, and RFFAs is 104,141 acres (updated from 104,167 acres in the draft EIS) or 8% of the total area of the CESA, and cumulative effects on wild horses are anticipated to be minor, long term, and localized. The focus of the BLM's management of wild horses is to reduce overpopulation on the range to protect the health of the animals and the land on which they depend. See response to Comment S-050, C-019 addressing the effects of drawdown on seeps and springs. The EIS also provides analysis of cumulative |

*Appendix J. Responses to Comments on the Draft EIS*

| Name and Affiliation | Comment ID | Category | Comment Text | Comment Response |
|---|---|---|---|---|
| | | | and Greater Sage Grouse (all required historical and present day mine permit monitoring parameters, GW contaminant migration modeling, perimeter soils contamination, etc.). | impacts on each of the resources mentioned in the comment at a level commensurate with the anticipated scale and intensity of the impacts, as directed by NEPA. Please see discussions of cumulative impacts on other resources mentioned in the comment in Section 3.3.2.4 (*Water Quality and Quantity*), Section 3.8.2.4 (*Special Status Species*), Section 3.9.2.1.1 (*Golden Eagles*), and Section 3.10.2.4 (*Livestock Grazing*). No change was made to the final EIS. |
| Tammi M. Adams and Laura Leigh Wild Horse Education | S-050, C-004 | Analysis scope, methods, and assumptions | This EIS is arbitrarily absent of any data nor analyses of existing and potential commination impacting humans and the environment despite being in operation in Nevada for 36-years, and in spite of federal laws protecting the air we breathe (CAA), the water we drink (CWA, SDWA), and the soils where we grow food, which wildlife, livestock, and wild horses and burros graze upon. | The EIS provides salient information about the existing conditions and affected environment and potential environmental consequences of implementing the alternatives. Please see resource-specific discussions in Section 3.15 (*Air Quality and Greenhouse Gas Emissions*), Section 3.3 (*Water Quality and Quantity*), Section 3.4 (*Soils*), Section 3.7 (*Wildlife and Fisheries Resources*), Section 3.10 (*Livestock Grazing*), and Section 3.11 (*Wild Horses*). No change was made to the final EIS. |
| Shane Bybee White Pine County Board of Commissioners | S-047, C-008 | Monitoring and mitigation | The County appreciates and supports wildlife mitigation efforts described in Sections 3.7 and 3.8. | Acknowledged. Thank you for your comment. |
| Tammi M. Adams and Laura Leigh Wild Horse Education | S-050, C-003 | Monitoring and mitigation | This Draft EIS has not provided a Proposed Plan committed to the protection of humans and the environment, nor the limited surface and groundwater resources, ambient air quality, etc. | The purpose of an EIS is to demonstrate that "Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process" (40 CFR 1502.1). The EIS must also discuss means to mitigate adverse environmental impacts (40 CFR 1502.16(9)). Importantly, "[while] NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation" (40 CFR 1508.1(s)). A "Proposed Plan," as stated in the comment, is not a requirement for preparing an EIS under NEPA. In fulfillment of the requirements of NEPA, the EIS evaluates the effectiveness of both ACEPMs (Appendix C) and agency-identified mitigation measures in avoiding, minimizing, or mitigating the impacts of the action alternatives. The EIS also identifies other Federal |

024

*Appendix J. Responses to Comments on the Draft EIS*

| Name and Affiliation | Comment ID | Category | Comment Text | Comment Response |
|---|---|---|---|---|
| | | | | environmental review laws and list Federal permits, licenses, and other authorizations applicable to the action alternatives. The BLM will consider the combined effect of these measures and requirements under other environmental laws in its decision regarding the authorization of the Juniper Project. No change was made to the final EIS. |
| Tammi M. Adams and Laura Leigh Wild Horse Education | S-050, C-014 | Monitoring and mitigation | Indeed, the BLM BFO did not even provide road safety measures for the wild horses and burros and mule deer. The multiple vehicular crashes with wild horses and burros and mule deer are barely acknowledged in this Draft EIS. At a bare minimum, BLM BFO and KG Mining should provide speed limits of 40 mph or less and road sensors that illuminate and flash for animal crossing and migration areas located within and surrounding the Bald Mountain Mine. These two small caveats would create protections for all wildlife in the area and possibly save a human life. Please provide discussion on these two small actions and provide for their implementation in any forthcoming Final EIS, Decision, and FONSI. | As stated in Section 3.11.2 of the EIS, the continued implementation of KG-BM's *Traffic Management Plan* and ACEPM no. 6, which require ongoing compliance with posted speed limits and other traffic-control measures, would minimize the risks associated with potential wild horse-vehicle collisions; however, these risks would continue for an additional 11 years of mine operations under the Proposed Action. KG-BM posts speed limit signs on the county roads to and from the BMM. Posted speed limits over the unpaved portions of the county roads range from 35 to 50 miles per hour, depending on road section. The BLM does not have jurisdiction over posted speed limits on county roads. When road conditions are poor, KG-BM instructs drivers to travel at reduced speeds to ensure safe passage to and from the mine site. ACEPM no. 143 also requires road signs for safety and protection of wild horses if a project involves heavy or sustained traffic. Several existing wild horse warning/awareness signs have been installed along the unpaved county road between Jiggs, Nevada and the BMM. The signs are illumated in areas where wild horses commonly cross the road. No change was made to the final EIS. |
| Scott Lake Center for Biological Diversity | S-054, C-011 | Monitoring and mitigation | BLM's failure to adequately avoid, minimize, and mitigate these impacts violates the Ely RMP as amended and FLPMA. The DEIS does not demonstrate that BLM had made any effort to avoid or minimize impacts. This is most apparent in BLM's conclusions that mule deer migration corridors would not meet NDOW's minimum width and that project-related noise would exceed | DMDMCs under Alternative A would be in accordance with the NDOW's minimum recommended 2,000-foot corridor width to facilitate mule deer migration following completion of concurrent reclamation. Alternative A was specifically developed to minimize impacts of the Proposed Action on mule deer migration. The 2015 ARMPA specifically incorporates use of the Nevada CCS as a way to achieve a net conservation gain for Greater |